**30**

1  HAGOP T. BEDOYAN, CSB NO. 131285
   JACOB L. EATON, CSB NO. 244834
2  LISA A. HOLDER, CSB NO. 217752
   KLEIN, DENATALE, GOLDNER,
3    COOPER, ROSENLIEB & KIMBALL, LLP
   5260 N. Palm Avenue, Suite 201
4  Fresno, California  93704
   Telephone: (559) 438-4374
5  Facsimile:  (559) 432-1847
   Email: hbedoyan@kleinlaw.com;
6      jeaton@kleinlaw.com; lholder@kleinlaw.com

7  Proposed Attorneys for Debtor-in-Possession

8          **UNITED STATES BANKRUPTCY COURT**

9          **EASTERN DISTRICT OF CALIFORNIA**

10

11 In re:                                    Case No.  15-14017

12 CLUB ONE CASINO, INC.,                    Chapter  11

13          Debtor-in-Possession.            DC No.  KDG-1

14                                           Emergency Hearing Date: October 16, 2015
                                             Emergency Hearing Time: 9:30 a.m.
15                                           Place:  United States Bankruptcy Court
                                                     2500 Tulare Street, Fifth Floor
16                                                   Department B, Courtroom 12
                                                     Fresno, California
17                                           Judge: Honorable Rene Lastreto II

18

19          **EMERGENCY MOTION TO USE CASH COLLATERAL**
                  **AND GRANT ADEQUATE PROTECTION**

20                              **MOTION**

21          CLUB ONE CASINO, INC., Debtor and Debtor in Possession ("Debtor" or "COCI"),

22 respectfully moves the court for an order authorizing it to use "cash collateral" in the form of

23 cash on hand, money on deposit, and accounts receivable ("the Cash Collateral"), and to grant

24 adequate protection to secured creditors asserting an interest in the Cash Collateral (i) on an

25 interim basis, on the terms and conditions set forth in the interim order annexed hereto as

26 ///

27 ///

28 ///

3HB057703                              1

1    **Exhibit "A"** ("Interim Order");[1] and (ii) on a final basis, after a final hearing.  In support of

2    this motion (the "Motion"), Debtor represents the following:

3                                                    **SUMMARY**

4           1.       COCI filed a Chapter 11 case (the "Case") on October 14, 2015, Case No. 15-

5    14021-B-11.

6           2.       Secured party: KMGI, Inc. ("KMGI" or the "Senior Lender"). Amount owed:

7    $24,290,150.00.

8           3.       Cash Collateral value: Cash on deposit ($965,925.52); Cash on hand

9    ($316,711.50); Accounts Receivable ($2,846,212.00).

10          4.       Total cash expected to be generated through March 31, 2016: $10,510,333.00.

11          5.       Proposed cash collateral use through March 31, 2016: $10,485,157.00 (with

12   Permitted Variances as such term is defined in the Interim Order.

13          6.       Proposed adequate protection to Senior Lender: continue to operate business,

14   generate income, and give replacement lien on post-petition collateral of like kind and to the

15   same extent as existed prior to commencement of Debtor's case and monthly adequate

16   protection payments of $50,000.00.

17                                    **JURISDICTION AND VENUE**

18          7.       Debtor commenced this Case by filing its Voluntary Petition under Chapter 11

19   of the United States Bankruptcy Code, 11 U.S.C. § § 101, *et seq.* (the "Bankruptcy Code"), on

20   October 14, 2015.  There is no Chapter 11 trustee and Debtor is also a Debtor in Possession.

21   The Debtor's parent company, Club One Acquisition Corp. ("COAC") also commenced a

22   Chapter 11 case on October 14, 2015.

23          8.       This Court has jurisdiction under 28 U.S.C. §§ 1334 and 157.  This is a "core"

24   proceeding under 28 U.S.C. § 157(b)(2)(A) and (M).  These matters have been referred to the

25   Court by United States District Court for the Eastern District of California according to

26   General Orders 182 and 223.

27          9.       Venue is properly in this Court under 28 U.S.C. § 1409(a).

28   ────────────────────
[1] To the extent any discrepancy exists between any provision described in this Motion and as set forth in the
Interim Order, the terms and conditions of the Interim Order shall control.

1                                        **LEGAL BASIS FOR MOTION**

2          10.      Under 11 U.S.C. § 363(b) & (c), Rules 9014, 4001(b), 2002(a)(2) of the Federal

3 Rules of Bankruptcy Procedure ("FRBP") and Local Rule 4001-1(c) & 9014-1(f)(4), Debtor

4 seeks an order of the Court authorizing the use of the Cash Collateral, and to grant adequate

5 protection to secured creditors asserting an interest in the cash collateral.

6                                      **FACTUAL BASIS FOR MOTION**

7       **A.  INTRODUCTION**

8          11.      Debtor was incorporated on March 28, 1994, for the purpose of operating an

9 entertainment complex located in central Fresno called Club One Casino.  Club One Casino

10 began operation in November 1995 and includes a gaming facility, bar, restaurant and banquet

11 facilities, administration, satellite wagering, and security offices.  The gaming facility includes

12 51 card-tables contained in designated settings that allow patrons to engage in various table

13 games as allowed under state law.  Over its two decades in business, the Debtor has grown to

14 become a significant community presence, a substantial taxpayer and a major employer in the

15 Fresno area:  it currently has about 280 active employees with a semi-monthly gross payroll of

16 approximately $265,000.00.

17          12.      Since 2008, the Debtor has suffered from litigation generated by its former

18 owners – George Sarantos ("Sarantos") and Elaine Long ("Elaine").  Sarantos and Elaine -

19 who already have received over $22 million in cash from their sale of the Club One Casino to

20 the Debtor's current ownership - are seeking an additional $2.7 million.  Despite the best

21 efforts of the Debtor and its ownership to resolve disputes with Sarantos and Long on a

22 consensual basis, the former owners continue to pursue aggressive collection efforts against

23 Club One Casino.  Sarantos, together with certain former employees of the Debtor and others,

24 also engaged in activities to harm the Debtor by using unlawful financing to relocate and

25 expand a competitor to Club One Casino, called the Clovis 500 Club.

26          13.      The Debtor and its parent holding company were forced to commence their

27 Chapter 11 cases in order to forestall Sarantos and Long's attempts to obtain the appointment

28 of a receiver over Club One Casino, to preserve its on-going business operations and to address

1 financial challenges to its business precipitated by unlawful competition from Clovis 500 Club

2 by restructuring its debts through the reorganization process.

3       **B. FORMATION AND BACKGROUND**

4       14.     COCI, a California S corporation, was founded by Sarantos and Charles "Bud"

5 Long in 1994.  In 2002, Long transferred his 50% interest in COCI to his wife, Elaine.  In July

6 of 2006, Sarantos, Elaine, and Kyle Kirkland ("Kirkland"), as principal for Kirkland Messina,

7 Inc., signed a Letter of Intent ("LOI") providing that a newly formed company would purchase

8 COCI from Sarantos and Elaine for $27,500,000.  The sale was concluded in 2008 under the

9 terms of a certain Acquisition Agreement described below.

10       15.     COCI is a wholly owned subsidiary of COAC".  COAC was created for the sole

11 purpose of holding the shares of COCI, which allowed the Senior Lender to hold a security

12 interest in COAC's shares of COCI.  The shares of COAC are owned by individuals licensed

13 by the State of California and the City of Fresno to engage in gaming activities.  COAC, like

14 COCI, is an "S" corporation and both use an accrual basis of accounting.

15       16.     COCI derives the majority of its annual income from its gaming operations.

16 COCI's gross receipts for 2013 and 2014 were $12,990,230 and $14,492,845, respectively.

17 COCI and COAC generated EBITDA of $274,605 and $460,058 during these same years,

18 respectively.

19       17.     Kirkland is COCI's President and Director.  Bill Hughes of GlassRatner

20 Advisory & Capital Group, LLC,. is Debtor's Chief Restructuring Officer.  In addition to

21 Kirkland, William "Bill" Zender of Bill Zender & Associates, LLC, a noted gaming and

22 regulatory enforcement consultant, is Debtor's independent director.  Hughes is an officer of

23 Debtor but not a director.  Until very recently, Dana Messina ("Messina") was also a director

24 and officer of the COCI, but he resigned on August 10, 2015.

25       18.     Kirkland serves pursuant to a management agreement, but has never received a

26 salary or management fee, despite working in excess of 70 hours per week managing the day-

27 to-day operations of COCI's casino since 2008.  Kirkland is also the President of the California

28

1  Gaming Association, a statewide trade association that represents California card rooms.

2  Kirkland does receive reimbursement from COCI for his expenses.

3       19.     COCI currently employs approximately 280 people year round, including full

4  and part time employees.  Other than Kirkland, no insiders are employed by Debtor.

5       20.     COCI's primary assets are its gaming licenses, cash on hand, bank deposits,

6  accounts receivable, kitchen, surveillance and gaming equipment, furnishings, and food and

7  beverage inventory.

8  **C.  INDEBTEDNESS AND REASONS FOR FILING CHAPTER 11**

9       21.     COCI's largest senior and secured creditor is KMGI, Inc., which is currently

10  owed approximately $24,290,150.00 (the "Senior Loan").  The Senior Lender is a special

11  purpose company which, on April 11, 2012, after receiving approval from the California

12  Gambling Control Commission, purchased the Senior Loan previously held by D.B. Zwirn

13  Special Opportunities Fund, L.P. ("Zwirn") and later Fortress Value Recovery Fund I LLC.

14  ("Fortress").  The Senior Lender purchased the Senior Loan – which had already matured and

15  been declared in default – in order to satisfy guarantees in favor of Fortress and because it

16  believed it could be more flexible with Sarantos and Elaine in restructuring the debts of the

17  business.  Efforts to refinance with third parties or to extend the Senior Loan with Fortress

18  were unsuccessful.  The Senior Lender is an entity jointly held by Messina and Kirkland.

19  Messina has sole voting authority for the Senior Lender.

20       22.     In connection with the sale, Sarantos and Elaine each received approximately

21  $10,700,000 in cash and a seller note for $2,500,000 due February 22, 2015.  Elaine also

22  received several million dollars of additional cash that had been paid into an escrow account

23  when her husband, Long, was unable to receive payments from COCI after being convicted of

24  a felony.  In total, over $22,000,000 in cash was distributed to Sarantos and Elaine at the close

25  of escrow.  In addition over $1,600,000.00 in interest on the seller notes was paid to Sarantos

26  and Elaine after the close of escrow.

27       23.     In connection with the Acquisition Agreement, COAC, Sarantos, Elaine and the

28  Senior Lender entered into a Seller Subordination Agreement dated February 22, 2008 (the

1    "Subordination Agreement"). Sarantos and Elaine are subordinated creditors under the

2    Subordination Agreement. The scope of the Subordination Agreement was the subject of

3    litigation in New York where it was determined by final, non-appealable order that the Seller

4    Notes owned by Sarantos and Elaine are subordinated to the Senior Loan and such Seller Notes

5    shall not receive payment until the Senior Loan is repaid in full.

6        24.    Subsequent to the close of sale, there was a dispute between COAC and the

7    sellers, Sarantos and Elaine, regarding an additional $1,000,513 (less than 4% of the purchase

8    price). COAC, Sarantos and Elaine arbitrated the dispute pursuant to the arbitration provisions

9    of the Acquisition Agreement. On July 8, 2011, the arbitrator awarded $1,000,513 to Sarantos

10   and Elaine as well as attorneys' fees, costs and expenses (the "Arbitration Award"). The

11   Arbitration Award was confirmed by the Fresno County Superior Court and reduced to a

12   Judgment on September 26, 2011, with an amended Judgment correcting certain typographical

13   errors being entered on November 8, 2011 (Case No. 11 CE CG 02432). With the accrual of

14   interest and costs, the Arbitration Award against COAC has grown to approximately

15   $1,379,929 as to Elaine and another $1,378,938 as to Sarantos. However, the Arbitration

16       25.    ///

17       26.    Award is not a claim against the Debtor's estate. Only COAC is liable on the

18   Arbitration Award.

19       27.    After confirmation of the Arbitration Award by the Fresno County Superior

20   Court, in January 2012, COAC and its lender sought declaratory and injunctive relief to (a)

21   declare the Arbitration Award as to COAC to be governed by the Subordination Agreement;

22   (b) block payment of the Arbitration Award as required under the Subordination Agreement;

23   and (c) to obtain a declaration that the Subordination Agreement prohibits the demand for, or

24   payment of, both the Arbitration Award and the Seller Notes until the Senior Loan is paid in

25   full. After a bench trial on March 24-26, 2014, the New York trial court (Index No.

26   650049/2012), in its Post-Trial Decision and Order dated October 21, 2014, (a) dismissed

27   COAC's complaint; (b) declared that no payment of interest or other payments of the

28   subordinated notes to Sarantos and Elaine may be paid prior to payment in full of the Senior

1  Loan; (c) declared that the Subordination Agreement does not bar payment by COAC of either

2  the Arbitration Award or the California judgments confirming the Arbitration Award; and (d)

3  held that Sarantos and Elaine were the prevailing parties, but the matter of attorney's fees

4  recoverable from COAC would be referred to a Special Referee (the "New York Judgment").

5  The Special Referee would decide if any payments were appropriate, and if so, in what

6  amount.  As of this date, the Special Referee has not made a ruling regarding legal fees.  On

7  August 19, 2015, a portion of the New York Judgment relating to the impact of the

8  Subordination Agreement on COAC's ability to satisfy the Arbitration Award or related

9  judgments was appealed by COAC and KMGI to the Appellate Division of the New York

10 Supreme Court.  That appeal is pending.  Neither Sarantos nor Elaine appealed the New York

11 Judgment.  Thus, the New York Court's findings that the Seller Notes are subordinated to the

12 Senior Loan are final and non-appealable.

13      28.     In May of 2015, Sarantos and Elaine sought to amend their existing complaint

14 against COAC, in Case No. 11 CE CG 02432, to add COCI as the alter-ego of COAC, and for

15 other relief including a TRO, a preliminary injunction and the appointment of a receiver.

16 Hearings in the matter were continued twice to October 15, 2015, and October 22, 2015.

17      29.     In a separate lawsuit initiated by Sarantos against Messina, KMGI and Kirkland

18 (Case No. 13CE CG 02124 MWS), Sarantos sought and obtained a TRO against COAC,

19 KMGI and their agents.  (KMGI has since been dismissed from the lawsuit).  The hearing to

20 have a Preliminary Injunction issued in this separate proceeding was also continued twice and

21 is now scheduled for November 6, 2015.

22      30.     On August 12, 2015 the Attorney General of the State of California filed an

23 Accusation against the Clovis 500 Club.  The Attorney General accused the Louis Sarantos, Jr.

24 dba the Clovis 500 Club of engaging in an undisclosed, unapproved financing scheme to

25 expand its business in violation of state gaming regulations.  The Attorney General is seeking

26 to have Louis Sarantos' license revoked and the gaming license of the Clovis 500 Club

27 cancelled. The owners and financial stakeholders of the Clovis 500 Club include George

28

1    Sarantos, his brother Louis and several former employees of COCI who were long time

2    associates of Sarantos.

3        31.    A precipitating factor in the filing of COCI's and COAC's' Chapter 11 cases

4    has been the expansion of the Clovis 500 Club which was completed using a clandestine

5    financing scheme alleged to be unlawful.  The expansion of this facility caused a substantial

6    drop in revenue and operating income of COCI. On August 26, 2015, COCI and COAC filed a

7    complaint in the Fresno County Superior Court (Case No. 15 CECG 02704) for damages

8    against Louis Sarantos, an individual and doing business as the Clovis 500 Club and 500 Club

9    Casino, and Sarantos for unfair competition and several other theories, including breaches of

10    fiduciary duty and a non-competition agreement by Sarantos.  The relocation and expansion of

11    the Clovis 500 Club using unlawful financing by Sarantos and Sarantos' brother, Louis, has

12    had a major negative impact on the revenues of COCI.

13        32.    COCI and COAC were forced to seek relief under Chapter 11 in order to avoid

14    the potential appointment of an unlicensed receiver, reorganize its business, and perhaps end

15    the years of unproductive litigation.

16            **AMOUNT OF CASH COLLATERAL USE SOUGHT BY DEBTOR**

17        33.    Debtor expects to move quickly in proposing a plan of reorganization and

18    expects to file a plan within fourteen (14) days.  Debtor intends to continue to operate its

19    business as a going concern as a part of its case.  In the interim, Debtor seeks the Court's

20    authorization to use Cash Collateral from the petition date through March 31, 2016.  However,

21    to avoid immediate and irreparable harm, pending a final hearing on the Motion, Debtor

22    requests interim authorization to use cash collateral on a weekly basis as set forth in the budget

23    attached as Exhibit "1" to the Interim Order (the "Budget").

24        34.    **Emergency Use**.  To avoid immediate and irreparable harm to the Debtor and

25    its estate pending a final hearing, Debtor requests interim authorization to use $1,559,165.00

26    from October 15 through November 15 (with Permitted Variances, as such term is defined in

27    the Interim Order) or through a final hearing on the Motion as described in the Budget.  Debtor

28

1  also requests authorization to use the cumulative amounts provided in each category of the

2  Budget through March 31, 2016.

3       35.    In the event the Court does not approve cash collateral use through March 31,

4  2016, Debtor reserves the right to submit amended budgets and will request periodic

5  continuances of the interim cash collateral hearing and ongoing cash collateral use until such

6  time as the Court approves final cash collateral use through March 31, 2016.

7       36.    **Urgent need for Cash Collateral**. Debtor owns and operates a 51-table gaming

8  operation in Downtown Fresno that is open 24 hours/day that relies exclusively on the

9  availability of cash to operate.  The immediate and irreparable harm that will befall Debtor if it

10 does not obtain the use of Cash Collateral is (a) Debtor will be unable to honor its obligations

11 to its gaming customers thereby violating California gaming laws, (b) Debtor will be unable to

12 purchase food, alcohol, and other inventory good required in order to operate, (c) Debtor will

13 be unable to pay its employees, and (d) Debtor will be unable to pay its utility bills, royalty

14 fees and insurance premiums all of which would cause immediate crises to Debtor's ability to

15 maintain its business, and effectively shut Debtor down.   Each item on the Budget was

16 considered and deemed by Debtor's principals to be necessary to Debtor's continued operation.

17              **ADEQUATE PROTECTION OFFERED BY DEBTOR**

18      37.    Debtor is aware of no other creditor asserting an interest in "cash collateral"

19 other than the Senior Lender.  Debtor will provide the Senior Lender with adequate protection

20 by continuing to operate its business, generating income, giving a replacement lien on post-

21 petition assets of like kind and to the same extent as existed prior to the commencement of

22 Debtor's case, and monthly adequate protection payments equal to the fees and expenses of

23 Senior Lender's counsel, which are estimated to be $50,000 per month, all as set forth in the

24 Interim Order.

25            **LOCAL BANKRUPTCY RULE 4001-1(c) RECITALS**

26      Pursuant to Local Bankruptcy Rule 4001-1(c), the Debtor provides the following

27 disclosures in connection with the relief set forth in the Interim Order:

28

1      (a)    Provisions or findings of fact that bind the estate or all parties-in-interest with

2  respect to the validity, perfection, or amount of the secured party's lien or debt. [LBR 4001-

3  1(c)(3)(B)] (Interim Order at Pgs. 2-3, Par. D (ii)):  Although the provision binds the Debtor, it

4  also provides for a mechanism for the Creditors Committee and other parties in interest to

5  investigate and challenge the validity, perfection and amount of the Senior Lender's lien or

6  debt.

7      (b)    Provisions or findings of fact that bind the estate or all parties-in-interest with

8  respect to the relative priorities of the secured party's lien and liens held by persons who are

9  not parties to the stipulation.  [LBR 4001-1(c)(3)(C)] (Interim Order at Pg. 3, Par. D (iii):

10  Although the provision binds the Debtor, it also provides for a mechanism for the Creditors

11  Committee and other parties in interest to investigate and challenge the priority of the Senior

12  Lender's lien.

13      (c)    Automatic relief from the automatic stay upon default, conversion to chapter 7,

14  or appointment of a trustee.  [LBR 4001-1(c)(3)(H)] (Interim Order at Pg. 10, Par. 7):  The

15  provision does not obviate the stay upon default.  The provision limits the Senior Lender to

16  taking only "immediate reasonable action to protect the Collateral from harm, theft and/or

17  dissipation."  The Interim Order requires the Senior Lender to "file a motion for relief from the

18  automatic stay in Bankruptcy Code section 362 prior to the exercise of any other remedies

19  following a Termination Event."

20      **PRAYER FOR RELIEF**

21      **WHEREFORE**, Debtor requests that the Court enter an order, substantially in the form

22  of **Exhibit "A"** hereto that, *inter ilia*:

23      1.    Grants the Motion on an interim basis pending a final hearing;

24      2.    Approves the Budget and authorizing Debtor to use Cash Collateral as noted in

25      the Budget (with Permitted Variances, as such term is defined in the Interim

26      Order) on an interim basis pending a final hearing;

27

28

3.  Authorizes Debtor to use Cash Collateral (with Permitted Variances, as such term is defined in the Interim Order) after a final hearing through March 31, 2016, or further order of the court authorizing use of Cash Collateral;

4.  Authorizes Debtor to use the cumulative amounts provided in each category in the Budget through (a) final hearing on the Motion; and (b) March 31, 2016;

5.  Grants adequate protection to Senior Lender as set forth in the Interim Order; and

6.  Grants such other and further relief as is just and proper.

Date: October 15, 2015

KLEIN, DeNATALE, GOLDNER,
COOPER, ROSENLIEB & KIMBALL, LLP

By  /s/ Hagop T. Bedoyan
HAGOP T. BEDOYAN
Proposed Attorneys for Debtor in Possession

HAGOP T. BEDOYAN, CSB NO. 131285
JACOB L. EATON, CSB NO. 244834
LISA A. HOLDER, CSB NO. 217752
KLEIN, DENATALE, GOLDNER,
   COOPER, ROSENLIEB & KIMBALL, LLP
5260 N. Palm Avenue, Suite 201
Fresno, California 93704
Telephone: (559) 438-4374
Facsimile: (559) 432-1847
Email: hbedoyan@kleinlaw.com;
      jeaton@kleinlaw.com; lholder@kleinlaw.com

Proposed Attorneys for Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| In re: | Case No.: 15-14017 |
| Club One Casino, Inc., | Chapter 11 |
| Debtor. | DC No. KDG-1 |
| | Emergency Hearing Date: October16, 2015 |
| | Emergency Hearing Time: 9:30 a.m. |
| | Place: United States Bankruptcy Court |
| |     2500 Tulare Street, Fifth Floor |
| |     Department B, Courtroom 12 |
| |     Fresno, California |
| | Judge: Honorable Rene Lastreto II |

### INTERIM ORDER (I) AUTHORIZING USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING FINAL HEARING, AND (IV) GRANTING CERTAIN RELATED RELIEF

The matter came before the Court on the motion dated October 14, 2015 (the "Motion"), seeking entry of an interim order (this "Interim Order"), *inter alia*,

(a) authorizing Club One Casino, Inc. (the "Debtor") to use cash collateral;

(b) authorizing the Debtor to grant adequate protection to KMGI, Inc. ("KMGI" or the "Senior Lender") as lender under the senior secured loan pursuant to a financing agreement dated February 22, 2008 ("Financing Agreement"); and

(c) scheduling a hearing (the "Final Hearing"), pursuant to Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to consider entry of a final order (the "Final Order"), approving and authorizing the use of cash collateral on a final basis.

Exhibit   A

Page   12

An interim hearing on the Motion (the "Interim Hearing") was held on October 16, 2015. The Court has considered the pleadings filed with the Court and the evidence proffered or adduced at the Interim Hearing; and has heard and resolved or overruled any and all objections to the interim relief requested in the Motion. Accordingly, it appearing that the relief requested in the Motion is in the best interests of the Debtor, its estate, and creditor and good and sufficient cause appearing therefor:

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.    Petition Date. On October 14, 2015 (the "Petition Date"), the Debtor commenced its chapter 11 case (the "Chapter 11 Case") by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of California, Fresno Division (the "Court"). On the same date, the Debtor's parent – Club One Acquisition Corp,. ("COAC") commenced a chapter 11 case in this Court. The Debtor's case is being jointly administered with the case of COAC. The Debtor is operating its business and managing its affairs as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date hereof, no trustee, examiner, or official committee of creditors holding unsecured claims (a "Creditors' Committee") has been appointed in the Chapter 11 Case.

B.    Jurisdiction; Venue. The Court has jurisdiction over this Chapter 11 Case, the parties, and the Debtor's property pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D). The Court is a proper venue of this Chapter 11 Case and the Motion under 28 U.S.C. §§ 1408 and 1409.

C.    Notice. Notice of the Motion was appropriate under the circumstances.

D.    Debtor's Acknowledgments and Stipulations. In requesting the use of cash collateral and as a material inducement for KMGI to authorize the use of cash collateral on the terms and conditions set forth herein, the Debtor acknowledges, represents, stipulates, and agrees, subject to the challenge rights set forth in paragraph 6 herein, as follows:

(i)    The Debtor, COAC and KMGI are parties to the financing agreement dated February 22, 2008, originally with D.B. Zwirm Special Opportunities Fund, L.P. as lender (the "Prepetition Loan Agreement").

Exhibit ___A___

Page ___13___

(ii)    All of the Debtor's obligations to KMGI under the Prepetition Loan Agreement (the "Prepetition Obligations") are secured by first-priority liens (the "Prepetition Liens") on substantially all of the Debtor's assets, other than its gaming license (including Cash Collateral, as defined below) as set forth in the Prepetition Loan Agreement (the "Prepetition Collateral").

(iii)   As of October 14, 2015, (a) the aggregate amount of principal, accrued interest; and fees owed under the Prepetition Loan Agreement is $24,290,150.00; (b) all of the Prepetition Obligations are unconditionally owing by the Debtor to the Senior Lender; and (c) the Prepetition Liens constitute valid, binding, enforceable, and perfected liens with priority over any and all other liens and are not subject to any challenge or defense, including, without limitation, respectively, avoidance, reductions, recharacterization, subordination (whether equitable, contractual or otherwise), claims, counterclaims, cross-claims, offsets, defenses; or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity, except as set forth in paragraph 6 herein;

(iv)    any payments made on account of the Prepetition Obligations before the Petition Date were (a) payments out of the Prepetition Collateral, (b) made in the ordinary course of business, and (c) did not diminish any property otherwise available for distribution to unsecured creditors; and

(v)     all of the Debtor's cash, including the cash in its deposit accounts and other accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral (as defined below);

E.      Cash Collateral.  For purposes of this Interim Order, the term "Cash Collateral" shall mean and include all "cash collateral," as defined in section 363 of the Bankruptcy Code, whether existing on the Petition Date, arising pursuant to this Interim Order, or otherwise and shall include, without limitation:

F.      Adequate Protection.  The Senior Lender is entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection to the extent of any diminution in the value of

Exhibit _____ A _____

Page _____ 14 _____

its interests in the Prepetition Collateral, including the Cash Collateral, resulting from, among other things, (a) the use of Cash Collateral, (b) the subordination of the Prepetition Obligations to the Carveout, and (c) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

G. <u>Purpose and Necessity of Use of Cash Collateral</u>. As discussed in the Motion, the Debtor requires the use of Cash Collateral (i) to maximize and preserve the value of its business, satisfy payroll obligations, and for other working capital and general corporate purposes of the Debtor and (ii) to pay fees and expenses related to this Chapter 11 Case. If the Debtor does not obtain authorization to use of Cash Collateral it will suffer immediate and irreparable harm.

H. <u>Good Cause Shown</u>. Good cause has been shown for entry of this Interim Order, the relief is necessary in order to avoid immediate and irreparable harm to the Debtor and its estate, and, accordingly, is in the best interests of the Debtor, its estate and its creditors.

I. <u>Immediate Entry of Interim Order</u>. The Debtor has requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2). This Court concludes that entry of this Interim Order is in the best interests of the Debtor's estate and creditors because its implementation will, among other things, allow for access to the funds necessary to sustain the continued operations of the Debtor and further enhance the Debtor's prospects of a reorganization or for a successful sale of substantially all of its assets. Based upon the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. <u>Disposition</u>. The Motion is granted on an interim basis on the terms set forth in this Interim Order. Any objection to the interim relief sought in the Motion that has not previously been withdrawn or resolved is hereby overruled on its merits. The term of this Interim Order and the use of Cash Collateral authorized hereunder shall expire on the earlier of (a) November 10, 2015, if the Final Order has not been entered by the Court prior to such date, and (b) upon the occurrence of a Termination Event (as defined below).

Exhibit _____A_____

Page _____15_____

**AUTHORIZATION FOR USE OF CASH COLLATERAL**

2.    <u>Authorization for Use of Cash Collateral</u>.

(a)    The Debtor is hereby authorized to use Cash Collateral up to $1,559,165.00 during the Interim Period, subject to and in accordance with the terms, conditions, and limitations set forth in this Interim Order and the Approved Budget.

(b)    The Debtor has delivered to Senior Lender a budget that has been approved (the "Approved Budget") for the time period from and including the Petition Date through March 31, 2016. A copy of the Approved Budget is attached hereto as **Exhibit "1."** The Debtor shall provide to the Senior Lender updates to the Approved Budget and financial reporting with respect to the Debtor in accordance with the terms hereof.

(c)    By not later than three business days after the end of the week following the Petition Date, the Debtor shall deliver to the Senior Lender a variance report (a "<u>Variance Report</u>") showing comparisons of actual results for each line item against such line item in the Approved Budget. Thereafter, the Debtor shall deliver to the Senior Lender, by not later than three business days after the close of each weekly period after the Petition Date, an Approved Variance Report for the trailing four-week period (or, if fewer than four weeks have elapsed since the Petition Date, then for the trailing one, two or three-week period, as applicable). Each Approved Variance Report shall indicate whether there are any adverse variances that exceed the "Permitted Variances," which means, in each case measured on a cumulative basis: (x) up to 10% on a line-item basis or (y) 10% in the aggregate for all Cash Receipts and Cash Disbursements ("Permitted Variances").

(d)    Any amendments, supplements, or modifications to the Approved Budget or an Approved Variance Report must be consented to in writing by the Senior Lender prior to the implementation thereof and shall not require further notice, hearing, or court order.

**ADEQUATE PROTECTION**

3.    <u>Adequate Protection for Senior Lenders</u>. As adequate protection for the diminution, if any, in the value of the Senior Lender's interests in the Prepetition Collateral (the "<u>Diminution Claim</u>"), the Senior Lender is hereby granted the following ((a) through (c) below shall be referred to collectively as the "Prepetition Adequate Protection Rights"):

Exhibit_____A_____

Page _____16_____

(a)     <u>Replacement Liens</u>.  Valid, perfected, postpetition security interests in and liens (the "<u>Replacement Liens</u>") in all of the assets of the Debtor's estate (excluding the Debtor's gaming license), to secure the Adequate Protection Claim (defined below), effective and perfected upon the date of this Interim Order and without the necessity of execution by the Debtor of mortgages, security agreements, pledge agreements, financing statements, and other agreements or instruments provided, however, that (i) solely for the purposes of this Interim Order, the Replacement Liens shall not attach to any proceeds from Avoidance Actions and (ii) notwithstanding anything to the contrary, the Replacement Liens shall only be and remain subject and subordinate to the Carveout.

(b)     <u>Adequate Protection Superpriority Claim</u>.  As further adequate protection, the Senior Lender is hereby granted a superpriority claim on account of the Diminution Claim, which claim shall have priority over all administrative expense claims and unsecured claims against the Debtor or its estate, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726, 1113 and 1114 and any other provision of the Bankruptcy Code (the "<u>Adequate Protection Claim</u>"), provided, however, that, solely for the purposes of this Interim Order, the Adequate Protection Claim shall not attach to any proceeds from Avoidance Action and shall be subject to the Carveout.

(c)     <u>Adequate Protection Payments</u>.  The Debtor shall provide Senior Lender with adequate protection, in part, by paying the fees and expenses of Senior Lender's counsel in the estimated amount of $50,000.00 per month.

<u>**CARVEOUT; RESTRICTIONS ON USE OF FUNDS**</u>

4.      <u>Carveout</u>.

(a)     The Replacement Liens and the Adequate Protection Claim and the Prepetition Liens shall be subject, in accordance with the priority set forth herein and subordinate only to, and proceeds thereof may be used to pay:  (i) fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) or to the Clerk of the Bankruptcy Court (the "<u>Case Administration Fees</u>"); (ii) unpaid professional fees and expenses ("<u>Professional Fees</u>") payable to each professional retained by the Debtor (the "<u>Debtor Professionals</u>") and Creditors' Committee (collectively with the Debtor

Exhibit_____A_____

Page _____17_____

Professionals, the "Estate Professionals") that are incurred or accrued prior to the date of the occurrence of a Termination Event (as defined below), but subject to the aggregate amount not in excess of the amounts set forth for each such professional in the Approved Budget through the week such Termination Event occurs, and ultimately allowed by the Court pursuant to sections 328, 330, 331 and 503 of the Bankruptcy Code or any order of the Court (whenever such fees may be actually incurred prior to the Termination Date); (iii) and claims for reimbursement or indemnification under the agreements entered into with Bill Zender and Associates, LLC, pursuant to the Casino Management Services Agreement, and GlassRatner Advisory & Capital Group, LLC, as the Chief Restructuring Officer for Club One Casino, Inc. and (iv) Case Administration Fees and Professional Fees incurred on or after the date of the occurrence of a Termination Event (as defined below) in an aggregate amount not to exceed $25,000, (collectively, the "Carveout"). So long as a Termination Event (as defined below) has not occurred, the Debtor shall be authorized to fund the amount set forth in the "Fees Paid" section of the Approved Budget for payment of Case Administration and Professional Fees to a trust account held by Debtor's counsel (the "Trust Account"), and such funding shall permanently reduce the Carveout on a dollar-for-dollar basis; and further the Debtor shall be permitted to pay Case Administration Fees and Professional Fees allowed and payable under Bankruptcy Code sections 328, 330, 331 and 503, in an aggregate amount not in excess of the amounts set forth for each such professional in the Approved Budget. In addition, after the occurrence of a Termination Event (as defined below), the Senior Lender shall fund (to the extent not yet funded) the payment of allowed Professional Fees and disbursements incurred by each Estate Professional (net of any retainer held by each such Professional) in an aggregate amount not in excess of the amounts set forth for each such professional in the Approved Budget through the week such Termination Event occurs, and such funding shall permanently reduce the Carveout on a dollar-for-dollar basis.

(b)    Nothing contained in this Interim Order shall be construed as consent to the allowance of any fees and expenses referred to above, and shall not affect any right of the any party to object to the reasonableness of such amounts.

///

Exhibit_____A_____

Page_____18_____

5.    Restrictions on Use of Funds.

(a)    Notwithstanding anything to the contrary, no Cash Collateral or any portion of the Carveout, may be used to pay any claims for services rendered by any of the professionals retained by the Debtor, any creditor or party in interest, any committee, any trustee appointed under this Chapter 11 Case or any Successor Case, or any other party to (i) request authorization to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than from the Senior Lender; or (ii) investigate (except as set forth in paragraph 5(b) below), assert, join, commence, support, or prosecute any action or claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, the Senior Lender or any of its respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, or action, including, without limitation, (A) any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code; (B) any action relating to any act, omission, or aspect of the relationship between the Senior Lender on the one hand, and the Debtor or any of its affiliates, on the other; (C) any action with respect to the validity and extent of the Prepetition Obligations or the Replacement Liens; (D) any action seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the Prepetition Liens or the Replacement Liens; and/or (E) except to contest the occurrence or continuance of any Termination Event (as defined below) as permitted in paragraph __, any action that has the effect of preventing, hindering, or delaying (whether directly or indirectly) the Senior Lenders in respect of their liens and security interests in the Collateral, Cash Collateral, or the Prepetition Collateral; or (F) use or seek to use Cash Collateral or sell or otherwise dispose of Prepetition Collateral, unless otherwise permitted hereby, without the consent of the Senior Lender.

(b)    Up to $25,000 in the aggregate of the Carveout, any DIP Collateral, any Prepetition Collateral, any Cash Collateral or proceeds of the DIP Facility may be used by the Creditors' Committee (to the extent such committee is appointed) to investigate (but not prosecute) the extent, validity, and priority of the Prepetition Obligations, the Prepetition Liens, or any other claims against

Exhibit____A____

Page ____19____

the Senior Lender so long as such investigation occurs within the Challenge Period (as defined below).

      6.    <u>Reservation of Certain Third-Party Rights and Bar of Challenges and Claims</u>.

      (a)    The Debtor's acknowledgements and stipulations set forth herein (the "<u>Debtor Stipulations</u>") shall be binding upon the Debtor in all circumstances upon entry of this Interim Order. The Debtor's Stipulations shall be binding upon each other party in interest, including the Creditors' Committee, if any, unless such Creditors' Committee or any other party in interest (including any chapter 11 trustee in the Chapter 11 Case or any chapter 7 trustee in any Successor Case) other than the Debtor, first, commences, by the earlier of (x) with respect to any Creditors' Committee, sixty calendar days from the formation of any Creditors' Committee, and (y) solely if no Creditors' Committee is formed, with respect to other parties in interest with requisite standing other than the Debtor or any Creditors' Committee, seventy-five calendar days following the date of entry of the Interim Order (such time period established by the earlier of clauses (x) and (y)), shall be referred to as the "Challenge Period," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (i) no Challenge (as defined below) is properly commenced during the Challenge Period or (ii) with respect only to those parties that properly file a Challenge (as defined below), such Challenge is fully and finally adjudicated, shall be referred to as the "Challenge Period Termination Date"), (A) a contested matter, adversary proceeding, or other action or "claim" (as defined in the Bankruptcy Code) challenging or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtor's Stipulations; or (B) a contested matter, adversary proceeding, or other action against the Senior Lender (in any capacity) in connection with or related to (I) the Prepetition Obligations, (II) the prepetition business relationship between or conduct of the Senior Lender and the Debtor, (III) the actions or inactions of any of the Senior Lender arising out of or related to the Prepetition Obligations or otherwise, (IV) any setoff, counterclaim, or defense to the Prepetition Obligations (including, but not limited to, those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code), or (V) any avoidance of or challenge (whether pursuant to Chapter 5 of the Bankruptcy Code or otherwise) to any transfer made by or on behalf of the Debtor to or for the benefit of the Senior Lender (but excluding, solely

Exhibit _____ A _____

Page _____ 20 _____

for the purpose of this Interim Order, those under section 506(c)) ((A) and (B) collectively, the "Challenges" and, each individually, a "Challenge"), and second, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely filed contested matter, adversary proceeding, or other action.

(b)     Upon the Challenge Period Termination Date and for all purposes in this Chapter 11 Case and any Successor Case, (i) all payments made to or for the benefit of the Senior Lender pursuant to, or otherwise authorized by, this Interim Order or otherwise (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, offset, subordination, recharacterization, defense, or avoidance; (ii) any and all such Challenges by any party in interest shall be deemed to be forever released, waived, and barred; (iii) the Prepetition Obligations shall be deemed to be a fully allowed secured claim within the meaning of section 506 of the Bankruptcy Code (which claim and liens shall have been deemed satisfied in full by the repayment of the Prepetition Obligations); (iv) the Prepetition Obligations shall be deemed to be a fully allowed claim; and (v) the Debtor's stipulations in paragraph __ and the releases in paragraph __ shall be binding on all parties in interest, including any Creditors' Committee or any trustee appointed in this Chapter 11 Case or any Successor Case.

## **TERMINATION; REMEDIES; MODIFICATION OF AUTOMATIC STAY**

7.     <u>Termination</u>.  Upon the occurrence a default by the Debtor of any of its obligations under this Order, unless waived in writing by the Senior Lender (the "Termination Event"), (i) the Debtor's authorization to use Cash Collateral shall immediately and automatically terminate and (ii) free of the restrictions of Bankruptcy Code section 362 or any other section of the Bankruptcy Code, the Senior Lender may take immediate reasonable action to protect the Collateral from harm, theft and/or dissipation.  Upon the occurrence and during the continuance of a Termination Event, the Senior Lender shall have no obligation to permit the continued use of Cash Collateral. The Senior Lender shall file a motion for relief from the automatic stay in Bankruptcy Code section 362 prior to the exercise of any other remedies following a Termination Event.

## **MISCELLANEOUS**

8.     <u>Limitation on Section 506(c) Claims</u>.  Upon entry of the Final Order, no costs or

Exhibit _____A_____

Page _____21_____

expenses of administration that have been or may be incurred in this Chapter 11 Case at any time

shall be surcharged against, and no person or entity may seek to surcharge any costs or expenses of

administration against the Senior Lender or any of their respective claims, the Carveout or the

Collateral, pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior

written consent, as applicable, of the Senior Lender.

9.  <u>Additional Perfection Measures</u>.  The Replacement Liens shall be perfected by

operation of law immediately upon entry of this Interim Order.  Neither the Debtor nor the Senior

Lender shall be required to enter into or obtain landlord waivers, mortgagee waivers, bailee waivers,

warehouseman waivers or other waiver or consent, or to file or record financing statements,

mortgages, deeds of trust, leasehold mortgages, notices of lien, or similar instruments in any

jurisdiction (including, trademark, copyright, trade name or patent assignment filings with the

United States Patent and Trademark Office, Copyright Office or any similar agency with respect to

intellectual property, or filings with any other federal agencies/authorities), or obtain consents from

any licensor or similarly situated party in interest, or take any other action in order to validate and to

perfect the DIP Liens or the Replacement Liens.

10.  <u>Delivery of Documentation</u>.  The Debtor shall deliver to the Senior Lender all

financial reports, budgets, forecasts, and all other legal or financial documentation, pleadings, and/or

filings that are either (i) required to be provided to the Senior Lender under the Prepetition Loan

Agreement or (ii) reasonably requested by the Senior Lender.

11.  <u>Access to Books and Records</u>.  The Debtor will (a) keep proper books, records and

accounts in accordance with GAAP in which full, true, and correct entries shall be made of all

dealings and transactions in relation to its business and activities; (b) cooperate, consult with, and

provide to the Senior Lender such information as required or allowed under Prepetition Loan

Agreement,  the provisions of this Interim Order or that is afforded to the Creditors' Committee

and/or the Creditors' Committee's respective legal or financial advisors; (c) permit, upon one

business days' notice, representatives of the Senior Lender to visit and inspect any of its properties,

to examine and make abstracts or copies from any of its books and records, to conduct a collateral

audit and analysis of its inventory and accounts, to tour the Debtor's business premises and other

Exhibit_____ _A_

Page _____ _22_

properties, and to discuss, and provide advice with respect to, its affairs, finances, properties, business operations, and accounts with its officers, employees and independent public accountants as often as may reasonably be desired; and (d) permit representatives of the Senior Lender to consult with and advise the Debtor's management on matters concerning the general status of the Debtor's business, financial condition and operations.

12.    <u>Successors and Assigns</u>.  The provisions of this Interim Order shall be binding upon the Debtor, the Senior Lender, and each of their respective successors and assigns, and shall inure to the benefit of the Debtor, the Senior Lender, and each of their respective successors and assigns including, without limitation, any trustee, examiner with expanded powers, responsible officer, estate administrator or representative, or similar person appointed in a case for the Debtor under any chapter of the Bankruptcy Code.  The terms and provisions of this Interim Order shall also be binding on all of the Debtor's creditors, equity holders, and all other parties in interest, including, but not limited to a trustee appointed under chapter 7 or chapter 11 of the Bankruptcy Code.

13.    <u>No Waiver</u>.  This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the Senior Lender may have to bring or be heard on any matter brought before this Court.

14.    <u>Survival</u>.  Except as otherwise provided herein, (a) the protections afforded under this Interim Order, and any actions taken pursuant thereto, shall survive the entry of an order (i) dismissing this Chapter 11 Case or (ii) converting this Chapter 11 Case into a case pursuant to chapter 7 of the Bankruptcy Code, and (b) the Replacement Liens and the Adequate Protection Claim shall continue in this Chapter 11 Case, in any such Successor Case, or after any such dismissal.  Except as otherwise provided herein, the Replacement Liens, and the Adequate Protection Claim shall maintain their priorities as provided in this Interim Order and the Final Order, and shall not be modified, altered or impaired in any way by any other financing, extension of credit, incurrence of indebtedness (except with respect to any additional financing to be provided by the Senior Lender in accordance with the Final Order), or any conversion of this Chapter 11 Case into a case pursuant to chapter 7 of the Bankruptcy Code or dismissal of this Chapter 11 Case, or by any other act or omission until the Prepetition Obligations have been or are deemed to have been

1    satisfied in accordance with the Bankruptcy Code.

2        15.   <u>Adequate Notice/Scheduling of Final Hearing</u>.  The notice given by the Debtor of the

3    Interim Hearing was given in accordance with Bankruptcy Rules 2002 and 4001(c) and the local

4    rules of this Court and, under the circumstances, was adequate and sufficient.  No further notice of

5    the request for the relief granted at the Interim Hearing is required.  The Debtor shall mail copies of

6    this Interim Order and notice of the Final Hearing to: (i) the Office of the United States Trustee; (ii)

7    the Office of the United States Attorney for the Eastern District of California; (iii) the Internal

8    Revenue Service; (iv) the Debtor's twenty largest unsecured creditors; (v) counsel to KMGI; (vi) all

9    other known parties asserting a lien against the Debtor's assets; and (vii) any other party requesting

10   notice after the entry of this Interim Order.  Any objection to the relief sought at the Final Hearing

11   shall be made in writing setting forth with particularity the grounds thereof, and filed with the Court

12   and served so as to be actually received no later than seven days prior to the Final Hearing at 4:00

13   p.m. (pacific) by the following: (a) counsel to the Debtor; (b) counsel to KMGI; and (d) the Office of

14   the United States Trustee. The Court shall conduct a Final Hearing on the Motion commencing on

15   November 10, 2015 at 2:30 p.m. (Pacific).

16       16.   <u>Immediate Binding Effect; Entry of Interim Order</u>.  This Interim Order shall not be

17   stayed and shall be valid and fully effective immediately upon entry, notwithstanding the possible

18   application of Bankruptcy Rules 6004(h), 7062, and 9014, or otherwise, and the Clerk of the Court is

19   hereby directed to enter this Interim Order on the Court's docket in this Chapter 11 Case.

20       17.   <u>Retention of Jurisdiction</u>.  This Court shall retain exclusive jurisdiction over all

21   matters pertaining to the implementation, interpretation, and enforcement of this Interim Order.

22

23

24

25

26

27

28   Dated: _____

                                       _____
                                       United States Bankruptcy Judge
                                      **Exhibit** _____ A _____

Case 15-14017    Filed 10/15/15    Doc 7

## Club One Casino, Inc.
### Weekly Cash Budget - Oct 2015 to Dec 2015 ($ in 000s)

| | 14-Oct | 21-Oct | 28-Oct | 4-Nov | 11-Nov | 18-Nov | 25-Nov | 2-Dec | 9-Dec | 16-Dec | 23-Dec | 30-Dec | 6-Jan |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash on Hand | 747,000 | 742,683 | 922,083 | 1,145,083 | 884,335 | 969,835 | 905,835 | 1,118,835 | 836,387 | 901,887 | 832,887 | 1,025,887 | 834,048 |
| Cash Receipts - Casino | 25,000 | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 235,000 |
| Cash Receipts - F&B | 5,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| Credit card reimbursement | | 5,000 | 5,000 | | | | | | | | | | |
| Inventory reductions - liquor | | | | 170,000 | | | | 170,000 | | | | 170,000 | |
| Marketing payments - Arise | | | | | | 10,000 | | | | | | | |
| One-time reimbursement - Arise | | | | | | | | | | | | 50,333 | |
| Chips redeemed for payment - Arise | | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 |
| Total cash collections | 30,000 | 395,000 | 395,000 | 560,000 | 390,000 | 400,000 | 390,000 | 535,000 | 365,000 | 365,000 | 365,000 | 585,333 | 400,000 |
| ATM replenishment - from cage | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) |
| ATM reimbursement - from bank | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 |
| ATM/Cash advance fee income | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Cash collection ATM (net) | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Purchases - Kitchen | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 |
| Purchases - Beverages - non-alcoholic | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Purchases - Beverages - alcoholic | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 |
| Purchases - Grinders Cafe | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Purchases - Gift Shop | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Total purchases | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| 8011-10 - Wages - Casino | | 15,333 | | 115,000 | | 115,000 | | 115,000 | | 115,000 | | 126,500 | |
| 8011-20 - Wages - Restaurant | | 3,067 | | 23,000 | | 23,000 | | 23,000 | | 23,000 | | 25,300 | |
| 8011-30 - Wages - Bar | | 533 | | 4,000 | | 4,000 | | 4,000 | | 4,000 | | 4,400 | |
| 8011-50 - Wages - Servers | | 3,067 | | 23,000 | | 23,000 | | 23,000 | | 23,000 | | 25,300 | |
| 8011-60 - Wages - Gift Shop | | 533 | | 4,000 | | 4,000 | | 4,000 | | 4,000 | | 4,400 | |
| 8011-70 - Wages - Facility/Janitorial | | 1,867 | | 14,000 | | 14,000 | | 14,000 | | 14,000 | | 15,400 | |
| 8011-80 - Wages - Security | | 2,800 | | 21,000 | | 21,000 | | 21,000 | | 21,000 | | 23,100 | |
| 8011-90 - Wages - Administration | | 3,067 | | 23,000 | | 23,000 | | 23,000 | | 23,000 | | 25,300 | |
| Total 8011-00 - Wages | | 30,267 | | 227,000 | | 227,000 | | 227,000 | | 227,000 | | 249,700 | |
| Total 8110-00 - Medical and Dental | | | | 35,000 | | | | 35,000 | | | | 35,000 | |
| Total 8117-00 - Payroll Taxes | | 3,333 | | 25,000 | | 25,000 | | 25,000 | | 25,000 | | 25,000 | |
| 8118-00 - Workers Compensation | | | | 30,000 | | | | 30,000 | | | | 30,000 | |
| 8210-00 - Travel and Entertainment | | | | 1,000 | | | | 1,000 | | | | 1,000 | |
| 8216-10 - Dry Cleaning | | | | 500 | | | | 500 | | | | 500 | |
| 8220-90 - Pest/Exterminator | | | | 350 | | | | 350 | | | | 350 | |
| 8311-90 - Facility Lease/Rent | | | | 50,598 | | | | 50,598 | | | | 52,622 | |
| 8312-90 - Facility CAM | | | | 6,000 | | | | 6,000 | | | | 6,000 | |
| 8313-90 - Facility Parking | | | | 6,000 | | | | 6,000 | | | | 6,000 | |
| Total - Facility | | | | 64,448 | | | | 64,448 | | | | 66,472 | |
| 8314-94 - Fresno Park Tower Utilities | | | | 3,000 | | | | 3,000 | | | | 3,000 | |
| 8314-90 - PG&E Utilities - Other | | | | 25,000 | | | | 25,000 | | | | 25,000 | |
| Total 8314-90 - PG&E Utilities | | | | 28,000 | | | | 28,000 | | | | 28,000 | |
| Adequate assurance payment | 34,317 | | | | | | | | | | | | |

Exhibit 1

Page 25

Case 15-14017    Filed 10/15/15    Doc 7

## Club One Casino, Inc.
## Weekly Cash Budget - Oct 2015 to Dec 2015 ($ in 000s)

| Account | 14-Oct | 21-Oct | 28-Oct | 4-Nov | 11-Nov | 18-Nov | 25-Nov | 2-Dec | 9-Dec | 16-Dec | 23-Dec | 30-Dec | 6-Jan |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8315-90 · Telephone | - | - | - | 5,000 | - | - | - | 5,000 | - | - | - | 5,000 | - |
| 8316-92 · Comm General Liability | - | - | - | 8,000 | - | - | - | 8,000 | - | - | - | 8,000 | - |
| 8316-94 · Empl Practices Insurance | - | - | - | 8,000 | - | - | - | 8,000 | - | - | - | 8,000 | - |
| Total 8316-90 · Insurance | - | - | - | 16,000 | - | - | - | 16,000 | - | - | - | 16,000 | - |
| 8410-20 · Lease-Casino Equipment | - | - | - | 25,000 | - | - | - | 25,000 | - | - | - | 25,000 | - |
| 8410-81 · Lease-Security Equipment | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 8410-90 · Lease-Admin Equipment | - | - | - | 1,500 | - | - | - | 1,500 | - | - | - | 1,500 | - |
| Total 8410-00 · Equip Rent/Lease | - | - | - | 26,500 | - | - | - | 26,500 | - | - | - | 26,500 | - |
| Total 8411-00 · Repair & Maint | - | - | - | 8,500 | - | - | - | 8,500 | - | - | - | 8,500 | - |
| Total 8412-00 · Office Supplies | - | - | - | 2,000 | - | - | - | 2,000 | - | - | - | 2,000 | - |
| Total 8413-00 · Operating Supplies | - | - | - | 30,000 | - | - | - | 30,000 | - | - | - | 30,000 | - |
| Total 8414-00 · Uniforms | - | - | - | 2,000 | - | - | - | 1,000 | - | - | - | 1,000 | - |
| Total 8415-00 · Linens | - | - | - | 5,000 | - | - | - | 5,000 | - | - | - | 5,000 | - |
| 8415-90 · Postage & FedEx | - | - | - | 500 | - | - | - | 500 | - | - | - | 500 | - |
| 8510-80 · Auto Repair & Maintenance | - | - | - | 3,000 | - | - | - | 3,000 | - | - | - | 3,000 | - |
| 8610-90 · Advertising & Marketing | - | - | - | 25,000 | - | - | - | 25,000 | - | - | - | 25,000 | - |
| 8611-90 · Sales Promotions | - | - | - | 7,500 | - | 25,000 | - | 7,500 | - | - | - | 7,500 | - |
| 8709-90 · Payroll Processing Fees | - | - | - | 3,000 | - | - | - | 2,000 | - | - | - | 2,000 | - |
| 8710-90 · Bank & Credit Card Charges | - | - | - | 3,000 | - | - | - | 3,000 | - | - | - | 3,000 | - |
| 8710-92 · Armoured Car Service | - | - | - | 800 | - | - | - | 1,000 | - | - | - | 1,000 | - |
| 8710-94 · Alarm-Fire Monitoring | - | - | - | 500 | - | - | - | 500 | - | - | - | 500 | - |
| 8711-90 · Taxes and Licenses | - | - | - | 3,500 | - | - | - | 2,000 | - | - | - | 2,000 | - |
| 8712-10 · Computer & IT Systems | - | - | - | 1,000 | - | - | - | 1,000 | - | - | - | 1,000 | - |
| 8713-10 · City Table Tax | - | - | - | - | 95,000 | - | - | - | - | - | - | - | - |
| 8713-20 · State Table Tax | - | - | - | 95,000 | - | - | - | - | - | - | - | - | - |
| 8713-22 · Gaming Applications | - | - | - | - | - | - | - | - | 95,000 | - | - | - | - |
| 8713-30 · Property Tax | - | - | - | 2,000 | - | - | - | 2,000 | - | - | - | 2,000 | - |
| 8716-10 · Prop Reimbursement | - | 10,000 | - | 10,000 | 10,000 | 10,000 | - | 10,000 | - | 10,000 | - | 10,000 | - |
| 8716-90 · Other Prof'l Services | - | - | - | 9,500 | - | - | - | 9,500 | - | - | - | 9,500 | - |
| 8718-10 · Royalty Payment | - | - | - | 13,000 | - | - | - | 13,000 | - | - | - | 13,000 | 13,000 |
| 8719-00 · Membership/Dues | - | - | - | 2,000 | - | - | - | 2,000 | - | - | - | 2,000 | 7,100 |
| 8719-90 · Donations | - | - | - | 1,000 | - | - | - | 1,000 | - | - | - | 1,000 | 1,000 |
| 8720-10 · Subscriptions | - | - | - | 1,000 | - | - | - | 1,000 | - | - | - | 1,000 | 1,000 |
| 8722-90 · Hotel/Cab- Cust & Guests | - | - | - | 1,000 | - | - | - | 1,000 | - | - | - | 1,000 | 1,000 |
| 8724-90 · Events/Musicians/DJs | - | - | - | 4,000 | - | - | - | 4,000 | - | - | - | 4,000 | 2,500 |
| 8913-41 · Decorations | - | - | - | 500 | - | - | - | 500 | - | - | - | 500 | 500 |
| 8913-44 · Miscellaneous | - | - | - | 1,000 | - | - | - | 1,000 | - | - | - | 1,000 | 1,000 |
| 8913-40 · Bang & Event Center - Other | - | - | - | 500 | - | - | - | 500 | - | - | - | 500 | 500 |
| Total 8913-40 · Banquet & Event | - | - | - | 2,000 | - | - | - | 2,000 | - | - | - | 2,000 | 2,000 |
| 8919-90 · Miscellaneous Expense | - | - | - | 1,000 | - | - | - | 1,000 | - | - | - | 1,000 | 1,000 |

Exhibit ___1___

Page ___26___

Club One Casino, Inc.
Weekly Cash Budget - Oct 2015 to Dec 2015 ($ in 000s)

| | 14-Oct | 21-Oct | 28-Oct | 4-Nov | 11-Nov | 18-Nov | 25-Nov | 2-Dec | 9-Dec | 16-Dec | 23-Dec | 30-Dec | 6-Jan |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3100 - Jackpot and Promo items | $ - | $ 30,000 | $ 30,000 | $ 30,000 | $ 30,000 | $ 35,000 | $ 35,000 | $ 30,000 | $ 30,000 | $ 30,000 | $ 30,000 | $ 30,000 | $ 30,000 |
| Total operating disbursements | $ 34,317 | $ 103,600 | $ 60,000 | $ 658,748 | $ 155,000 | $ 352,000 | $ 65,000 | $ 655,448 | $ 155,000 | $ 322,000 | $ 60,000 | $ 655,172 | $ 88,600 |
| Adequate protection payments | $ - | $ - | $ - | $ 50,000 | $ - | $ - | $ - | $ 50,000 | $ - | $ - | $ - | $ - | $ 50,000 |
| Professional Expenses | | | | | | | | | | | | | |
| William Zender | $ - | $ - | $ - | $ - | $ 12,500 | $ - | $ - | $ - | $ 12,500 | $ - | $ - | $ - | $ 12,500 |
| Glass-Ratner | $ - | $ - | $ - | $ - | $ 25,000 | $ - | $ - | $ - | $ 20,000 | $ - | $ - | $ - | $ 15,000 |
| Unsecured committee counsel | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| United States Trustee fees | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Klein DeNatale Goldner | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Law Offices of John Maloney | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 8714-90 - Accounting Fees | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 10,000 | $ - |
| Dowling Aaron, Inc. | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Professional Expenses | $ - | $ - | $ - | $ - | $ 37,500 | $ - | $ - | $ - | $ 32,500 | $ - | $ - | $ 10,000 | $ 27,500 |
| Chip Redemption - Arise | $ - | $ 115,000 | $ 115,000 | $ 115,000 | $ 115,000 | $ 115,000 | $ 115,000 | $ 115,000 | $ 115,000 | $ 115,000 | $ 115,000 | $ 115,000 | $ 115,000 |
| Total Cash Disbursements | $ 34,317 | $ 218,600 | $ 175,000 | $ 823,748 | $ 307,500 | $ 467,000 | $ 180,000 | $ 820,448 | $ 302,500 | $ 437,000 | $ 175,000 | $ 780,172 | $ 281,100 |
| Ending Cash | $ 742,683 | $ 922,083 | $ 1,145,083 | $ 884,335 | $ 969,835 | $ 905,835 | $ 1,118,835 | $ 836,387 | $ 901,887 | $ 832,887 | $ 1,025,887 | $ 834,048 | $ 955,948 |

3

Exhibit _____1_____

Page _____27_____

## Club One Casino, Inc.
## Weekly Cash Budget - Oct 2015 to Dec 2015 ($ in 000s)

| | 13-Jan | 20-Jan | 27-Jan | 3-Feb | 10-Feb | 17-Feb | 24-Feb | 2-Mar | 9-Mar | 16-Mar | 23-Mar | 30-Mar | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash on Hand | 955,948 | 799,248 | 1,027,248 | 638,676 | 953,676 | 744,476 | 972,476 | 833,776 | 1,031,426 | 760,726 | 978,726 | 861,026 | 760,726 |
| Cash Receipts - Casino | 235,000 | 235,000 | 235,000 | 235,000 | 235,000 | 235,000 | 235,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 5,455,000 |
| Cash Receipts - F&B | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 1,205,000 |
| Credit card reimbursement | | | | | | | | | | | | | |
| Inventory reductions - liquor | | | | | | | | | | | | | 20,000 |
| Marketing payments - Arise | | | | 170,000 | | | | 170,000 | | | | 170,000 | 1,020,000 |
| One-time reimbursement - Arise | | | | | | | | | | | | | 50,333 |
| Chips redeemed for payment - Arise | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 2,760,000 |
| Total cash collections | 400,000 | 400,000 | 400,000 | 570,000 | 400,000 | 400,000 | 400,000 | 575,000 | 405,000 | 405,000 | 405,000 | 575,000 | 10,510,333 |
| ATM replenishment - from cage | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) | (210,000) | (5,040,000) |
| ATM reimbursement - from bank | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | 5,040,000 |
| ATM/Cash advance fee income | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 72,000 |
| Cash collection ATM (net) | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 72,000 |
| Purchases - Kitchen | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 384,000 |
| Purchases - Beverages - non-alcoholic | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 72,000 |
| Purchases - Beverages - alcoholic | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 168,000 |
| Purchases - Grinders Cafe | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 24,000 |
| Purchases - Gift Shop | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 72,000 |
| Total purchases | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 720,000 |
| 8011-10 - Wages - Casino | 126,500 | | 126,500 | | 126,500 | | 126,500 | | 126,500 | | 126,500 | | 1,360,833 |
| 8012-20 - Wages - Restaurant | 25,300 | | 25,300 | | 25,300 | | 25,300 | | 25,300 | | 25,300 | | 272,167 |
| 8013-30 - Wages - Bar | 4,400 | | 4,400 | | 4,400 | | 4,400 | | 4,400 | | 4,400 | | 47,333 |
| 8011-50 - Wages - Servers | 25,300 | | 25,300 | | 25,300 | | 25,300 | | 25,300 | | 25,300 | | 272,167 |
| 8011-60 - Wages - Gift Shop | 4,400 | | 4,400 | | 4,400 | | 4,400 | | 4,400 | | 4,400 | | 47,333 |
| 8011-70 - Wages - Facility/Janitorial | 15,400 | | 15,400 | | 15,400 | | 15,400 | | 15,400 | | 15,400 | | 165,667 |
| 8011-80 - Wages - Security | 23,100 | | 23,100 | | 23,100 | | 23,100 | | 23,100 | | 23,100 | | 248,500 |
| 8011-90 - Wages - Administration | 25,300 | | 25,300 | | 25,300 | | 25,300 | | 25,300 | | 25,300 | | 272,167 |
| Total 8011-00 - Wages | 249,700 | | 249,700 | | 249,700 | | 249,700 | | 249,700 | | 249,700 | | 2,686,167 |
| Total 8110-00 - Medical and Dental | | 35,000 | | | | 35,000 | | | | 35,000 | | | 210,000 |
| Total 8117-00 - Payroll Taxes | 30,000 | | 30,000 | | 25,000 | | 25,000 | | 25,000 | | 25,000 | | 288,333 |
| 8118-00 - Workers Compensation | | | 30,000 | | | | | 30,000 | | | | 30,000 | 240,000 |
| 8210-00 - Travel and Entertainment | | | 1,500 | | | | | 1,500 | | | | 1,500 | 7,500 |
| 8216-10 - Dry Cleaning | | | 500 | | | | | 500 | | | | 500 | 3,000 |
| 8220-90 - Pest/Exterminator | | | 350 | | | | | 350 | | | | 350 | 2,100 |
| 8311-90 - Facility Lease/Rent | | | 52,622 | | | | | | | | | | 206,440 |
| 8312-90 - Facility CAM | | | 6,000 | | | | | 6,000 | | | | 6,000 | 36,000 |
| 8313-90 - Facility Parking | | | 6,000 | | | | | 6,000 | | | | 6,000 | 36,000 |
| Total - Facility | | | 66,972 | | | | | 14,350 | | | | 14,350 | 291,040 |
| 8314-94 - Fresno Park Tower Utilities | | | 3,000 | | | | | 3,000 | | | | 3,000 | 18,000 |
| 8314-90 - PG&E Utilities - Other | | | 25,000 | | | | | 25,000 | | | | 25,000 | 150,000 |
| Total 8314-90 - PG&E Utilities | | | 28,000 | | | | | 28,000 | | | | 28,000 | 168,000 |
| Adequate assurance payment | | | | | | | | | | | | | 34,317 |

Exhibit 1

Page 28

FINAL

## Club One Casino, Inc.
## Weekly Cash Budget - Oct 2015 to Dec 2015 ($ in 000s)

| | 13-Jan | 20-Jan | 27-Jan | 3-Feb | 10-Feb | 17-Feb | 24-Feb | 2-Mar | 9-Mar | 16-Mar | 23-Mar | 30-Mar | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8315-90 · Telephone | - | - | 5,000 | - | - | - | - | 5,000 | - | - | - | 5,000 | 30,000 |
| 8316-92 · Comm General Liability | 8,000 | - | 8,000 | - | - | - | - | 8,000 | - | - | - | 8,000 | 48,000 |
| 8316-94 · Empl Practices Insurance | - | - | 8,000 | - | - | - | - | 8,000 | - | - | - | 8,000 | 48,000 |
| Total 8316-90 · Insurance | 16,000 | - | 16,000 | - | - | - | - | 16,000 | - | - | - | 16,000 | 96,000 |
| 8410-20 · Lease-Casino Equipment | - | - | 25,000 | - | - | - | - | 25,000 | - | - | - | 25,000 | 150,000 |
| 8410-81 · Lease-Security Equipment | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 8410-90 · Lease-Admin Equipment | - | - | 1,500 | - | - | - | - | 1,500 | - | - | - | 1,500 | 9,000 |
| Total 8410-00 · Equip Rent/Lease | - | - | 26,500 | - | - | - | - | 26,500 | - | - | - | 26,500 | 159,000 |
| 8411-00 · Repair & Maint | - | - | 8,500 | - | - | - | - | 8,500 | - | - | - | 8,500 | 51,000 |
| 8412-00 · Office Supplies | - | - | 2,000 | - | - | - | - | 2,000 | - | - | - | 2,000 | 12,000 |
| 8413-00 · Operating Supplies | - | - | 30,000 | - | - | - | - | 30,000 | - | - | - | 30,000 | 180,000 |
| 8414-00 · Uniforms | - | - | 1,000 | - | - | - | - | 1,000 | - | - | - | 1,000 | 7,000 |
| 8415-00 · Liners | - | - | 5,000 | - | - | - | - | 5,000 | - | - | - | 5,000 | 30,000 |
| 8415-90 · Postage & FedEx | - | - | 500 | - | - | - | - | 500 | - | - | - | 500 | 3,000 |
| 8510-80 · Auto Repair & Maintenance | - | - | 3,000 | - | - | - | - | 3,000 | - | - | - | 3,000 | 18,000 |
| 8610-90 · Advertising & Marketing | - | - | 25,000 | - | - | - | - | 25,000 | - | - | - | 25,000 | 150,000 |
| 8611-90 · Sales Promotions | - | - | 7,500 | - | - | - | - | 7,500 | - | - | - | 7,500 | 70,000 |
| 8709-90 · Payroll Processing Fees | - | - | 2,000 | - | - | - | - | 2,000 | - | - | - | 2,000 | 13,000 |
| 8710-90 · Bank & Credit Card Charges | - | - | 3,000 | - | - | - | - | 3,000 | - | - | - | 3,000 | 18,000 |
| 8710-92 · Armoured Car Service | - | - | 1,000 | - | - | - | - | 1,000 | - | - | - | 1,000 | 5,800 |
| 8710-94 · Alarm-Fire Monitoring | - | - | 500 | - | - | - | - | 500 | - | - | - | 500 | 3,000 |
| 8711-90 · Taxes and Licenses | - | - | 2,000 | - | - | - | - | 2,000 | - | - | - | 2,000 | 13,500 |
| 8712-10 · Computer & IT Systems | - | - | 1,000 | - | - | - | - | 1,000 | - | - | - | 1,000 | 6,000 |
| 8713-10 · City Table Tax | 95,000 | - | - | - | 95,000 | - | - | - | 100,000 | - | - | - | 480,000 |
| 8713-20 · State Table Tax | - | - | - | - | - | - | - | - | - | - | - | 204,000 | 204,000 |
| 8713-22 · Gaming Applications | - | - | - | - | - | - | 2,000 | - | - | - | - | - | - |
| 8713-30 · Property Tax | - | - | 2,000 | - | - | - | - | - | 2,000 | - | - | 2,000 | 14,000 |
| 8716-10 · Prop Reimbursement | 10,000 | - | 10,000 | - | 10,000 | - | 10,000 | - | 10,000 | - | 10,000 | - | 120,000 |
| 8716-90 · Other Prof'l Services | - | - | - | 9,500 | - | - | - | - | 9,500 | - | - | 9,500 | 57,000 |
| 8718-10 · Royalty Payment | - | - | 13,000 | 13,000 | - | - | - | 13,000 | - | - | - | 13,000 | 78,000 |
| 8719-00 · Membership/Dues | - | - | 2,000 | 2,000 | - | - | - | 2,000 | - | - | - | 2,000 | 17,100 |
| 8719-90 · Donations | - | - | 1,000 | 1,000 | - | - | - | 1,000 | - | - | - | 1,000 | 6,000 |
| 8720-10 · Subscriptions | - | - | 1,000 | 1,000 | - | - | - | 1,000 | - | - | - | 1,000 | 6,000 |
| 8722-90 · Hotel/Cab- Cust & Guests | - | - | 1,000 | 1,000 | - | - | - | 1,000 | - | - | - | 1,000 | 6,000 |
| 8724-90 · Events/Musicians/DJs | - | - | 2,500 | 2,500 | - | - | - | 2,500 | - | - | - | 2,500 | 18,000 |
| 8913-41 · Decorations | - | - | 500 | 500 | - | - | - | 500 | - | - | - | 500 | 3,000 |
| 8913-44 · Miscellaneous | - | - | 1,000 | 1,000 | - | - | - | 1,000 | - | - | - | 1,000 | 6,000 |
| 8913-40 · Banq & Event Center - Other | - | - | 500 | 500 | - | - | - | 500 | - | - | - | 500 | 3,000 |
| Total 8913-40 · Banquet & Event | - | - | 2,000 | 2,000 | - | - | - | 2,000 | - | - | - | 2,000 | 12,000 |
| 8919-90 · Miscellaneous Expense | - | - | 1,000 | 1,000 | - | - | - | 1,000 | - | - | 1,000 | - | 6,000 |

5

Exhibit _____ 1

Page _____ 29

## Club One Casino, Inc.
## Weekly Cash Budget - Oct 2015 to Dec 2015 ($ in 000s)

| | 13-Jan | 20-Jan | 27-Jan | 3-Feb | 10-Feb | 17-Feb | 24-Feb | 2-Mar | 9-Mar | 16-Mar | 23-Mar | 30-Mar | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3100 - Jackpot and Promo items | $ 30,000 | $ 30,000 | $ 30,000 | $ 30,000 | $ 30,000 | $ 30,000 | $ 30,000 | $ 30,000 | $ 30,000 | $ 30,000 | $ 30,000 | $ 30,000 | $ 730,000 |
| Total operating disbursements | $ 444,700 | $ 60,000 | $ 651,172 | $ 93,000 | $ 469,700 | $ 60,000 | $ 411,700 | $ 265,350 | $ 486,200 | $ 60,000 | $ 410,700 | $ 479,850 | $ 7,257,257 |
| Adequate protection payments | $ - | $ - | $ - | $ 50,000 | $ - | $ - | $ - | $ - | $ 50,000 | $ - | $ - | $ - | $ 250,000 |
| **Professional Expenses** | | | | | | | | | | | | | |
| William Zender | $ - | $ - | $ - | $ - | $ 12,500 | $ - | $ - | $ - | $ 12,500 | $ - | $ - | $ - | $ 62,500 |
| Glass-Ratner | $ - | $ - | $ - | $ - | $ 15,000 | $ - | $ - | $ - | $ 15,000 | $ - | $ - | $ - | $ 90,000 |
| Unsecured committee counsel | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| United States Trustee fees | $ - | $ - | $ 10,400 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 10,400 |
| Klein DeNatale Goldner | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Law Offices of John Maloney | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 8714-90 - Accounting Fees | $ - | $ - | $ 15,000 | $ - | $ - | $ - | $ 15,000 | $ - | $ - | $ 15,000 | $ - | $ - | $ 55,000 |
| Dowling Aaron, Inc. | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Professional Expenses | $ - | $ - | $ 25,400 | $ - | $ 27,500 | $ - | $ 15,000 | $ - | $ 27,500 | $ 15,000 | $ - | $ - | $ 217,900 |
| Chip Redemption - Arise | $ 115,000 | $ 115,000 | $ 115,000 | $ 115,000 | $ 115,000 | $ 115,000 | $ 115,000 | $ 115,000 | $ 115,000 | $ 115,000 | $ 115,000 | $ 115,000 | $ 2,760,000 |
| Total Cash Disbursements | $ 559,700 | $ 175,000 | $ 791,572 | $ 288,000 | $ 612,200 | $ 175,000 | $ 541,700 | $ 380,350 | $ 678,700 | $ 190,000 | $ 525,700 | $ 594,850 | $ 10,485,157 |
| Ending Cash | $ 799,248 | $ 1,027,248 | $ 638,676 | $ 953,676 | $ 744,476 | $ 972,476 | $ 833,776 | $ 1,031,426 | $ 760,726 | $ 978,726 | $ 861,026 | $ 844,176 | $ 844,176 |

6

Exhibit ___1___

Page ___30___