**13**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Debra I. Grassgreen (CA Bar No. 169978)
Kenneth H. Brown (CA Bar No. 100396)
Malhar S. Pagay (CA Bar No. 189289)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, California 94111-4500
Telephone: 415/263-7000
Facsimile: 415/263-7010
Email: jpomerantz@pszjlaw.com
       dgrassgreen@pszjlaw.com
       kbrown@pszjlaw.com
       mpagay@pszjlaw.com

Attorneys for KMGI, Inc.

# UNITED STATES BANKRUPTCY COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br>**CLUB ONE CASINO, INC.,**<br>       Debtor | Case No.: 15-14017-B-11<br>Chapter 11<br>DC No. KDG-1<br>Hearing Date:<br>Date:    November 10, 2015<br>Time:    2:30 PM<br>Place:   United States Bankruptcy Court<br>         2500 Tulare Street, 5th Floor<br>         Dept. B, Courtroom 13<br>         Fresno, California 93721<br>Judge:   Honorable René Lastreto II |

**KMGI, INC.'S REPLY TO OBJECTION OF SUBORDINATED NOTEHOLDERS TO DEBTOR'S MOTION TO USE CASH COLLATERAL AND GRANT ADEQUATE PROTECTION**

KMGI, Inc. ("KMGI" or "Senior Lender") hereby submits its reply to the *Objection of Subordinated Noteholders* ("Objection") to Club One Casino, Inc.'s Motion to Use Cash Collateral and Grant Adequate Protection filed by Elaine R. Long and George Sarantos (together, the "Subordinated Noteholders") who are the holders of subordinated notes issued by the debtor, Club One Casino, Inc. ("COCI" or "Debtor"), on February 22, 2008 ("Subordinated Notes"). In support thereof, KMGI respectfully represents as follows:

# I.

# INTRODUCTION

1. The Objection is without merit. More critically, the Subordinated Noteholders lack standing to file it. The Subordinated Noteholders are categorically prohibited from asserting objections to the use of cash collateral because they entered into a subordination agreement with COCI, Club One Acquisition Corp., Inc. ("COAC") and KMGI's predecessor, in which they agreed to subordinate the Subordinated Notes to the senior indebtedness now held by KMGI. They further agreed to an express *standstill* provision that precludes them from exercising any rights and remedies against the Debtor in connection with the Subordinated Notes until the loan held by KMGI is paid in full. At present, KMGI is owed over $24,000,000.

2. Ignoring their contractual obligations, the Subordinated Noteholders filed the Objection. If the Court decides to consider the merits of the Objection, it should be overruled for the reasons set forth below. The Objection is full of extraneous statements that are irrelevant to the Debtor's request to use cash collateral to operate its business and administer this case (the "Chapter 11 Case")[1] and confuses the claims that the Subordinated Noteholders have against this estate with the claims the same parties assert against the Debtor's parent, which is not a party to this Motion.

3. The Debtor and KMGI have negotiated a simple, twelve paragraph stipulation governing the use of cash collateral (the "Proposed Stipulation") and the only relief the Debtor is requesting is approval of the Proposed Stipulation. The Proposed Stipulation does not alter any substantive rights. Instead, it assures that value is preserved for all parties in interest and maintains the *status quo* so that this bankruptcy case can be administered and the Court can determine the appropriate course for the Debtor's reorganization.

---

[1] The Objection demonstrates that the Subordinated Noteholders were confused about the nature and extent of the relief requested. Accordingly, counsel for KMGI reached out to counsel for the Subordinated Noteholders and (a) confirmed that the only relief requested is as set forth in the Proposed Stipulation and (b) advised that KMGI would consider any specific comments to the Proposed Stipulation, despite their continued violation of the standstill provisions of the Subordination Agreement (as defined below).

## II.

## RELEVANT FACTS

**A.     The Sale of COCI.**

4.     In 2008, the Subordinated Noteholders sold COCI to COAC.  Declaration of Dana Messina ("Messina Decl.") ¶ 7.  As part of the sale of COCI, the Subordinated Noteholders entered into an Agreement for Purchase and Sale of Stock ("Acquisition Agreement").  A true and correct copy of the Acquisition Agreement is attached to the Messina Declaration as Exhibit "A."  Under the terms of the Acquisition Agreement, COAC agreed to purchase COCI for $27 million.  COAC financed a portion of the purchase price with a loan originally held by D.B. Zwirn Special Opportunities Fund, L.P. ("Zwirn"), then Fortress Value Recovery Fund I LLC ("Fortress"), and now KMGI. ("Senior Loan").  True and correct copies of (a) the Financing Agreement dated as of February 22, 2008, by and among COAC, Club One Merger Sub, Inc. and COCI, various lenders and Zwirn, as Agent (the "Financing Agreement"), (b) the Security Agreement, and (c) filed UCC-1, are attached to the Messina Declaration as Exhibits "B," "C," and "D" respectively.

5.     In connection with the sale, the Subordinated Noteholders each received approximately $10,700,000 in cash and a seller note for $2,500,000.  True and correct copies of the seller notes (referred to herein as the Subordinated Notes) are attached to the Messina Declaration as Exhibit "E."  The obligor on the Subordinated Notes is Club One Merger Sub, Inc., which was merged into the Debtor, COCI.  Subordinated Noteholder Long also received several million dollars of additional cash that had been paid into an escrow account when her husband was unable to receive payments after being convicted of a felony.  In total, over $22,000,000.00 in cash was distributed to the Subordinated Noteholders at the close of escrow.  Messina Decl. ¶ 8.

6.     In connection with the Acquisition Agreement, COAC, COCI, the Subordinated Noteholders and Zwirn entered into a Seller Subordination Agreement dated February 22, 2008 (the "**Subordination Agreement**").  A true and correct copy of the Subordination Agreement is attached to the Messina Declaration as Exhibit "F."  The Subordinated Noteholders are subordinated to the Senior Loan under the Subordination Agreement.

7.      On or about April 11, 2012, KMGI entered into a Loan Purchase Agreement by and between Fortress as seller ("Seller" or "Agent") and KMGI as Purchaser (the "Loan Purchase Agreement"). True and correct copies of the Loan Purchase Agreement and accompanying UCC-1 financing statement amendment, filed April 12, 2012, are attached to the Messina Declaration as Exhibits "G" and "H," respectively.

8.      The Loan Purchase Agreement provides:

> "[T]he Loan is subject to the terms and conditions of that Seller Subordination Agreement, dated as of February 22, 2008, among Agent, on behalf of Lenders, Borrower, George Sarantos . . . and Elaine Long
>
> ….
>
> Seller will convey its interest and obligations in Seller Subordination Agreement to Purchaser at Closing pursuant to the Subordination Assignment and Assumption [Agreement]. . . ."

Loan Purchase Agreement at 1.

9.      On April 11, 2012, Seller and KMGI entered into the Subordination Assignment and Assumption Agreement, by which the Seller Subordination Agreement was transferred from Seller to KMGI. A true and correct copy of the Subordination Assignment and Assumption Agreement is attached to the Messina Declaration as Exhibit "I."

B.      **Arbitration of Disputed $1,000,513 of the Purchase Price; Arbitration Award; Subsequent Judgment.**

10.     Subsequent to the closing of the sale, a dispute between COAC and the Subordinated Noteholders regarding an additional $1,000,513 (less than 4% of the purchase price) claimed by the Subordinated Noteholders was arbitrated pursuant to the arbitration provisions of the Acquisition Agreement. The Subordinated Noteholders were awarded $1,000,513, plus attorneys' fees and costs, on July 8, 2011 ("Arbitration Award"). The Arbitration Award was subsequently reduced to a judgment *against COAC* ("COAC Judgment") on November 8, 2011. However, because the judgment is against COAC only – not the Debtor - it is not a claim against the Debtor's estate. Messina Decl. ¶ 15.

**C.    New York Litigation.**

11.    The Subordination Agreement was the subject of litigation before the New York Supreme Court. The court determined by final, non-appealable order that the Subordination Agreement is fully enforceable with respect to the Subordinated Notes, the Subordinated Notes are subordinate to the Senior Loan held by KMGI pursuant to the terms of the Subordination Agreement, and the Subordinated Notes shall not receive payment until the Senior Loan is paid in full. More detail concerning the decision by the New York Supreme Court holding that the Subordination Agreement was enforceable with respect to the Subordinated Notes is set forth in the Messina Declaration.[2] COCI is not a party to the New York Litigation.

12.    In the Subordinated Noteholders' Objection, the Subordinated Noteholders acknowledge that they are only seeking to enforce their rights to recovery on the COAC Judgment and not the Subordinated Notes. Objection, at fn.1.  **It is undisputed that the COAC Judgment is not a claim against the Debtor's estate.**

**D.    Key Provisions of the Subordination Agreement.**

13.    The Subordination Agreement contains the following provisions:[3]

   a.   "[N]o part of the Subordinated Indebtedness shall have any claim to the assets of [the Debtors] on a parity with or prior to the claim of the Senior Indebtedness." Subordination Agreement § 2(b)(1).

   b.   "[U]nless and until the Senior Indebtedness has been paid in full, without the express written consent of the Agent, (A) no Subordinated Creditor will take, demand, or receive from [the Debtor and the Debtor will not] make, give, or permit, directly or indirectly, by set-off, redemption, purchase or in any other manner, any payment of or security for the whole or any part of the Subordinated Indebtedness and (B) *no Subordinated Creditor will . . . exercise any of their rights or remedies with respect to the Subordinated Indebtedness.*" *Id.* § 2(b)(2)(emphasis added). This italicized language is hereafter referred to as the "**Standstill Provision.**"

   c.   All rights and interests of the Senior Lender and all agreements and obligations of the Subordinated Creditors under the Subordination Agreement "shall remain in full force and effect irrespective of: (i) "any lack of validity or enforceability of any of the [loan documents relating to the Senior Debt] or

---

[2] A copy of the October 21, 2014, opinion of the New York Supreme Court is attached as Exhibit B to the Request for Judicial Notice filed by the Subordinated Noteholders.

[3] All capitalized terms used, but not defined herein, shall have the definition ascribed to them in the Subordination Agreement.

        ***"any exchange, release or nonperfection of any Lien on any Collateral,*** or any release, amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the Senior Indebtedness or any guarantee thereof". *Id.* §§ 7 (a) and (c) (emphasis added).

    d.    "The provisions of this Agreement shall continue in full force and effect notwithstanding the occurrence of any event contemplated under clause (a) of the definition of an "Insolvency Event." Insolvency Event expressly includes a bankruptcy filing by the Debtor. *Id.* §§ 1(b) and 11.

    e.    The Subordination Agreement is binding upon the Subordinated Noteholders in the event of an assignment of the rights by the Agent and the original lenders. *Id.* § 23.

    14.    These provisions, and in particular the Standstill Provision, make clear that the Subordinated Noteholders are contractually required to refrain from taking any action that would interfere with KMGI's rights pursuant to the Senior Loan Documents until the Senior Loan is paid in full. These provisions were violated by the Subordinated Noteholders when they filed their objection to the use of cash collateral. Because the only claims that the Subordinated Noteholders have against *this estate* are on account of the Subordinated Notes, the Court should find that the Subordinated Noteholders lack standing or have waived their right to assert the Objection.

### III.

### ARGUMENT

**A.    The Subordination Agreement Is Fully Enforceable in This Bankruptcy Case.**

    15.    Section 510(a) of title 11 of the United States Code (the "Bankruptcy Code") provides "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a). The New York Supreme Court, in a final non-appealable decision, has determined that the Subordination Agreement is enforceable with respect to the Subordinated Notes under applicable nonbankruptcy law and the Subordination Agreement expressly provides that it is fully enforceable in the event of a bankruptcy filing by the Debtor. Moreover, bankruptcy courts routinely enforce intercreditor agreement provisions limiting the rights of subordinated lenders.; Se*e, e.g., In re Electrical Components International, Inc.*, 2010 Bankr. LEXIS 5797, at* 26 (Bankr. D. Del. Apr. 2010); *Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund, Ltd.* (*In re Ion Media Networks,*

6

*Inc.*), 419 B.R. 585, 594-95 (Bankr. S.D. N.Y. 2009) (intercreditor agreement was "strictly enforceable in accordance with its terms" and subordinated creditor was prevented from being heard on issues in chapter 11 case in contravention of such agreement); *In re Bear Island Paper Co.*, No. 10-31202, 2011 Bankr. LEXIS 1884, at *69-71 (Bankr. E.D. Va. Mar. 30, 2011) (enforcing an intercreditor agreement to subordinate pre-petition liens); *In re Hendricks Furniture Group, LLC*, 2009 Bankr. LEXIS 5156, at *35-37 (Bankr. W.D. N.C. July 1, 2009) (enforcing a DIP lender's subordination agreement against junior lenders); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 140 (Bankr. D. N.J. 2010) (finding section 510 provides that a "subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law"); *In re Curtis Ctr. Ltd. P'ship*, 192 B.R. 648, 660 (Bankr. E.D. Pa. 1996) ("The terms of [the intercreditor] agreement are fully enforceable in this Bankruptcy case pursuant to 11 U.S.C. § 510(a) . . ."). The Subordination Agreement is fully enforceable in this Chapter 11 Case.

16. There is a strong public policy in favor of honoring subordination agreements in a bankruptcy proceeding. *Ion Media*, 419 B.R. at 595 ("Giving effect to the plain language of the Intercreditor Agreement . . . reinforces general principles of public policy. Affirming the legal efficacy of unambiguous intercreditor agreements leads to more predictable and efficient commercial outcomes and minimizes the potential for wasteful and vexatious litigation."). *Ion Media* emphasized that "plainly worded contracts establishing priorities and limiting obstructionist, destabilizing and wasteful behavior should be enforced and creditor expectations should be appropriately fulfilled." *Id*.

B. **The Objecting Subordinated Noteholders Lack Standing and Have Waived the Right to Object to the Use of Cash Collateral.**

17. The Subordination Agreement prohibits the Subordinated Noteholders from filing the Objection and asserting objections to the use of cash collateral. Therefore, the Subordinated Noteholders lack standing to assert their objections to the Debtor's use of cash collateral. In *In re Erickson Retirement Communities, LLC*, 425 B.R. 309, 314 (Bankr. N.D. Tex. 2010), the bankruptcy court held that a virtually identical standstill provision in the subordination agreements denied the subordinated creditors standing and/or they contractually waived their right to seek an examiner. In

*Erickson*, the "standstill" provisions in the subordination agreements were essentially the same as the Standstill Provision in the Subordination Agreement at issue here. The standstill provision in *Erickson* provided that the subordinated creditors could not "***exercise any rights or remedies or take any action*** or proceeding to collect or enforce any of the Subordination Obligations" without prior written consent from the senior secured lender until the senior loan was satisfied in full. *Id*. at 314 (emphasis added).

18. The agent for the senior secured lender argued that the subordinated entities "lack standing and/or have waived their right" to pursue a motion for appointment of an examiner "because they essentially agreed to stand still, be 'silent seconds,' and yield in all respects to the senior, secured lenders until the senior secured lenders are paid in full." *Erickson*, 425 B.R. at 314. The agent also observed that the request for an examiner was "an indirect demand for payment" in violation of the parties' subordination agreement. *Id*. Because "subordination agreements are interpreted and enforced in accordance with general contract principles," the court determined that a reasonable person in the position of the subordinated party would understand the meaning of the subordination agreement to be that, until the senior lenders were paid in full, the subordinated parties must "stand still." *Id*. at 315.

19. As parties to the Subordination Agreement, the Subordinated Noteholders lack standing and/or have waived their right to object to the Debtor's use of cash collateral. With standstill provisions virtually identical to those in *Erickson*, the Subordination Agreement prohibits the Subordinated Noteholders from ***"exercise[ing] any of their rights or remedies with respect to the Subordinated Indebtedness"*** and provide that until the Senior Loan has been paid in full, they will not "take, demand or receive from [Debtor] any payment of or security for the whole or any part of the Subordinated Indebtedness". §§ 2(b)(2) (emphasis added). The Subordinated Noteholders are similarly barred from interfering with the disposition of any collateral for the benefit of the Senior Lender, including the use of cash collateral or the granting of adequate protection.

20. The Subordination Agreement categorically prohibits the Subordinated Noteholders from objecting to the use of cash collateral as an action to enforce the Debtor's obligations to the Subordinated Noteholders and a prohibited attempt under section 2(b)(2) of the Subordination

Agreement to "*exercise any of their rights or remedies with respect to the Subordinated Indebtedness.*" (Emphasis added; *see Erickson*, 425 B.R. at 315 (finding that motion to appoint examiner was "tantamount to both a pursuit of a remedy and the commencement of an action (i.e. a contested matter) that is aimed, ultimately, at collection of [the subordinated creditor's] claims."). At bottom, the Objection and tactics are aimed at slowing down the sale and plan confirmation process "gaining leverage to enhance or create recoveries" for themselves -- "the very type of obstructionist behavior that the [subordination] agreements are intended to suppress." *Id.*; *see also Ion Media*, 419 B.R. at 595.

21. The Subordinated Noteholders agreed to the explicit and strict restrictions in the Subordination Agreement that were drafted to eliminate actions to gain leverage over the Senior Lender, such as objecting to the use of the Senior Lender's cash collateral and granting it adequate protection. In exchange for more than $21 million in cash payments, the Subordinated Noteholders knowingly waived all legal and statutory rights that conflict with their obligation to stand still until the Senior Loan is paid in full. Because the New York Supreme Court has ruled, in a final non-appealable decision, that the Subordination Agreement is fully enforceable with respect to the Subordinated Notes and the filing of the Objection is a clear violation of the Subordination Agreement, the Subordinated Noteholders lack standing to assert their objections to the use of cash collateral and the Objection should be disregarded and/or overruled.

22. The COAC Judgment, which the Subordinated Noteholders admit is the only claim they are seeking to enforce in connection with their Objection, does not provide the Subordinated Noteholders standing to file the objection because the COAC Judgment is not a claim against the Debtor's estate.

C. **Even If the Court Were to Consider the Merits of the Subordinated Noteholders' Objections, They Must be Overruled.**

23. Following the initial hearing on this Motion, and in order to streamline this case and focus on the substantive issues, the Debtor and KMGI reviewed the proposed form of order and agreed to simply seek approval of the Proposed Stipulation, which is twelve paragraphs long and is fully compliant with this Court's local rules and the Bankruptcy Code. Nonetheless, **the**

**Subordinated Noteholders have objected to numerous items that are not at issue.** Responses to the specific objections are set forth below:

| Objection | Response |
|---|---|
| "If the Proposed Order were entered, KMGI would have a valid claim, in a fixed amount, and not subject to challenge by any party" Objection at 18, lines 19-25. | *Untrue*. The Proposed Order provided a challenge period in which parties in interest could challenge all of the Debtor's stipulations. Nonetheless, KMGI agreed to remove all of the stipulations regarding the validity, priority, and amount of its claim and is fully prepared to address those issues in connection with confirmation of a plan. *None of these provisions are included in the Proposed Stipulation.* |
| "Creditors do oppose the use of estate property . . . to compensate insiders" | The only funds in the budget that are being paid to insiders are to the two new independent parties that have been engaged and for documented, actual out-of-pocket expense reimbursements for Mr. Kirkland. These individuals were obviously not "insiders" prepetition. The Subordinated Noteholders complain that Mr. Kirkland is not independent yet at the same time they object to paying outside parties who are. The Debtor has shown that it is an appropriate exercise of its business judgment to engage these parties and as such, their reasonable fees are appropriately part of the budget. *Absent a reasonable budget for payment of these expenses, the estate would be administratively insolvent.* |
| "Creditors do oppose the use of estate property . . . to compensate professionals who have not been employed and who have not filed fee applications" | Simply because a line item for a professional in the budget is included in the budget does not mean that the professional can be paid without approval of the Court. *The Debtor has sought or will seek approval to employ and pay all professional fees (including fees to Glass Ratner) and KMGI agrees to add language to the Proposed Stipulation confirming that position.* |
| "Creditors oppose a cumulative use provision requested for Debtor's budget"  "Debtor should be required to stay within the 10% variance per approved line item in its proposed budget" | *This Objection has no merit*. The budget is detailed by line item and the reference to "cumulative" accounts for the timing of payments and refers to the cumulative budget week over week for a given line item. For example, if the Debtor spends less than an amount that is budgeted for a given week, but incurs the expense for that line item in the following week, then the Debtor would not be in default simply because the payment was paid one week later. *The Debtor is required to stay within the 10% variance by line item, but can roll forward, within a line item, the weekly budgeted amounts.* |

DOCS_SF:89144.7 47518/001                          10

| | | |
|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10 | "Creditors oppose . . . Debtor's request to grant a replacement lien" | Because the Senior Lender's cash collateral is being consumed during the case, the Senior Lender is entitled to adequate protection. The proposed replacement lien is 1) *limited to the extent there is diminution of the value of the collateral, 2) only to the extent the prepetition lien is valid and enforceable, and 3) attaches only to collateral of the same type as the Senior Lender has a valid lien prepetition.* In addition, the Senior Lender will add a sentence to the Proposed Stipulation confirming that the proposed replacement lien is subordinated to the compensation and expense reimbursement (excluding professional fees) allowed to any trustee thereafter appointed in the case. **The replacement lien is consistent with Local Bankruptcy Rule 4001(c)(4)(B). The replacement lien maintains the status quo and does not improve the Senior Lender's position.** |
| 11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>26<br>27<br>28 | "Creditors do oppose the use of estate property to pay KMGI's legal fees." | What constitutes adequate protection must be decided on a case-by-case basis. *See Resolution Trust Corp. v. Swedeland Dev. Group (In re Swedeland Dev. Group)*, 16 F.3d 552, 564 (3d Cir. 1994); *MBank Dallas v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396 (10th Cir. 1987); *Martin v. United States (In re Martin)*, 761 F.2d 472 (8th Cir. 1985); *Shaw Indus. v. First Nat'l Bank (In re Shaw Indus).*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003); *In re Columbia Gas Sys., Inc.*, 146 B.R. 114 (Bankr. D. Del. 1992). The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See Swedeland*, 16 F.3d at 564 (**"[T]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained pre-bankruptcy."**)(Emphasis added) (*quoting O'Connor*, 808 F.2d at 1396); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 636 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).<br><br>Cash payments are a recognized form of adequate protection under section 361 of the Bankruptcy Code. *See* 11 U.S.C. § 361(1). The Senior Lender is entitled to the payment of their attorneys' fees under the terms of the Financing Agreement. *See* Financing Agreement § 12.04.<br><br>The Subordinated Noteholders assert that the estate is solvent which would entitle the Senior Lender to fees and interest under section 361. However, the Senior Lender believes that it is undersecured. The Senior Lender will |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| | |
|---|---|
| | agree that if it is determined that it is undersecured; the monthly payments will be applied to the principal of the debt. |
| "KMGI and the Debtors have not cited any legal authority for the carveout" | The common mechanism to assure that funds are available for the payment of fees in chapter 11 cases is a court approved carveout of the secured lenders' collateral in favor of estate professionals in cash collateral or financing orders.  *See, e.g., In re US Flow Corp.*, 332 B.R. 792, 795-96 (Bankr. W.D. Mich. 2005); *Harvis Trien & Beck, P.C. v. Federal Home Loan Mortgage Corp. (In re Blackwood Assocs., L.P.)*, 187 B.R. 856, 860 (Bankr. E.D.N.Y.1995), *aff'd*, 153 F.3d 61 (2d Cir.1998); *see also  In re Ames Dep't Stores*, 115 B.R 34, 38 (Bankr. S.D. N.Y. 1990) ("[I]t has been the uniform practice in this Court . . . to insist on a carve out from a super-priority status and post-petition lien in a reasonable amount designed to provide for payment of the fees of debtor's and the committees' counsel and possible trustee's counsel in order to preserve the adversary system.  Absent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced.").  **The objection to the carveout is without merit.** |
| "Additionally, Creditors oppose … the request for superpriority claim …." | Section 507(b) of the Bankruptcy Code provides that, where a debtor in possession provides adequate protection to the holder of a secured claim and "notwithstanding such protection," such holder has an allowable administrative claim arising from (among other things) the debtor's use of cash collateral, "then such creditor's claim … shall have priority over every other [administrative] claim …."  11 U.S.C. § 507(b).  Thus, the superiority claim is expressly contemplated in the Bankruptcy Code. **The objection to the superpriority claim is without merit.** |

## IV.

## **CONCLUSION**

For the reasons set forth above, KMGI respectfully requests that this Court overrule the Objection, approve the use of cash collateral by the Debtor, enter an order approving the Proposed Stipulation and grant such other relief as may be just and proper.

Dated:  November 6, 2015            PACHULSKI STANG ZIEHL & JONES LLP

By: _/s/ Kenneth H. Brown_
Kenneth H. Brown

Attorneys for KMGI, Inc.