203

WALTER & WILHELM LAW GROUP
a Professional Corporation
Riley C. Walter #91839
Michael L. Wilhelm #101495
Holly E. Estes #276933
205 E. River Park Circle, Ste. 410
Fresno, CA 93720
Telephone:    (559) 435-9800
Facsimile:    (559) 435-9868
E-mail:        rileywalter@W2LG.com
E-mail:        mwilhelm@W2LG.com
E-mail:        hestes@W2LG.com

Co-Counsel for Elaine Long and George Sarantos

BETTS, RUBIN & MCGUINNESS
James Betts #110222
907 Santa Fe Avenue, Suite 201
Fresno, CA  93721
Telephone:    (559) 438-8500
Facsimile:    (559) 438-6959
E-mail: br@bettsrubinlaw.com

Co-Counsel for Elaine Long

CORNWELL & SAMPLE
Stephen Cornwell #40737
7045 N. Fruit Ave.
Fresno, CA 93711
Telephone:    (559) 431-3142
Facsimile:    (559) 436-1665
E-mail: steve@cornwellsample.com

Co-Counsel for George Sarantos

IN THE UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| In re | CASE NO.  15-14017 |
| CLUB ONE CASINO, INC., | DC No.: WW-3 |
| Debtor in Possession. | Chapter 11 |
| TAX ID:        77-0370542<br>Address:        1033 Van Ness Avenue<br>                    Fresno, CA 93721 | Date:        December 22, 2015<br>Time:        3:00 p.m.<br>Place:        2500 Tulare Street<br>                    Fresno, CA  93721<br>                    Courtroom 13<br>Judge:        Honorable René Lastreto II |

EXHIBIT PAGE IN SUPPORT MOTION FOR SUBSTANTIVE
CONSOLIDATION OF BANKRUPTCY CASES 15-14017 AND
15-14021

00098368-PNV-11.20.2015

# EXHIBIT PAGE IN SUPPORT MOTION FOR SUBSTANTIVE CONSOLIDATION OF BANKRUPTCY CASES 15-14017 AND 15-14021

| Exhibit | Description | Pages |
|---|---|---|
| A | Declaration of George Sarantos In Support Of Opposition To Motion To Use Cash Collateral And Grant Adequate Protection, And Opposition To Stipulation Re: Final Order Authorizing Final Cash Collateral Use And Granting Adequate Protection [DC-78] | 5 |
| B | Declaration of Kyle Kirkland in Support of Motion to Use Cash Collateral and Grant Adequate Protection [DC-9] | 8 |
| C | Request for Judicial Notice in Support of Opposition to Motion to Use Cash Collateral and Grant Adequate Protection, and Opposition to Stipulation re: Final Order Authorizing Final Cash Collateral Use And Granting Adequate Protection [DC-77] ("Request for Judicial Notice"), Exhibit A (the "Arbitration Award"), Exhibit B ("New York Decision"), but excluding original Exhibit C. | 58 |
| D | Club One Casino, Inc.'s Schedules [DC-64] | 38 |
| E | Club One Casino, Inc.'s Statement of Financial Affairs [DC-65] | 27 |
| F | Club One Acquisition Corp. Schedules and Statement of Financial Affairs [DC-20] | 32 |
| G | COCI filed its Amended Schedules [DC-149] | 7 |
| H | Motion for Order Approving the Engagement Contract of Bill Hughes and Glass Ratner Advisory & Capital Group, LLC ("Glass Ratner") [DC-51] | 18 |
| I | Motion For Order Directing Joint Administration Of Related Cases Pursuant To Federal Rule Of Bankruptcy Procedure 1015(b) [DC-22] | 10 |

Dated: November 20, 2015

WALTER & WILHELM LAW GROUP,
a Professional Corporation

By: Holly E. Estes
Holly E. Estes,
Co-Counsel for Elaine Long and George Sarantos

# EXHIBIT A

**6**

WALTER & WILHELM LAW GROUP
a Professional Corporation
Riley C. Walter #91839
Holly E. Estes #276933
205 E. River Park Circle, Ste. 410
Fresno, CA 93720
Telephone:    (559) 435-9800
Facsimile:    (559) 435-9868
E-mail:        rileywalter@W2LG.com
E-mail:        hestes@W2LG.com

Co-Counsel for Elaine Long and George Sarantos

BETTS, RUBIN & MCGUINNESS
James Betts #110222
907 Santa Fe Avenue, Suite 201
Fresno, CA 93721
Telephone:    (559) 438-8500
Facsimile:    (559) 438-6959
E-mail: br@bettsrubinlaw.com

Co-Counsel for Elaine Long

CORNWELL & SAMPLE
Stephen Cornwell #40737
5703 N. West Avenue, Suite 101
Fresno, CA 93711
Telephone:    (559) 431-3142
Facsimile:    (559) 436-1665
E-mail: steve@cornwellsample.com

Co-Counsel for George Sarantos

## IN THE UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

| | |
|---|---|
| In re | CASE NO.  15-14017 |
| CLUB ONE CASINO, INC., | DC No.: KDG-1 |
| Debtor in Possession. | Chapter 11 |
| TAX ID:      77-0370542 | Date:      November 10, 2015 |
| Address:    1033 Van Ness Avenue | Time:      2:30 p.m. |
| Fresno, CA 93721 | Place:     2500 Tulare Street |
| | Fresno, CA  93721 |
| | Courtroom 13 |
| | Judge:     Honorable René Lastreto II |

DECLARATION OF GEORGE SARANTOS IN SUPPORT OF
OPPOSITION TO MOTION TO USE CASH COLLATERAL AND
GRANT ADEQUATE PROTECTION, AND OPPOSITION TO
STIPULATION RE: FINAL ORDER AUTHORIZING FINAL CASH
COLLATERAL USE AND GRANTING ADEQUATE PROTECTION

00096099-RCN-11.02.2015

**DECLARATION OF GEORGE SARANTOS IN SUPPORT OF OPPOSITION TO MOTION TO USE CASH COLLATERAL AND GRANT ADEQUATE PROTECTION, AND OPPOSITION TO STIPULATION RE: FINAL ORDER AUTHORIZING FINAL CASH COLLATERAL USE AND GRANTING ADEQUATE PROTECTION**

I, George Sarantos, hereby declare and represent as follows:

1.    In 1995, I and Charles "Bud" Long established Club One Casino, Inc. ("COCI"). Later Bud Long was replaced by his wife, Elaine Long, as a co-owner of COCI.

2.    In 2007, Messrs. Kirkland and Messina became interested in purchasing Club One. Eventually they offered $27 million to purchase the Club. The agreement provided that they would pay the sellers $22 million upon close and the owners would each carry back $2.5 million notes bearing interest at 10%.

3.    As part of the transaction the sellers were required to sign a Subordination Agreement subordinating the loan made by a hedge fund to the buyers. The Subordination Agreement provided that as long as Club One Acquisition Corp. ("COAC") and COCI had a certain minimal amount of cash on hand, and as long as the Fortress loan was not in default, the interest payments on the seller notes as well as payment on any other obligation could be made to Sarantos and Long even before the Fortress loan was paid in full.

4.    The purchase price adjustment was to be made as a result of an audit by the Casino's accountants which was to be concluded within three months of the sale. The sale closed February 22, 2008. The audit included accounting for the cash and chips of the Club to be sure that the buyers got what they purchased and that the sellers did not leave additional surplus cash in the casino.

5.    The accountants for the Club determined that the amount of the purchase price adjustment was $1,000,513.00. The sellers made a demand that the purchase price adjustment be paid. However, the buyers, Messrs. Kirkland and Messina, refused to pay the purchase price adjustment. As a result, Long and I filed a demand for arbitration in December of 2008.

6.    In July of 2011, the arbitration was resolved in favor of Sarantos and Long resulting in an arbitration award of $1,966,187.00. The final arbitration award included the purchase price adjustment ("PPA") plus interest, attorneys fees, costs and expenses.

7.    COAC had been created for this whole purpose in holding shares of COCI and to enable the purchase of the stock in the purchase and sale agreement.

8.    The original loan was through D.B. Zwirn Special Opportunities Fund, L.P., which loaned $22.5 million to Kirkland and Messina pursuant to a lending agreement. This loan would mature on February 22, 2012. The COAC stock was pledged as collateral for the loan. The loan by the hedge fund was personally guaranteed up to $7 million by Kirkland and Messina personally.

9.    The loan by D.B. Zwirn was transferred to Fortress.

10.    The total money involved in the sale was $22.5 million acquired from a senior lender, $5 million in notes provided by the buyers as well as $1 million of purchase price adjustment kept by Kirkland and Messina. As such for a $27 million purchase, they acquired $28.5 million of cash or value. So their initial investment in the company has been nothing.

11.    Following the entry of the arbitration award as a judgment by the California Superior Court, efforts at collecting the judgment were undertaken by my counsel. This led to the receipt of a letter from Fortress instructing COAC not to pay any award to Sarantos or Long on the premise that doing so would be a violation of the Subordination Agreement. It was subsequently determined in discovery in the New York action that this letter from Fortress had actually been drafted by Kirkland and Messina themselves. The letter demanded a cessation of interest payments on the seller notes to Sarantos and Long because "one or more defaults have occurred." The letter also stated that payment of the final arbitration award was barred by the subordination agreement due to the purported defaults.

DECLARATION OF GEORGE SARANTOS IN SUPPORT OF
OPPOSITION TO MOTION TO USE CASH COLLATERAL AND
GRANT ADEQUATE PROTECTION, AND OPPOSITION TO
STIPULATION RE: FINAL ORDER AUTHORIZING FINAL CASH
COLLATERAL USE AND GRANTING ADEQUATE PROTECTION

-3-

00096099-RCN-11.02.2015

12.     In 2008, reports indicated that COCI had more than adequate cash to pay the purchase price adjustment pursuant to the terms of the Subordination Agreement and as much as Club One had adequate cash reserves to satisfy the terms of the Subordination Agreement.   Nonetheless, Kirkland and Messina refused to make that payment.

13.     Kirkland and Messina then filed a lawsuit in the state of New York in Manhattan on January 9, 2012, seeking to block enforcement of the California judgment alleging that the Subordination Agreement prohibited payment by COAC to Sarantos and Long on the notes and on the arbitration award.   KMGI, Inc. was joined in that case.   COAC and KMGI, Inc. used the same law firm to represent their claims.

14.     In January of 2011, Kirkland and Messina formed KMGI, Inc. for the sole purpose of purchasing the Fortress loan.   Kirkland and Messina are the sole shareholders of KMGI, Inc.   Subsequent testimony from Mr. Kirkland indicates that KMGI, Inc. was funded with approximately $15 million of personal investment from Kirkland and Messina.

15.     In February of 2012, the Fortress note was allowed to go into a maturity default.   Kirkland and Messina then paid off the Fortress loan in full with accrued interest about six weeks after the note became due.   Utilizing KMGI, Inc., Kirkland and Messina could have arranged for a refinancing of the debt or simply a payoff of the loan but instead arranged for an assignment from Fortress of a loan in default.   This had significant repercussions in that this note in default, according to the terms of the note, allowed for penalty interest rate of 16.5%. After KMGI, Inc. had acquired the note in default, Kirkland and Messina released their own $7 million personal guarantees so they would not have to personally guarantee the defaulted loan now owned by KMGI, Inc.   Had they not released the guarantees the note would have been current in payments.

16.     The matter was tried in New York in March of 2014.   The New York court decided in favor of Sarantos and Long holding that the Subordination Agreement did

DECLARATION OF GEORGE SARANTOS IN SUPPORT OF
OPPOSITION TO MOTION TO USE CASH COLLATERAL AND
GRANT ADEQUATE PROTECTION, AND OPPOSITION TO
STIPULATION RE: FINAL ORDER AUTHORIZING FINAL CASH
COLLATERAL USE AND GRANTING ADEQUATE PROTECTION

00096099-RCN-11.02.2015

not preclude the collection of the judgment based on the Purchase Price Adjustment. The New York court found that Kirkland and Messina fully expected to lose the arbitration and intentionally reduced the amount of COCI's cash on hand in order for COAC to assert losing at the arbitration that the Subordination Agreement prohibited the payment of the Purchase Price Adjustment. The court further found that Kirkland and Messina failed to take reasonable measures to avoid a maturity default in the Fortress loan followed by their purchase of the Fortress loan as owners of KMGI, Inc. They paid themselves default interest on the purchase loan. The New York Court found that COAC and Kirkland and Messina breached in the implied covenant of good faith and fair dealing and that payment by COAC to Sarantos and Long on the California civil judgment is not prohibited by the Subordination Agreement. Sarantos and Long are currently each owed approximately $1,400,000.00 by COAC on the purchase price adjustment and approximately $3,560,000.00 on the seller carry-back notes.

17.    The bankruptcy was filed on Wednesday, October 14, 2015. My attorney in the underlying matter concerning the judgment obtained as a result of the purchase price adjustment is Stephen Cornwell. Mr. Cornwell prepared a motion to impose the COAC judgment against COCI based on principles of alter ego. This motion was to be heard on Thursday, October 15 one day after the bankruptcy was filed. Mr. Cornwell also filed a motion to have a receiver appointed to collect funds to pay off the judgment which was to be heard a week later.

I am over the age of eighteen and if I were called as a witness in connection with these proceedings I would testify as set out herein.

I so declare under penalty of perjury this _2_ day of November, 2015 at Fresno, California.

George Sarantos

# EXHIBIT B

8

HAGOP T. BEDOYAN, CSB NO. 131285
JACOB L. EATON, CSB NO. 244834
LISA A. HOLDER, CSB NO. 217752
KLEIN, DENATALE, GOLDNER,
   COOPER, ROSENLIEB & KIMBALL, LLP
5260 N. Palm Avenue, Suite 201
Fresno, California  93704
Telephone: (559) 438-4374
Facsimile:  (559) 432-1847
Email: hbedoyan@kleinlaw.com;
      jeaton@kleinlaw.com; lholder@kleinlaw.com

Proposed Attorneys for Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

In re:

CLUB ONE CASINO, INC.,

           Debtor-in-Possession.

Case No.  15-14017-B-11

Chapter  11

DC No.  KDG-1

Emergency Hearing Date: October 16, 2015
Emergency Hearing Time: 9:30 a.m.
Place:  United States Bankruptcy Court
       2500 Tulare Street, Fifth Floor
       Department B, Courtroom 12
       Fresno, California
Judge: Honorable Rene Lastreto II

## DECLARATION OF KYLE R. KIRKLAND IN SUPPORT OF MOTION TO USE CASH COLLATERAL AND GRANT ADEQUATE PROTECTION

I, Kyle R. Kirkland, declare as follows:

1.     I am the president, director and 40% shareholder of CLUB ONE ACQUISITION CORP. ("COAC").  CLUB ONE CASINO, INC. ("COCI" or "Debtor") is the wholly-owned subsidiary of COAC and files consolidated tax returns with COAC.  COAC filed a Chapter 11 case on October 14, 2015, Case No. 15-14021-B-11  COCI commenced the herein Chapter 11 case on October 14, 2015.

2.     I submit this declaration (the "Declaration") in support of COCI's *Motion to Use Cash Collateral and Grant Adequate Protection* ("Motion").  Except as otherwise indicated,

3HA755002

1

1    all statements in this Declaration are based upon my personal knowledge; my review of the

2    COCI and COAC's books and records, relevant documents and other information prepared or

3    collected by Debtor's employees; or my opinion based on my experience with Debtor's

4    operations and financial condition. In making my statements based on my review of Debtor's

5    books and records, relevant documents and other information prepared or collected by the

6    Debtor's employees, I have relied upon these employees recording, preparing or collecting any

7    such documentation and other information. If I were called to testify as a witness in this

8    matter, I could and would competently testify to each of the facts set forth herein based upon

9    my personal knowledge, review of documents, or opinion. I am authorized to submit this

10   Declaration on behalf of Debtor.

11        3.      I have been the president and director of Debtor since February of 2008, and

12   General Manager of COCI since June of 2009. I have over 20 years of experience in the

13   California gaming industry. I am also the former chairman and director of Steinway Musical

14   Instruments, Inc. Prior to my role at Steinway Musical Instruments, Inc., I was employed in the

15   finance industry. I received an M.B.A. from Stanford University in 1988 and graduated from

16   Harvard College in 1984, magna cum laude in economics.

17        4.      Debtor was incorporated on March 28, 1994, for the purpose of operating an

18   entertainment complex located in downtown Fresno called Club One Casino. Club One Casino

19   began operation in November 1995 and includes a gaming facility, bar, restaurant and banquet

20   facilities, administration, satellite wagering, and security offices. The gaming facility includes

21   51 card-tables contained in designated settings that allow patrons to engage in various table

22   games as allowed under state law. Over its two decades in business, the Debtor has grown to

23   become a significant community presence, a substantial taxpayer and a major employer in the

24   Fresno area: it currently has about 280 active employees with a semi-monthly gross payroll of

25   approximately $265,000.00.

26        5.      COCI, a California S corporation, was founded by Sarantos and Charles "Bud"

27   Long in 1994. In 2002, Long transferred his 50% interest in COCI to his wife, Elaine. In July

28   of 2006, Sarantos, Elaine, and I, as principal for Kirkland Messina, Inc., signed a Letter of

1  Intent ("LOI") providing that a newly formed company would purchase COCI from Sarantos

2  and Elaine for $27,000,000.  The sale was concluded in 2008 under the terms of a certain

3  Acquisition Agreement described below.

4       6.     COCI is a wholly owned subsidiary of COAC".  COAC was created for the sole

5  purpose of holding the shares of COCI, which allowed the Senior Lender to hold a security

6  interest in COAC's shares of COCI.  The shares of COAC are owned by individuals licensed

7  by the State of California and the City of Fresno to engage in gaming activities.  COAC, like

8  COCI, is an "S" corporation and both use an accrual basis of accounting.

9       7.     COCI derives the majority of its annual income from its gaming operations.

10  COCI's gross receipts for 2013 and 2014 were $12,990,230 and $14,492,845, respectively.

11  COCI and COAC generated EBITDA of $274,605 and $460,058 during these same years,

12  respectively.

13       8.     In addition to me, William "Bill" Zender of Bill Zender & Associates, LLC, a

14  noted gaming and regulatory consultant, is Debtor's only other director.  Mr. Zender became an

15  independent director of COCI pursuant to the terms of a Casino Management Services

16  Agreement Dated October 1, 2015, between Debtor and COAC and Bill Zender and Associates

17  LLC ("Zender Agreement").  COCI will seek approval of the Court for Zender to continue as

18  the director of COCI throughout this case under the terms of the Zender Agreement.

19       9.     Bill Hughes of GlassRatner Advisory & Capital Group, LLC,. is Debtor's Chief

20  Restructuring Officer.  Hughes is an officer of Debtor but not a director.  Until very recently,

21  Dana Messina ("Messina") was also a director and officer of the COCI, but he resigned on

22  August 10, 2015.

23       10.     I serve as the day to day general manager of COCI pursuant to a management

24  agreement, but have never received a salary or management fee, despite the fact that I spend in

25  excess of 70 hours per week managing the day to day operations of COCI's casino and

26  attending to operational and industry issues.  COCI accrues management fees for my services

27  in its books, but it has never been paid to me nor my predecessor, Kirkland Messina, Inc.

28  However, my monthly out of pocket expenses are reimbursed by COCI.  I am also the President

3HA755002

3

1  of the California Gaming Association, a statewide trade association that represents California

2  card rooms.

3      11.    COCI's primary assets are its gaming licenses, cash on hand, bank deposits,

4  accounts receivable, kitchen, surveillance and gaming equipment, furnishings, and food and

5  beverage inventory.

6      12.    COCI's largest senior and secured creditor is KMGI, Inc., which is currently

7  owed approximately $24,290,150.00 (the "Senior Loan").  The Senior Lender is a special

8  purpose company which, on April 11, 2012, after receiving approval from the California

9  Gambling Control Commission, purchased the Senior Loan previously held by D.B. Zwirn

10  Special Opportunities Fund, L.P. ("Zwirn") and later Fortress Value Recovery Fund I LLC.

11  ("Fortress").  The Senior Lender purchased the Senior Loan – which had already matured and

12  been declared in default – in order to satisfy guarantees in favor of Fortress and because it

13  believed it could be more flexible with Sarantos and Elaine in restructuring the debts of the

14  business. Efforts to refinance with third parties or to extend with Fortress the Senior Loan were

15  unsuccessful.  The Senior Lender is an entity jointly held by Messina and me.  Messina has sole

16  voting authority for the Senior Lender.

17      13.    In connection with the sale, Sarantos and Elaine *each* received approximately

18  $10,700,000 in cash and a seller note for $2,500,000 due February 22, 2015.  Elaine also

19  received several million dollars of additional cash that had been paid into an escrow account

20  when her husband, Long, was unable to receive payments from COCI after being convicted of

21  a tax-related felony.  In total, over $22,000,000 in cash was distributed to Sarantos and Elaine

22  at the close of escrow.  An additional $1,600,000.00 in interest on the seller notes was paid to

23  Sarantos and Elaine after the close of escrow.

24      14.    In connection with the Acquisition Agreement, COAC, Sarantos, Elaine and the

25  Senior Lender entered into a Seller Subordination Agreement dated February 22, 2008 (the

26  "Subordination Agreement").  Sarantos and Elaine are subordinated creditors under the

27  Subordination Agreement. The scope of the Subordination Agreement was the subject of

28  litigation in New York where it was determined by final, non-appealable order that the Seller

3HA755002                                 4

1  Notes owned by Sarantos and Elaine are subordinated to the Senior Loan and such Seller Notes

2  shall not receive payment until the Senior Loan is repaid in full.

3       15.     Subsequent to the close of sale, there was a dispute between COAC and the

4  sellers, Sarantos and Elaine, regarding an additional $1,000,513 (less than 4% of the purchase

5  price). COAC, Sarantos and Elaine arbitrated the dispute pursuant to the arbitration provisions

6  of the Acquisition Agreement. On July 8, 2011, the arbitrator awarded $1,000,513 to Sarantos

7  and Elaine as well as attorneys' fees, costs and expenses (the "Arbitration Award"). The

8  Arbitration Award was confirmed by the Fresno County Superior Court and reduced to a

9  Judgment on September 26, 2011, with an amended Judgment correcting certain typographical

10  errors being entered on November 8, 2011 (Case No. 11 CE CG 02432). With the accrual of

11  interest and costs, the Arbitration Award against COAC has grown to approximately

12  $1,379,929 as to Elaine and another $1,378,938 as to Sarantos. However, the Arbitration

13  Award is not a claim against the Debtor's estate. Only COAC is liable for the Arbitration

14  Award.

15       16.     After confirmation of the Arbitration Award by the Fresno County Superior

16  Court, in January 2012, COAC and its lender sought declaratory and injunctive relief to (a)

17  declare the Arbitration Award as to COAC to be governed by the Subordination Agreement; (b)

18  block payment of the Arbitration Award as required under the Subordination Agreement; and

19  (c) to obtain a declaration that the Subordination Agreement prohibits the demand for, or

20  payment of, both the Arbitration Award and the Seller Notes until the Senior Loan is paid in

21  full. After a bench trial on March 24-26, 2014, the New York trial court (Index No.

22  650049/2012), in its Post-Trial Decision and Order dated October 21, 2014, (a) dismissed

23  COAC's complaint; (b) declared that no payment of interest or other payments of the

24  subordinated notes to Sarantos and Elaine may be paid prior to payment in full of the Senior

25  Loan; (c) declared that the Subordination Agreement does not bar payment by COAC of either

26  the Arbitration Award or the California judgments confirming the Arbitration Award; and (d)

27  held that Sarantos and Elaine were the prevailing parties, but the matter of attorney's fees

28  recoverable from COAC would be referred to a Special Referee (the "New York Judgment").

3HA755002                   5

1    The Special Referee would decide if any payments were appropriate, and if so, in what amount.

2    As of this date, the Special Referee has not made a ruling regarding legal fees. On August 19,

3    2015, a portion of the New York Judgment relating to the impact of the Subordination

4    Agreement on COAC's ability to satisfy the Arbitration Award or related judgments was

5    appealed by COAC and KMGI to the Appellate Division of the New York Supreme Court.

6    That appeal is pending. Neither Sarantos nor Elaine appealed the New York Judgment. Thus,

7    the New York Court's findings that the Seller Notes are subordinated to the Senior Loan are

8    final and non-appealable.

9        17.    In May of 2015, Sarantos and Elaine sought to amend their existing complaint

10    against COAC, in Case No. 11 CE CG 02432, to add COCI as the alter-ego of COAC, and for

11    other relief including a TRO, a preliminary injunction and the appointment of a receiver.

12    Hearings in the matter were continued twice to October 15, 2015, and October 22, 2015

13    (Receivership Motion).

14        18.    In a separate lawsuit initiated by Sarantos against Messina, KMGI and me (Case

15    No. 13CE CG 02124 MWS), Sarantos sought and obtained a TRO against COAC, KMGI and

16    their agents. (KMGI has since been dismissed from the lawsuit). The hearing to have a

17    Preliminary Injunction issued in this separate proceeding was also continued twice and is now

18    scheduled for November 6, 2015.

19        19.    On August 12, 2015 the Attorney General of the State of California filed an

20    Accusation against the Clovis 500 Club. The Attorney General accused the Louis Sarantos, Jr.

21    dba the Clovis 500 Club of engaging in an undisclosed, unapproved financing scheme to

22    expand its business in violation of state gaming regulations. The Attorney General is seeking

23    to have Louis Sarantos' license revoked and the gaming license of the Clovis 500 Club

24    cancelled. The owners and financial stakeholders of the Clovis 500 Club include George

25    Sarantos, his brother Louis and several former employees of COCI who were long time

26    associates of Sarantos.

27        20.    A precipitating factor in the filing of COCI's and COAC's' Chapter 11 cases has

28    been the expansion of the Clovis 500 Club which was completed using a clandestine financing

3HA755002                      6

1    scheme alleged to be unlawful.  The expansion of this facility caused a substantial drop in

2    revenue and operating income of COCI. On August 26, 2015, COCI and COAC filed a

3    complaint in the Fresno County Superior Court (Case No. 15 CECG 02704) for damages

4    against Louis Sarantos, an individual and doing business as the Clovis 500 Club and 500 Club

5    Casino, and Sarantos for unfair competition and several other theories, including breaches of

6    fiduciary duty and a non-competition agreement by Sarantos.  The relocation and expansion of

7    the Clovis 500 Club using unlawful financing by Sarantos and Sarantos' brother, Louis, has had

8    a major negative impact on the revenues of COCI.

9         21.    COCI and COAC were forced to seek relief under Chapter 11 in order to avoid

10   the potential appointment of an unlicensed receiver to reorganize its business and perhaps end

11   the years of unproductive litigation.

12        22.    **Emergency Use**.  To avoid immediate and irreparable harm to the Debtor and

13   its estate pending a final hearing, Debtor requests interim authorization to use $1,59,165.00

14   from October 15 through November 15 (with a 10% variance) or through a final hearing on the

15   Motion as described in the Budget.  Debtor also requests authorization to use the cumulative

16   amounts provided in each category of the Budget through March 31, 2016.

17        23.    In the event the Court does not approve cash collateral use through March 31,

18   2016, Debtor reserves the right to submit amended budgets and will request periodic

19   continuances of the interim cash collateral hearing and ongoing cash collateral use until such

20   time as the Court approves final cash collateral use through March 31, 2016.

21        24.    **Urgent need for cash collateral**. As stated above, Debtor owns and operates a

22   51 table license gaming operation in Downtown Fresno that is open 24 hours/day that relies

23   exclusively on the availability of cash to operate.  The immediate and irreparable harm that will

24   befall Debtor if it does not obtain the use of Cash Collateral is (a) Debtor will be unable to

25   honor its obligations to its gaming customers thereby violating California gaming laws, (b)

26   Debtor will be unable to purchase food, alcohol, and other inventory good required in order to

27   operate, (c) Debtor will be unable to pay its employees, and (d) Debtor will be unable to pay its

28   utility bills, royalty fees and insurance premiums all of which would cause immediate crises to

3HA755002                                7

1   Debtor's ability to maintain its business, and effectively shut Debtor down.  Each item on the

2   Budget was carefully considered and deemed by Debtor's principals to be necessary to

3   Debtor's continued operation.

4        25.    Debtor and I are aware of no other creditor asserting an interest in "cash

5   collateral" other than KMGI.  Debtor will provide KMGI with adequate protection by

6   continuing to operate its business, generating income, giving a replacement lien on post-

7   petition assets of like kind and to the same extent as existed prior to the commencement of

8   Debtor's case, and monthly adequate protection payments in the amount of $50,000.00.

9        26.    I have reviewed the Interim Order attached to the Motion and agree to the terms

10  contained in the Interim Order.

11       27.    For all of the foregoing reasons, I respectfully request that the Court grant the

12  relief requested in the Motion filed concurrently herewith.

13       I declare under penalty of perjury that the foregoing is true and correct to the best of my

14  knowledge.

15  Executed this 15th day of October, 2015 in Fresno, California.

16

17                              _____

18                              Kyle R. Kirkland

19

20

21

22

23

24

25

26

27

28

3HA755002                           8

ORIGINAL

# EXHIBIT C

87

WALTER & WILHELM LAW GROUP
a Professional Corporation
Riley C. Walter #91839
Holly E. Estes #276933
205 E. River Park Circle, Ste. 410
Fresno, CA 93720
Telephone:   (559) 435-9800
Facsimile:    (559) 435-9868
E-mail:        rileywalter@W2LG.com
E-mail:        hestes@W2LG.com

Co-Counsel for Elaine Long and George Sarantos

BETTS, RUBIN & MCGUINNESS
James Betts #110222
907 Santa Fe Avenue, Suite 201
Fresno, CA 93721
Telephone:   (559) 438-8500
Facsimile:    (559) 438-6959
E-mail: br@bettsrubinlaw.com

Co-Counsel for Elaine Long

CORNWELL & SAMPLE
Stephen Cornwell #40737
5703 N. West Avenue, Suite 101
Fresno, CA 93711
Telephone:   (559) 431-3142
Facsimile:    (559) 436-1665
E-mail: steve@cornwellsample.com

Co-Counsel for George Sarantos

IN THE UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| In re | CASE NO.  15-14017 |
| CLUB ONE CASINO, INC., | DC No.: KDG-1 |
| Debtor in Possession. | Chapter 11 |
| TAX ID:      77-0370542<br>Address:    1033 Van Ness Avenue<br>                    Fresno, CA 93721 | Date:     November 10, 2015<br>Time:     2:30 p.m.<br>Place:    2500 Tulare Street<br>              Fresno, CA  93721<br>              Courtroom 13<br>Judge:   Honorable René Lastreto II |

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION
TO MOTION TO USE CASH COLLATERAL AND GRANT ADEQUATE
PROTECTION, AND OPPOSITION TO STIPULATION RE: FINAL
ORDER AUTHORIZING FINAL CASH COLLATERAL USE AND
GRANTING ADEQUATE PROTECTION

00096100-RCN-11.02.2015

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION TO MOTION TO USE CASH COLLATERAL AND GRANT ADEQUATE PROTECTION, AND OPPOSITION TO STIPULATION RE: FINAL ORDER AUTHORIZING FINAL CASH COLLATERAL USE AND GRANTING ADEQUATE PROTECTION**

Creditors, George Sarantos ("Sarantos") and Elaine Long ("Long") (together "Creditors") respectfully requests that the Court take judicial notice of Exhibits "A" through Exhibits "C" attached to the Exhibits to the Request for Judicial Notice In Support of Creditors Opposition to Motion to Use Cash Collateral and Grant Adequate Protection, Opposition to Stipulation re: Final Order Authorizing Cash Collateral Use and Granting Adequate Protection, and by this reference incorporated herein.

**Exhibit "A"** is American Arbitration Association Commercial Arbitration Tribunal Interim Award.  (Case Name: George Sarantos; Elaine Long v. Club One Acquisition Corp.; Case No.: 74 180 Y 000008 09 S1M).

**Exhibit "B"** is Supreme Court of the State of New York County of New York: Commercial Division Part 49 Post-Trial Decision and Order. (Case Name: Club One Acquisition Corp. v. George Sarantos and Elaine Long; Index No.: 650049/2012).

**Exhibit "C"** is Declaration of Charles A. Hansen in Support of Motion for Preliminary Injunction. (Case Name: George Sarantos v. Kyle Kirkland; Dana Messina; KMGI, Inc.; Case No.: 13CECG02124 MWS).

///
///
///
///
///
///
///
///
///
///

Attached to the Exhibits to the Request for Judicial Notice In Support of Creditors Opposition to Motion to Use Cash Collateral and Grant Adequate Protection, Opposition to Stipulation re: Final Order Authorizing Cash Collateral Use and Granting Adequate Protection are true and accurate copies of the above records. These records are judicially noticeable pursuant to FRE 201(b), as records of the court which are generally known within the jurisdiction of this Court and capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. (BP West Coast Prods. LLC v. Greene, 318 F.Supp.2d 987, 994 (E.D. Cal. 2004).)

Dated: November 2, 2015

WALTER & WILHELM LAW GROUP,
a Professional Corporation

By: _Holly E. Estes_

Holly E. Estes,
Co-Counsel for George Sarantos and Elaine Long

# EXHIBIT A

AMERICAN ARBITRATION ASSOCIATION

COMMERCIAL ARBITRATION TRIBUNAL

GEORGE SARANTOS; ELAINE LONG,

        Claimants

           v.

CLUB ONE ACQUISITION CORP.,

        Respondent

Case No.: 74 180 Y 000008 09 S1M

INTERIM AWARD

    I, THE UNDERSIGNED ARBITRATOR, having been duly designated in accordance with the arbitration agreement in Section 15.10 of an Agreement for Purchase and Sale of Stock entered into as of February 24, 2007 between Club One Acquisition Corp., a California corporation, as Buyer, and George Sarantos and Elaine R. Long, as Sellers, and having heard the proofs and arguments of the parties, do hereby enter this Interim Award as follows:

## I

### Preliminary Statement

    This arbitration arises from the sale by Claimants George Sarantos and Elaine Long ("Claimant Sellers") to Respondent Club One Acquisition Corp. ("Respondent Buyer") of a licensed card room known as Club One Casino in Fresno, California for $27 million pursuant to an Agreement for Purchase and Sale of Stock entered as of February 24, 2007 (the "PSA"). Claimant Sellers seek to recover $1,000,513.00 of Closing Date Cash they allege was due and owing under the terms of the PSA following the sale. Respondent Buyer, contending that Claimant Sellers breached various terms of the Agreement and fraudulently failed to disclose certain material facts regarding the

financial condition of the Casino, has counterclaimed, seeking a reduction of the $27 million purchase price by approximately $4.5 million. As amplified in a "Supplemental Brief Re Damages", Respondent seeks to recover two items of damages: a) "damages caused by the misrepresentations and inaccuracies in the Sellers' financial statements provided to the Buyer *prior to closing*;" and b) "[f]inal adjustments to the purchase price pursuant to paragraph 3.5.1 of the [PSA] which the parties agreed would be made after the Closing Balance Sheet was audited." The principal issues encompassed by Respondent's counterclaim are a) whether Claimant Sellers misrepresented that certain financial statements for the Casino were in compliance with Generally Accepted Accounting Principles ("GAAP"); b) whether the financial statements inaccurately represented the financial condition and performance of the Casino; and c) whether certain cash that had been set aside as a cushion to cover excess chip liability of the Casino was due and payable to Claimant Sellers upon closing of the sale as part of Closing Date Cash.

<div align="center">II</div>

<div align="center"><u>Procedural Background</u></div>

This arbitration is proceeding under the following arbitration clause in Section 15.10 of the PSA:

> **Binding Arbitration.** Any dispute arising out of or in connection with the interpretation, enforcement, or performance of this Agreement (including but not limited to, adjustments to the Purchase Price or entries on the Closing Data Balance Sheets) shall be submitted to binding arbitration before a single arbitrator in San Francisco, California or, at the option of Purchaser, Fresno, California under the rules of the American Arbitration Association. There shall be limited discovery prior to the arbitration hearing as follows: (a) exchange of witness lists and copies of documentary evidence and documents relating to or arising out of the issues to be arbitrated, (b) depositions of all party witnesses and (c) such other depositions as may be allowed by the arbitrator upon a showing of good cause. Depositions shall be conducted in accordance with the California Code of Civil

Procedure, the arbitrator shall be required to provide in writing to the parties the basis for the award or order of such arbitrator, and a court reporter shall record all hearings, with such record constituting the official transcript of such proceedings.

The applicable arbitration rules are the Commercial Arbitration Rules of the American Arbitration Association ("Association") in effect at the time the arbitration was filed.

Claimants filed their respective Demands for Arbitration on December 30, 2008, each seeking to recover their 50% portion of an alleged $1,000,513.00 upward adjustment to the purchase price for the Casino due and owing pursuant to Section 3.5.1 ("Purchase Price Adjustments") of the PSA. Respondent Buyer filed its Response and Counterclaim on January 8, 2009, alleging that Claimant Sellers had made misrepresentations, overstated net income and hid the Casino's declining income and true financial condition by producing false and fraudulent financial statements, resulting in Respondent having overpaid for the Casino by as much as $6 million. By agreement of the parties, Claimants' claims were consolidated by the Association for purposes of this proceeding. The undersigned arbitrator was appointed by the Association as sole arbitrator on or about March 19, 2009, and an initial preliminary hearing was held on April 22, 2009.

During the course of this arbitration Procedural Orders Nos. 1 through 17 were entered to address various procedural and discovery issues which orders are made part of the record of this arbitration. The parties engaged in mutual discovery, including exchange of documents and several depositions of party representatives, percipient witnesses and experts. The hearings were originally scheduled to commence on December 14, 2009 but were continued until April 26, 2010 on Claimants' motion due to delays in production of documents. The hearings were again continued to July 12, 2010 by stipulation of the parties due to further delays in completing discovery. However, the hearings could not proceed in July due to the illness of counsel for one of the parties, and new hearings were set to commence on October 4, 2010. Following submittal of pre-hearing briefs by the parties, evidentiary hearings were held on October 4, 5, 6, 7, and 8, November 29 and 30, and on December 1 and 21, 2010. Each side called various

percipient and expert witnesses to testify both on direct and cross-examination. Various documentary exhibits were admitted into evidence. Only the November and December hearings have been transcribed by a certified shorthand reporter. Following the hearings, the parties each submitted a post-hearing brief, as well as a reply to the other party's post-hearing brief, plus subsequent letters of clarification. The hearings were declared closed as of March 16, 2011.

Certain additional claims raised by Respondent during the course of these proceedings were added by amendment relating to alleged fire code and American Disability Act violations on the Casino property, which the parties have agreed to bifurcate and defer pending issuance of an interim award on the principal claims addressed herein. Also, the parties have agreed to bifurcate presentation of evidence and any determination regarding the amount of any award of prevailing party attorney's fees and costs until after an interim award on the merits has been issued.

The hard work, advocacy, and courtesy of counsel throughout these proceedings has been appreciated.

### III

### Factual Background

What follows is not intended as a comprehensive or detailed statement of all of the evidence presented at the hearings, but only as a summary of the essential facts derived from the evidence that inform the determinations made below.

Claimant George Sarantos is the founder of a licensed card room casino in Fresno known as Club One Casino which by the time of the subject transaction had grown into a lucrative forty-nine table operation. In 2002 his 50% partner, Bud Long, transferred his one-half interest in the Casino to his wife, Elaine R. Long, because Mr. Long had become ineligible to hold a State Gambling License due to a felony conviction for making false tax returns. The state regulatory authorities, however, refused to license Ms. Long because of her continued affiliation with her husband. Mr. Sarantos did not want to buy out Ms. Long's interest and so they undertook to sell the casino. Eventually in the Spring of 2006, a mutual acquaintance and experienced, successful entrepreneur in the California gaming industry, Haig Kalegian, introduced Mr. Sarantos and Ms. Long to

4

Respondent Club One Acquisition Corp's principals, Kyle Kirkland and Dana Messina as prospective purchasers.

Messrs. Kirkland and Messina are sophisticated and experienced businessmen, both of whom started their careers at Drexel Burnham Lambert. Mr. Kirkland has an MBA degree from Stanford, and Mr. Messina has an MBA degree from Harvard. Through their firm, Kirkland & Messina, Inc., they have successfully acquired large companies such as the Selmer Company (musical instruments), Steinway & Sons (pianos), and Utilimaster (largest producer of walk-in vans such as are used by Federal Express and UPS). Among his various other business activities, Mr. Kirkland has provided consultation with respect to the financing and management of various California and Nevada gaming establishments. Mr. Messina has provided consultation to the U.S. Government on business valuations of large companies with respect to ESOP's.

Various letters of intent ("LOI") were circulated between the parties during March-July, 2006, with a final LOI executed July 17, 2006. During one such iteration Claimant Sellers proposed a price based on a multiple of earnings, but that was rejected by Respondent Buyer as too complicated. Throughout the negotiations, Claimant Sellers consistently maintained a selling price of $27 million.

An Agreement for Purchase and Sale of Stock ("PSA") was eventually executed on February 24, 2007. The PSA contemplated a 6 month period during which the Respondent Buyer would complete "to its satisfaction its due diligence review of the Company, the condition of the Assets and Business and all matters contained in the Disclosure Statement and identified on the schedules and exhibits to [the PSA]." PSA, Section 8.8. As it turned out, due to various delays in the closing, the due diligence period lasted nearly two years.

The PSA contained, in pertinent part, the following provisions that are implicated by the parties' claims.

> 3.2    **Purchase Price.** As payment for the Shares (other than any Exchanged Shares) and the Sellers' obligations under this Agreement, Buyer shall pay the Sellers twenty-seven million

dollars ($27,000,000) in the aggregate, subject to adjustment as provided under this Paragraph 3 (the "Purchase Price").

3.3    **Payment of Purchase Price.** At Closing, the Purchase Price shall be paid as follows: (a) the Deposit shall be paid to the Sellers in accordance with the Escrow Agreement, with one hundred twenty-five thousand dollars ($125,000) being paid to each of the sellers in cash at the Closing by wire transfer in same day available funds . . .; (b) ten million eight hundred seventy-five thousand dollars ($10,875,000), plus or minus 50% of any adjustments as provided for in Paragraph 3.5, shall be paid in cash at Closing by wire transfer in same day available funds . . . [to Elaine Long]; (c) ten million eight hundred seventy-five thousand dollars ($10,875,000), plus or minus 50% of the adjustments as provided for in Paragraph 3.5, minus the Exchange Right Amount (as defined below), shall be paid in cash at the Closing by wire transfer in same day available funds . . . [to George Sarantos]; and (d) five million dollars ($5,000,000) paid pursuant to the terms of the two (2) $2,500,000 10% promissory notes due seven (7) years from the Closing Date to be issued at the Closing to Buyer, one to each of Elaine R. Long and George Sarantos, in the form of Exhibit 3.3(c), subject to adjustment as provided therein and in this Agreement (the "Notes").

3.4    **Balance Sheets.** Following the Closing, Buyer shall cause the Company's accounting firm to review the Company's books and records as of the Closing Date ("Closing Audit") and to deliver, within 90 days following the Closing Date, the balance sheet for the Company as of the Closing Date ("**Closing Date Balance Sheet**") to Buyer and the Sellers. The Closing Date Balance Sheet shall be prepared on a "reviewed" basis in accordance with

6

generally accepted accounting principals [sic] ("GAAP") and shall include (a) all appropriate accruals and reserves in accordance with GAAP to the extent applicable, including without limitation adequate reserves for "Chip Liability" (as defined below), bad debts, self insured retentions ("SIR") and employee vacation and/or benefit accruals, and (b) a pro rata allocation for each bonus or other incentive compensation payable to any Company employee, based on the ratio of (i) the number of days from the beginning of the Company's fiscal year in which the Closing occurs to the Closing Date and (ii) the number of days from the beginning of the Company's fiscal year in which the Closing occurs to the date on which such bonus or other incentive compensation is then due. "Chip Liability" shall mean chip liability, calculated in accordance with past practice, of the Company as shown on the balance sheet included in the compiled financial statements of the Company for the fiscal year ended December 31, 2006.

3.4.1    **Closing Date Cash**.  For purposes of this Agreement, the term "Closing Date Cash" means the cash, cash equivalents (other than the Company's accounts receivable) and prepaid expenses, if any, which reasonably benefit the Company following the Closing, shown on the Closing Date Balance Sheet, <u>minus</u> the fees incurred by the Company, whether before, on or after the Closing, in the preparation of the Closing Date Balance Sheet.

3.4.2    **Balance Sheet Liabilities**.  For purposes of this Agreement, the term "Balance Sheet Liabilities" means the aggregate amount of all liabilities shown on the Closing Date Balance Sheet.

\*   \*   \*

7

3.5    **Adjustments to Purchase Price.**  The Purchase Price shall be adjusted as set forth below:

3.5.1 **Purchase Price Adjustments.**  The Purchase Price shall be increased or decreased as follows:

(a)    <u>increased</u> by the amount of the Closing Date Cash;

(b)    <u>decreased</u>, dollar for dollar, by the amount the Balance Sheet Liabilities and any other amounts outstanding, whether consisting of principal, interest, penalty or other costs or expenses, under any indebtedness or similar obligations of the Company as of the Closing Date;

(c)    <u>decreased</u> by three hundred ten thousand dollars ($310,000);

(d)    <u>decreased</u> by 50% of the Fresno Tax adjustment;

(e)    <u>decreased</u> to the extent the Closing Date Balance Sheet does not conform to GAAP; and

(f)    <u>increased</u> by the Section 338 (h) (10) Adjustment Amount.

\* \* \*

3.5.2 **Adjustment Disputes.**  If Buyer and the Sellers are unable to agree on adjustments to the Purchase Price, including disagreements regarding any entries on the Closing Date Balance Sheet, then the dispute shall be resolved in accordance with <u>Paragraph 15.10</u>.

3.5.3 **Payment.**  The adjustment of the Purchase Price determined in accordance with clause (d) of <u>Paragraph 3.5.1</u> shall reduce the cash amount of the Purchase Price payable at closing to both Sellers. Any net positive adjustment to the Purchase Price determined in accordance with clauses (a), (b), (c), (e) and (f) of <u>Paragraph 3.5.1</u> shall be paid by wire transfer by Buyer, 50% to each Seller, following the Closing promptly after determination or resolution of

8

any disagreements for which adjustments to the Purchase Price are permitted pursuant to Paragraph 3.5.1 above, whichever occurs later.  Any net negative adjustment to the Purchase Price determined in accordance with clauses (a), (b), (c), (e) and (f) of Paragraph 3.5.1 shall be reduced 50% from the principal amount of each of the Notes.

\* \* \*

4.     **Representations and Warranties of the Sellers.**   Subject to the matters set forth in the Disclosure Statement attached as Schedule 4 to this Agreement (the "**Disclosure Statement**"), the Sellers, jointly and severally, make the representations and warranties to Buyer set forth below.  As used in this Agreement, (a) "the Knowledge of the Company" or similar phrases shall mean events, circumstances or facts actually known or which should have been known after reasonable inquiry, by George Sarantos and (b) "the knowledge of the Sellers" or similar phrases shall mean events, circumstances or facts actually known by such Seller solely with respect to such Seller.

\* \* \*

4.3     **Financial Statements.**    Part 4.3 of the Disclosure Statement sets forth the compiled financial statements of the Company for the fiscal years ended December 31, 2003, December 31, 2004, and December 31, 2005, comprised of balance sheets of the Company as of such dates, together with statements of income and retained earnings. Following the execution of this Agreement, the Sellers shall cause the Company to furnish to Buyer the periodic unaudited monthly financial statements of the Company through the Closing Date.  To the best of the knowledge of the Sellers and the Company, and except as set forth on Part 4.3 of the Disclosure Statement, all financial statements delivered under this Agreement have been prepared in accordance with generally accepted

9

accounting principles consistently applied, and fairly present the financial position of the Company as of the respective dates of the balance sheets included in the financial statements, and the results of its operation for the respective periods indicated.  All such financial statements are true, complete and correct in all material respects in accordance with the books and records of the Company.  All such financial statements contain and reflect all reasonably necessary adjustments for a fair presentation of the results of operations and financial conditions for the periods covered by the financial statements, and with respect to any of the Company's indebtedness, liabilities, contracts and commitments, contain and reflect reserves for all material liabilities and for all reasonably anticipated material losses and costs in excess of expected receipts.

\* \* \*

4.19   **Compliance with Laws.**  The Company has complied with, and is not in violation of, applicable federal, state or local statutes, laws and regulations (including without limitation, any applicable environmental, health, building, zoning or other law, ordinance or regulation) affecting the Assets or the operations of the Business, where non-compliance or violation would have a material adverse effect on the Assets or the operation of the Business.

8.   **Conditions Precedent to Buyer's Performance.**

**Accuracies of Representations and Warranties of the Sellers.**

All representations and warranties by the Sellers in this Agreement or in any written statement that shall be delivered to Buyer by the Company or any Seller under this Agreement shall be true in all material respects on and as of the Closing Date as though made at that time.

10

11.    **Obligations After the Closing.**

**Indemnities of the Sellers.**

(a)  The Sellers, jointly and severally, shall indemnify, defend and hold harmless Buyer, its affiliates, officers, directors, agents, employees and lenders and, on and after the Closing Date, the Company and its affiliates, officers, directors, agents and employees (collectively, the "**Buyer Indemnitees**"), from and against any and all liabilities, judgments, obligations, claims, actions, damages, losses, costs and expenses of any nature whatsoever, including attorneys' fees, whether or not legal, mediation or arbitration proceedings are commenced, which arise in connection with, result from or relate to (i) the operation of the Business prior to the Closing Date, (ii) the Company's ownership, transfer or use of the Assets prior to the Closing Date, (iii) any breach of, or failure to perform, any of the representations, warranties, covenants or obligations of the Company or any Seller under this Agreement or any other instrument furnished or to be furnished by the Company or any Seller in connection with this Agreement, (iv) any breach of any representation or warranty contained in <u>Paragraph 4.3</u> above without taking into account any knowledge qualifier contained therein, or (v) any litigation matter pending on the Closing Date and involving the Company, its assets, liabilities or business on or prior to the Closing Date. * * *

14.    **Termination.** Either Buyer on the one hand, or the Sellers acting together on the other hand, may terminate this Agreement prior to the Closing Date as provided below.

14.1  **Without Liability.**  Without liability to the other party if . . . (iii) the Closing shall not have occurred on or before the date that is one year from the execution of this Agreement, other than by reason of such party's default or breach of any covenant hereunder.

14.2  **Without Prejudice of Rights.**  Without prejudice to other rights and remedies which the terminating party may have, if material default shall be made by the other party in the observance or in the due and timely satisfaction of any of the conditions to be satisfied by such other party or the performance of any covenants and agreements to be performed by such other party under this Agreement.

The PSA incorporated an extensive and detailed Disclosure Statement that included:

A. Compiled financial statements for Club One for years 2003, 2004, 2005, 2006;[1]

B. A December 20, 2006 letter from the Club's outside accountant, Jim Hering, which stated as follows:

The following items in the compiled Club One Casino, Inc. financial statements depart from GAAP:

1. Depreciation has been calculated, in large part, using income tax lives and methods and may not comply with the requirements of Accounting Research Bulletin No. 43.  An analysis of each individual asset would be required to determine if there is a more appropriate method or life for GAAP purposes and if the departure is material.

---

[1] Each financial statement was preceded by a letter from Club One's accountants stating:  "We have compiled the accompanying balance sheet of Club One Casino, Inc. . . . A compilation is limited to presenting in the form of financial statements information that is the representation of management.  We have not audited or reviewed the accompanying financial statements and, accordingly, do not express an opinion or any form of assurances on them."  The same language appears in a February 27, 2007 cover letter transmitting the Club's 2006 financial statement, which includes a note that "The Company prepares its financial statements on the accounting basis used for Federal income tax purposes, which is a comprehensive basis of accounting <u>other than generally accepted accounting principles</u>. ".  [Emphasis added].

2. No provision has been made in the financial statements for accrued vacation pay. Although Statement of Financial Accounting Standards No. 43 requires accruing a liability for employee's compensation for future absences, the Company has expensed vacation pay when paid in compliance with federal income tax law.

3. Goodwill has not been tested for impairment. Statement of Financial Accounting Standards No. 142 requires that goodwill be tested for impairment at least annually. The Company has been amortizing the goodwill over a 15 year period, using the straight line method, in accordance with federal income tax law. In addition, the Company has written off other intangibles, over faster periods, in prior years.

These are the only departures from GAAP that I'm aware of. The buyer should be encouraged to have their own accounting professionals review the financial statements and ask questions regarding methods of accounting or presentation.

C. Reference to a class action lawsuit against the Club known as the Savang litigation;

D. Disclosure that California Division of Gaming Control had recommended to the California Gambling Control Commission that Elaine Long's application for licensure should be denied, and, that the California Attorney General's Office would be initiating new administrative proceedings regarding her application for a license.

The closing of the acquisition was delayed for nearly a year after the signing of the PSA due to delays in Kyle Kirkland's efforts to obtain a California gaming license. For nearly two years prior to the February 22, 2008 closing of the acquisition, Respondent Buyer's representatives had full and unobstructed access to all of the Casino's books and records, employees, accountants, auditors and lawyers, including password access to the Casino's record keeping system. Kyle Kirkland in particular was

13

physically on the premises for extended periods of time reviewing the Casino's records and interfacing with its employees.

In past acquisitions, Respondent Buyer had used the services of the Deloitte accounting firm to conduct due diligence in order to determine the acquired company's cash flow or EBITDA (earnings before interest, taxes, depreciation and amortization), and it had attempted to so use Deloitte for this transaction but Deloitte declined the assignment. Therefore, Respondent Buyer decided to rely on the investigation conducted by Club One's new accountants (Baker Peterson) that had been selected by Respondent to prepare Club One's 2007 audited financial statements. Given that the Casino's finances had been maintained in Quickbooks by the Club's bookkeeper, Becky Balistreri, with minimal involvement by its outside accountants Dunn Jeffries, the Baker Peterson audit turned out to be a complex and time-consuming process that was substantially, although not finally, completed by the time of the February 22, 2008 closing of the acquisition.

Respondent Buyer had arranged for a $22.5 million loan from D.B. Zwerin to finance its acquisition of Club One Casino. The loan was arranged through Imperial Capital.

In an October 18, 2006 email from Kyle Kirkland to Roland Rudas of Imperial Capital Mr. Kirkland stated:

> Attached is a revised Merits/Risks assessment, revised to include the increase in the CA minimum wage as of 1/1/07. It's an 18+% increase and affects most of the Casino personnel. The Club thinks it can pass some of that on but no assurances, obv.

> I'm taking a closer look at the model, but given how tight I think DBZ will set the covenants, I'd ratchet down the margins going forward. We know that 2005-2006 were banner years and costs are definitely going up. Specifically. . .

Minimum wage increase will push the wages, salaries (net of Sarantos mgt fee) up by 18-20%

Rent on 12,000 sq ft is increasing ... probably $6-10k/month; call it another $100,000/year.

Parking cost went up by $1k/month.

None of these are deal breaking increases, but we should adjust the margins accordingly.

Mr. Rudas replied as follows:

I took the margins down so that 2007 EBITDA would be about $6.4 MM roughly flat over estimated 2006. That is roughly about $600k lower than the previous assumptions. Is that reasonable?

Approximately a month before the February 22, 2008 closing of the transaction, Respondent Buyer submitted to D.B. Zwerin a "reformatted" version of the Casino's 2007 compiled financial statements which was prepared by Respondent Buyer's CPA, Ted Tawinganone.

Also, prior to the closing Dana Messina instructed Baker Peterson to include EBITDA calculations in their 2007 audit.

By December 10, 2007, Baker Peterson auditors had confirmed that Club One's financial data had been maintained on an income tax basis, and raised the question whether future financial reporting would be switched to GAAP accounting. An internal Baker Peterson email on February 12, 2008 indicated that Respondent's Dana Messina had looked at the financials provided by Becky Balistreri and had noted that certain clearing accounts and other items had "looked strange". On February 18, 2008, Dana Messina was made aware by the Baker Peterson auditors that a $288,000 item included in the Casino's cash account "wasn't really there." During the course of their audit field

work, Baker Peterson provided various adjusted trial balances on February 18 and 21, 2008. The February 18, 2008 trial balance showed a downward adjustment to the Casino's 2007 net profits in the amount of $226,413.00. On February 19, 2008 Dana Messina reviewed the adjustments in the February 19, 2008 trial balances in detail and observed that they did not include an "accrual" for the $250,000 to be paid in settlement of the Savang litigation. On February 20, 2008 Baker Peterson confirmed that they would have to accrue the $250,000 settlement. On February 19, 2008 Baker Peterson advised Dana Messina that they were working through the management fee issue, that they would be making final adjusting entries on February 19 or 20, and that they would send Mr. Messina a revised trial balance as soon as those adjustments were made. On February 21, 2008, Baker Peterson emailed another trial balance to Respondent Buyer's CPA, Mr. Tawinganone, in which they confirmed that downward adjustments of $754,051 to the Casino's 2007 net profits would be necessary in order to state the financial statements as GAAP. Erin Goldfarb, who did most of the work on the audit and was in communication with Dana Messina and Ted Tawinganone, acknowledged in her testimony that she would not have forwarded this information to Mr. Tawinganone without instructions from Dana Messina to do so.

## IV

## Discussion and Determination of The Merits

A.    Are Claimant Sellers Liable for Any Material Misrepresentations of Fact or Non-Disclosures made Either Intentionally, Negligently or In Violation of Their Contractual Obligations Under the PSA?

Respondent Buyer contends that Claimant Sellers a) failed to provide accurate financial statements in compliance with GAAP which would have shown that the Casino's revenue had declined by $323,749 from 2006 to 2007 and was $417,042 less in 2007 than what the Sellers had represented, and, that cash flow had declined from 2006 to 2007 in the amount of $764,859, b) failed to disclose that they had violated applicable gaming ordinances by not preparing audited GAAP financial statements for years preceding 2007; and c) failed to disclose various issues such as illegal promotions, letters of warning from DOJ, lack of an emergency preparedness plan, lack of a sexual

harassment prevention plan, for which Respondent Buyer is not seeking to recover any damages.

A preponderance of the evidence supports the conclusion that Claimant Sellers did not knowingly engage in any intentional or negligent misrepresentations or non-disclosures of any material facts that would be actionable either as fraud or deceit, or, as a material breach of the terms of the PSA; even assuming any such misrepresentations or non-disclosures occurred, Respondent Buyer could not have reasonably relied to its detriment upon any such misrepresentations or non-disclosures of fact because it either knew, or in the exercise of even minimal diligence should have known, of any such material facts.

The following facts derived from the evidence support the foregoing conclusions:

Email and oral communications between Respondent Buyer's representatives and the Casino's 2007 audit team at Baker Peterson clearly show that Respondent Buyer knew or had in its possession prior to the February 22, 2008 closing information that indicated a) that the financial statements for the Casino through 2006 were compiled or income tax basis, and were not according to GAAP; b) that the 2007 EBITDA for the Club One Casino would be substantially lower than in 2006, and, that 2007 revenue would be significantly lower than in 2006; c) that the Casino's 2004, 2005 and 2006 financial statements were not GAAP but merely compilations of the Casino's QuickBooks records; d) that $288,000 shown as being in the Casino's cash account really wasn't there; e) that there was an accrual of $250,000 for settlement of the Savang class action; and f) that trial balance adjustments of $754,051 were necessary in order for the Casino's financial statement for 2007 to conform to GAAP.  The claims of Respondent Buyer's representatives to the contrary, i.e. that they did not know or understand or could not have known this, are simply not credible in light of this evidence.  The credibility of their assertions is also brought into question for the reasons stated in Claimants' post-hearing briefs, i.e. evasive and inconsistent testimony under oath in the hearings, grossly inaccurate and misleading statements made under oath in a pre-hearing declaration submitted in this arbitration, and questionable conduct in submitting a re-engineered financial statement to Respondent Buyer's lender.

To the extent any technical breach of the terms of the PSA may have occurred because the financial statements provided to Respondent Buyer were either not in accordance with GAAP or were inaccurate, Respondent Buyer is estopped to assert any such breach because it proceeded with the closing of the transaction knowing full well that the financial statements were neither prepared in accordance with GAAP nor accurate because of various known items listed above.  Also, the so-called "compromise" reached between Claimants' counsel for the transaction, Hal Bolen, and Respondent's counsel, Mr. Wertlieb, by which Respondent was made fully aware of the fact that Claimants were not able to certify that the Club's financial statements complied with GAAP, further supports the conclusion that Respondent is estopped to assert that non-compliance with GAAP was a breach of the Agreement.

Respondent Buyer contends that it "believed that if any additional liabilities were discovered between the time the PSA was signed and the closing, they would be corrected by the mechanism set forth in the PSA under Section 3.5.1.", i.e. that the purchase price would be "decreased to account for undiscovered liabilities." (Respondent's Closing Arbitration Brief, at p. 19)  Presumably, Respondent Buyer is referring to Section 3.5.1 (e).  But if that is what Respondent's principals believed, then they were mistaken because that is not what Section 3.5.1 (e) provides.  Respondent Buyer should have understood that there would not likely be any decrease in the Purchase Price "to the extent the Closing Date Balance Sheet does not conform to GAAP" since Baker Peterson had been hired to make sure that the 2007 financial statement and the Closing Date Balance Sheet would in fact conform to GAAP, which they did.

The Jue v. Smiser case relied on by Respondent Buyer for the proposition that a buyer who learns of misrepresentations and omissions may nevertheless proceed to closing and then sue for fraud, is distinguishable because it involved real property and relies upon Civil Code Section 3343 "which establishes the measure(s) of recovery for fraud in the sale of real property" and "suggests that fraud in the inception of the transaction is sufficient. [citation omitted]"   There is no evidence that Claimant Sellers knowingly misrepresented or concealed material facts when they entered into the PSA. Furthermore, as discussed below, Respondent Buyer has not suffered any damages as the result of any alleged misrepresentations or omissions, assuming any had occurred.

Respondent Buyer has asserted claims of non-disclosure regarding the stated intention of gaming regulatory authorities to initiate proceedings to revoke the Casino's license because of Claimant Long's continued involvement. It is not clear whether Respondent Buyer is asserting any claim for damages based on any such non-disclosure, but if it is, there has been no proof of any such damages.

Respondent Buyer has asserted an alternative argument based on the indemnity provision in Section 11.1 of the PSA. Claimants dispute the applicability of this provision, arguing that a) by its language it is limited to claims by third parties; and b) even if applicable to damages resulting from any breach by Claimants, it would nullify the knowledge qualifier and render illusory the "compromise" that was reached between counsel for the parties because of Claimants' known inability to certify that the compiled financial statements had been prepared in accordance with GAAP. It is not at all clear that direct harm to Respondent Buyer caused by any alleged misrepresentation or non-disclosure by Claimant Sellers (as distinguished from third-party claims) would come within the meaning of "liabilities, judgments, obligations, claims, actions, damages, losses, costs and expenses . . .which . . .result from or relate to . . .(iv) any breach of any representation or warranty contained in Paragraph 4.3 . . .". But in any event, regardless of how one may interpret the indemnity language, the provision has not been triggered because Claimants have been determined not to have materially breached the terms of the PSA.

B.    <u>Assuming Claimant Sellers Breached the PSA by Failing to Provide Accurate Financial Information, Has Respondent Buyer Been Damaged?</u>

Even assuming the evidence were to support Respondent's contention that Claimant Sellers had committed fraud and/or breached the terms of the PSA, which it does not, Respondent's counterclaim fails because Respondent has not proven any compensable damages.

Respondent's damage claim is based on the assertion that it would not have closed the transaction and purchased the Casino for $27 million had it known that a) the Casino's income stream was declining based on the correct EBITDA for 2007; or b) that the actual $5,884,864 EBITDA for 2007 (as opposed to the $6,771,132 2007 EBITDA

reflected in the Casino's financial statements) results in a valuation, based on a 4.0 multiplier, of $23,468,838. On that basis, Respondent seeks to recover damages in the form of a reduction in the purchase price in the amount of $3,531,162, plus interest. But Respondent Buyer is not seeking a rescission of the PSA; rather, and without citing any supporting legal authority, Respondent is essentially seeking to recover the difference between what it paid for the Casino and a reduced purchase price that it would arguably have negotiated for had it known of the alleged misrepresentations and non-disclosures. Respondent's damages theory is speculative, unsupported by the evidence, and flawed.

First, damages recoverable for the tort of deceit are based on the "out-of-pocket rule" as noted in the authorities cited by Claimant Sellers. A preponderance of the evidence at the hearing (unrebutted testimony by Haig Kelegian and George Swarts) shows that at the time of closing the Club One Casino was worth five times 2007 actual EBITDA, which results in a valuation well in excess of the $27 million that Respondent agreed to pay for the Casino. The fact that Respondent may have internally used a 4 times EBITDA valuation is irrelevant, in that the $27 million price was a fixed negotiated contract price that was not based on or geared to any particular earnings multiple.

Second, damages recoverable on a breach of contract theory are those that are necessary to place the non-breaching party in as good a position as if the breaching party had fully performed. Cal. Civ. Code Sec. 3300; CACI Sec. 350. As indicated, the evidence shows that Respondent acquired for the fixed price of $27 million a casino property that was worth substantially more. Therefore, there is no need to compensate Respondent through an award of damages to place it in the position it would have been in but for Claimants' wrongdoing --- Respondent received value in excess of what it had bargained for, not less. Any assumptions as to what Respondent might have done by way of renegotiating the acquisition price had it known of any discrepancies is pure speculation; indeed every inference that can reasonably be drawn from the evidence indicates that Respondent would not have jeopardized the closing of the transaction by trying to renegotiate the acquisition price and thus risk losing a highly attractive leveraged deal in which Respondent was putting up only $1.5 million in cash for a business that was generating annual cash flow in excess of $5 million.

20

Third, a preponderance of the evidence shows that the Casino's revenues did not decline between 2006 and 2007, but rather remained essentially flat; to the extent that there was a decline in cash flow for 2007, a preponderance of the evidence shows that Respondent fully anticipated a substantial increase in operating costs due to changes in the minimum wage law and had fully taken this into account and factored it into its analysis well in advance of the closing. Again, Respondent is not seeking to rescind the transaction; also, it would be pure speculation to surmise what steps Respondent may have taken to renegotiate the deal had it known that revenues were flat and that cash flow had declined.

C.    Are Claimant Sellers Entitled to Recover $1,000,513 Representing Excess Closing Date Cash Due and Owing Pursuant to Section 3.5 of the PSA?

Given the above rulings with respect to Respondent Buyer's fraud and breach of contract claims, the only remaining issue in this phase is whether the $1,000,513 in excess Closing Date Cash that Claimant Sellers are seeking to recover pursuant to Section 3.5.1 (a) should be reduced by $537,078 (or by $200,000) representing amounts that Respondent has denominated as "restricted cash" necessary to cover "chip liability", i.e. monies that the Casino is required to hold under California's Gambling Control Act for the benefit of patrons who may wish to turn in their chips.

By way of background, under California law a gaming establishment must maintain in a segregated account an amount of money not less than the total value of its chips in circulation, i.e. a fund sufficient to cover payments to patrons when they redeem their chips. Claimant Sellers had utilized a $200,000 letter of credit as a cushion against fluctuating chip liability, and the PSA provided in Section 11.5 that Claimant Sarantos agreed to maintain that letter of credit for "not less than 60 days following the Closing, on terms and conditions and in an amount consistent with past practice . . .". However, shortly before the closing the California Department of Justice notified the Casino that a line of credit was insufficient to support chip liability. Claimant Sellers therefore established a separate chip liability account in the amount of $200,000 to substitute for the line of credit, and the parties entered into an amendment of the PSA eliminating Section 11.5 and adding the following sentence to Section 6.2 of the PSA ("Conduct of

21

Business in Normal Course"):  "Without limiting the foregoing, the Sellers shall cause the Company to maintain at all times a deposit account, with a balance of no less than $200,000 (or such other amount required from time to time to comply with California gambling laws and regulations), to support the Company's Chip Liability." [Emphasis added] Also, an April 22, 2008 letter addressed to Baker Peterson from Club One confirming certain representations in connection with Baker Peterson's year 2007 audit includes the following statement:  "15) We have restricted $200,000 of cash in addition to the chip liability balance at 12/31/07 in accordance with California Gambling Regulations Section 2053.  The restricted cash will not be used for purposes other than those outlined in California Gambling Regulations Section 2053."  The letter includes a signature by Claimant George Sarantos as "Owner", and also a handwritten side note by Mr. Sarantos stating "[t]his $200,000 is a Messina, Kirkland condition."  The letter also contains a footnote, presumably prepared by Baker Peterson, stating as follows:  "This representation letter relates to the restated financial statements issued April 24, 2008, and item #15 above relates to one of the issues that resulted in said restatement.  Please see AA700 for our research memo regarding the restatement.  The $200,000 of restricted cash referred to in item #15 is management's estimate of the amount they need to restrict over and above chip liability.  California Gambling Regulations Section 2053 is not specific as to the amount of cash that must be restricted for chip liability, and leaves it open to management's estimate and judgment.  In conversations with George Sarantos (50% owner of Club One at 12/31/07 and 20% owner subsequent to the merger described as AA600 and disclosed in the financial statements) on April 1, 2008 and again on April 24, 2008, we discussed the restricted cash issue.  George indicated that although he is still an owner, that for all intents and purposes, he is no longer functioning as acting management and deferred to Dana Messina and Kyle Kirkland for management estimates.  However, George verbally agreed on both occasions that if Dana and Kyle felt that $200,000 was necessary, he would also concur."

Respondent Buyer contends that the $337,078 which is the chip liability as of 12/31/07 plus the additional $200,000 account created shortly prior to closing is "restricted cash", which is not the same as "free cash", and that therefore these amounts should not be included within the "Closing Date Cash" that is to be credited to Sellers at

closing pursuant to Section 3.5.1 (a) of the PSA.  Respondent argues that "restricted cash" is a "continuing obligation" of the Casino that comes within the term "indebtedness or similar obligations of the Company" for which the purchase price is to be decreased pursuant to Section 3.5.1(b) of the PSA.  Respondent also argues that it both defies logic and is unfair that the purchase price should be increased by restricted cash that belongs to neither the Buyer nor the Seller.

Claimant Sellers dispute that any of the chip liability monies should be deducted from the Closing Date Cash due to Sellers under Section 5.3.1 (a), or, that any of it should be used to decrease the purchase price under Section 5.3.1 (b).  First, they point out, correctly, that $337,078 of actual chip liability as of 12/31/07 has already been taken into account as a Balance Sheet Liability on the Closing Date Balance Sheet and which has decreased the Purchase Price pursuant to Section 5.3.1 (b).  With respect to the additional $200,000 segregated cushion account created to replace the disallowed $200,000 letter of credit cushion, Claimant Sellers make the following arguments as to why this amount is appropriately considered as Closing Date Cash to be paid to them as an increase in the Purchase Price under Section 5.3.1 (a).  First, that Respondent's Mr. Messina had written in a July 25, 2008 email to Claimants' Marshall Scott that he had been able to confirm informally with DOJ that so long as the Casino held cash in its cage, vault and bank accounts 1.5 times the amount of actual "chip liability" the restricted cash requirement would be in the range of $25,000 to $100,000.  Second, that Respondent had deliberately forestalled any efforts to negotiate a release or reduction of the segregated $200,000 account so that it could argue for a price reduction based on that account.  Third, that Respondent Buyer always knew that it would have to incur some kind of operating expense in order to cover a $200,000 chip liability "cushion", whether by funding it with the Casino's cash, or, by borrowing that amount.  Fourth, that the characterization of the account as "restricted cash" was made unilaterally, solely at the direction of and solely based on the subjective opinion of Mr. Messina, rather than by the auditors, in order to support an argument for a purchase price adjustment.

Given that the $337,708 actual chip liability has already been deducted from the purchase price, the issue, therefore, comes down to whether Claimants' claim for Closing Date Cash in the amount of $1,000,513 should be reduced by the $200,000 chip liability

23

"cushion" account that was created to satisfy the DOJ and is accounted for in the Closing Date Balance Sheet as "restricted cash." It is difficult to see how that $200,000 chip liability cushion, which is not included under Liabilities in the Closing Date Balance Sheet (unlike the $337,708 actual chip liability, that is reflected as a liability), would come within the scope of "Balance Sheet Liabilities" to reduce the Purchase Price under Section 3.5.1 (b). "Balance Sheet Liabilities" is defined in PSA Section 3.4.2 as "the aggregate amount of all liabilities shown on the Closing Date Balance Sheet." The $200,000 is not shown as a liability on the Closing Date Balance Sheet. Therefore, Section 3.5.1 (b) does not apply. Also, the original intent of the parties, as reflected in Section 11.5 of the PSA, was for Claimant Sarantos to be absolved of any continuing chip liability cushion obligation beyond 60 days following the Closing. Section 11.5 was replaced in the Amendment to the PSA by language requiring Sellers to "cause the Company to maintain at all times a deposit account, with a balance of no less than $200,000 (or such other amount required from time to time to comply with California gambling laws and regulations), to support the Company's Chip Liability." [Emphasis added]. Unlike the "60 days following the Closing" reference in original Section 11.5, this substituted language did not indicate any continuing obligation upon Sellers that would survive the Closing because Sellers would not have any control over the ability of the Casino to maintain a $200,000 deposit account to cover chip liability after the Closing, i.e. after the Closing they no longer were able to "cause the Company to maintain" a $200,000 balance in the account. Clearly, then, the mutual intent of the parties was for the new owners of the Casino to assume responsibility for maintaining such an account after closing (whether by using excess Casino cash, or, borrowing the $200,000). That the Sellers, particularly Mr. Sarantos, would have no management responsibility following the Closing with respect to allocation of amounts to be set aside as a chip liability cushion is reflected in the aforementioned footnote to the April 22, 2008 representation letter. Respondent Buyer could easily have specified in the amendment to the PSA that this $200,000 chip liability cushion account would be a liability of the Casino as an adjustment to the Purchase Price, but it did not do so. Claimant Sellers are correct that the cost to Respondent of maintaining a $200,000 chip account balance is simply an operating expense of the Casino; while the chip liability

24

cushion account may be "restricted cash" while the Casino is operating, it nonetheless is money that would ultimately inure to the economic benefit of Respondent Buyer upon a liquidation or sale following satisfaction of the actual outstanding chips liability.

For all of the foregoing reasons, it is determined that Claimant Sellers have the more persuasive argument that the $200,000 chip liability cushion account should not be deducted from the $1,000,513 due to Sellers as Closing Date Cash.

Accordingly, pursuant to PSA Section 3.5.3, Claimant Sellers are each entitled to receive from Respondent Buyer 50% of $1,000,513, i.e. $500,256.50.

<div align="center">V</div>

<div align="center">**Interim Award and Further Proceedings**</div>

Respondent Club One Acquisition Corp. shall recover nothing on its counterclaims for fraud, deceit, negligent misrepresentation and breach of contract. Respondent Club One Acquisition Corp. shall pay to Claimant George Sarantos the amount of $500,256.50. Respondent Club One Acquisition Corp. shall pay to Claimant Elaine R. Long the amount of $500,256.50.

Claimant Sellers have requested an award of pre-award interest at 10%. A rate of 10% simple annual interest is appropriate in contract cases under the California law cited by Claimants. PSA Section 3.5.3 provides that "any net positive adjustment to the Purchase Price determined in accordance with clauses (a), (b), (c), (e), and (f) of Paragraph 3.5.1 shall be paid by wire transfer by Buyer, 50% to each Seller, following the Closing promptly after determination or resolution of any disagreements for which adjustments to the Purchase Price are permitted pursuant to Paragraph 3.5.1 above, whichever occurs later." It is unclear from this provision what date any pre-award interest should start to run from on the monies awarded to Claimant Sellers. Claimants shall within ten calendar days from the date of this Interim Award submit a letter brief setting forth their position regarding the date from which 10% pre-award interest should run, what the appropriate rate should be for any post-Final Award interest, as well as their calculation of a) the dollar amount of pre-award interest that is due to date, and b) the *per diem* dollar amount of pre-award interest that shall continue to accrue until the date of the

Final Award. Respondent shall provide its response regarding the foregoing matters within five calendar days following Claimants' brief.

The PSA provides, in pertinent part, in Section 15.11 that "[i]f any party commences or is made a party to any mediation, arbitration or litigation to enforce, interpret or obtain a declaration of rights under this Agreement, the prevailing party in any such proceeding shall be entitled to recover from the other party all attorneys' fees, costs (whether otherwise taxable or recoverable) and expenses incurred in connection with such a proceeding or any appeal or enforcement of any judgment obtained in any such proceeding. Any judgment or order entered in any proceeding shall contain a specific provision providing for the recovery of attorneys' fees and costs incurred in enforcing such judgment or order." Claimants, as the prevailing parties, are entitled to recover their attorneys fees, costs and expenses incurred in connection with this arbitration. Claimants shall within ten calendar days from the date of this Interim Award submit in declaration form their claim for recovery of such attorneys fees, costs and expenses, together with supporting declarations and copies of invoices (portions of which may redacted to protect any privileged information against disclosure or waiver). Respondent shall have five calendar days thereafter to submit their response and any opposition.

The parties may mutually agree to reasonable modifications of the foregoing briefing schedule if necessary, so long as the agreement is confirmed in writing and both the arbitrator and the case manager are notified.

The parties will be advised whether a teleconference will be necessary to hear argument on any of the above remaining issues.

The allocation of the costs of arbitration, i.e. AAA fees and arbitrator compensation, shall be addressed in the Final Award.

The parties shall promptly meet and confer regarding the remaining bifurcated claims regarding fire code and ADA issues. Should either party decide to proceed with arbitration of those bifurcated claims, they shall contact the case manager to schedule a preliminary hearing conference for the purpose of setting the hearing and pre-hearing schedule for that remaining phase.

26

Following the completion of all remaining phases of this arbitration, a Final Award shall issue. This Award shall remain in full force and effect until such time as a Final Award is rendered.

Dated: April 12, 2011

_____
Yaroslav Sochynsky, Arbitrator

# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION PART 49
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
CLUB ONE ACQUISITION CORP.,

                        Plaintiff,

       -against-

GEORGE SARANTOS and ELAINE LONG,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
KMGI, INC.,

                     Plaintiff-Intervenor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**POST-TRIAL
DECISION AND ORDER**

Index No.: 650049/2012

O. PETER SHERWOOD, J.:

       This action arises from the sale of a gambling casino located in Fresno, California by
Defendants, George Sarantos ("Sarantos") and Elaine Long ("Long") (together, "Defendants") to
Plaintiff, Club One Acquisition Corp. ("Club One" or the "Company"). In this action, Club One
seeks to block enforcement of judgments entered in the California Superior Court confirming an
arbitration award for nearly $2 million against Club One and in favor of Defendants ("California
Judgments"). Non-parties Dana Messina ("Messina") and Kyle Kirkland ("Kirkland") are 80%
shareholders of Club One. Plaintiff-Intervenor, KMGI, Inc. ("KMGI") is a single purpose entity
wholly owned by Kirkland and Messina and is the holder of Senior Notes secured by the casino.
Club One seeks a declaration that a certain Subordination Agreement[1] entered into by Club One, its
lender and Defendants prohibits Club One from paying amounts concededly owed Defendants
pursuant to: (i) the California Judgments[2] and (ii) certain promissory notes issued by Club One in
connection with Kirkland and Messina's acquisition of Club One Casino, Inc. ("Club One Casino")
from the Defendants in February 2008 ("Seller Notes"), prior to payment in full of amounts owed

---

    [1]The terms "Subordination Agreement," "Senior Indebtedness," "Purchase and Sale
Agreement" and "Purchase Price Adjustment" are referenced in various documents used in
connection with the sale of a gambling casino and are defined below at pages 4-6.

    [2]The California Judgments represent a $1,000,513.00 post-closing purchase price
adjustment owed to Defendants under the Purchase and Sale Agreement governing the
acquisition of Club One Casino, plus legal fees, costs and interest awarded by the arbitrator.

under a loan obtained by Club One to finance the acquisition.[3] The Senior Notes are currently held by KMGI.

Defendants contend by way of affirmative defense that the provision of the Subordination Agreement relied on by Club One seeking to block payment of the California Judgments is unenforceable due to Club One's breach of the implied covenant of good faith and fair dealing. Defendants assert that rather than paying the post-closing Purchase Price Adjustment that they knew was legitimately owed, Club One, Kirkland and Messina (i) submitted a purchase price adjustment calculation that they knew was false and was designed solely to avoid payment of a legitimate obligation owed to Defendants; (ii) withheld payment of the correct Purchase Price Adjustment demanded by Defendants and forced Defendants through a protracted arbitration wherein Club One knowingly asserted frivolous counterclaims; (iii) engineered cash deficits and a default on Club One's Senior Indebtedness in order to invoke restrictions contained in the Subordination Agreement that is related to the Senior Indebtedness and thereby to avoid payment of the arbitration award; and (iv) secretly purchased the Senior Indebtedness and kept it in a perpetual state of default to avoid making any payments to Defendants.

In their Post-trial Brief Defendants request a judgment declaring that the Subordination Agreement does not bar payment of the California Judgments or amounts due pursuant to certain Seller Notes (*see* NYSCEF Doc. No. 166, p. 20). This request is the polar opposite of the relief requested by Club One and KMGI for a declaration that the Subordination Agreement bars Defendants from collecting on the California Judgments and an injunction against Defendants to the same effect (*see* NYSCEF Doc. Nos. 1 and 77).

In a Decision and Order dated September 30, 2013, this court denied Club One's motion for summary judgment seeking a declaration that (1) the Arbitration Award constitutes Subordinated Indebtedness under the Subordination Agreement; (2) the Subordination Agreement prohibits Defendants (the "Subordinated Creditors") from taking, demanding or receiving from Club One payment of any part of the Arbitration Award unless and until the Senior Indebtedness is paid in full;

---

[3]Club One and KMGI are represented by the same counsel. At trial they presented a single defense and submitted joint pre-trial and post-trial briefs. References in this Decision and Order to arguments made by Club One should be understood to be the arguments of both.

2

(3) the Subordination Agreement prohibits Club One from making, giving, or permitting any payment of any part of the Arbitration Award unless and until the Senior Indebtedness is paid in full; and (4) the Subordination Agreement prohibits the Defendants from exercising any of their rights or remedies with respect to the Arbitration Award unless and until the Senior Indebtedness is paid in full.

A non-jury trial was held on March 24-26, 2014 at which time the court heard evidence presented by all parties, and received extensive post-trial briefs. The case is now ready for decision on the merits.

## FINDINGS OF FACT

The critical facts, which can be found in written contracts, related documents, and the findings in a decision accompanying an arbitration award involving Defendants and Club One, are largely undisputed. Club One accuses Defendants of attempting to re-litigate many of the issues already decided by the arbitrator, despite the fact that the arbitrator found in favor of Defendants. For its part, Club One states that it "does not dispute that the arbitrator ruled against it on those issues," but then proceeds to re-hash many of those rulings here. However, Club One's principal argument is that "the mere fact that [Club One] did not prevail at the arbitration does not mean that it acted in bad faith by defending itself in the arbitrations" (Club One Post-Trial Br. at 2). Much of the material proof offered at the trial was considered by the arbitrator. Generally, the findings of fact here are consistent with the findings of the arbitrator.

Club One Casino operates a licensed card room casino in Fresno, California (JX-42; Sarantos Trial Aff. 3). Club One Casino was founded by Sarantos and Charles "Bud" Long in 1995. In 2002, Long transferred his 50% interest in Club One Casino to his wife, Elaine Long.   In July 2006, Sarantos, Elaine Long, Messina, and Kirkland signed a Letter of Intent ("LOI") providing that Kirkland and Messina would purchase Club One Casino from Sarantos and Long for $27 million (Tr. 46:12-19; JX-42 at 5).

Kirkland and Messina are "sophisticated and experienced businessmen" (JX-42 at 5). Before the parties signed the LOI, Kirkland and Messina had unrestricted opportunities to inspect the condition of Club One Casino, including its physical and financial condition.  Sarantos provided

Kirkland and Messina with financial information, including tax returns and "compiled" financial statements for 2003, 2004, and 2005 (Tr. 48:4-11; 220:17-26; 221:12-26). Both Messina and Kirkland knew that the compiled financial statements were not audited (JX-42 at 12; Tr. 221:12-26; 70: 8-12).

After signing the LOI and for the next 19 months, due diligence continued through the closing which occurred on February 22, 2008 (Tr. 48:20-26). Messina and Kirkland were provided with information concerning Club One Casino's 2006 financial performance and had access to the card room casino (Tr. 48:15-24; 50:13-18). During this time, Kirkland and Messina also had full and unobstructed access to the company's books and records (JX-42 at 13; Tr. 52:5-14; *see also* Tr. 53:8-10). Kirkland and Messina also had their accountant, Ted Tawinganone, assist with due diligence prior to the closing (Tr. 56:3-19; 57:7-9). Around November of 2007, Baker Peterson was retained by Club One Casino, upon the recommendation of Kirkland and Messina, to perform an audit of Club One Casino for 2007 (JX-42 at 14). Kirkland and Messina were fully involved in the 2007 audit and communicated directly with the auditors on a regular basis prior to closing (Tr. 223:2-10, 15-23). As a result, Kirkland and Messina were aware prior to the closing that Club One Casino's 2007 financial statements would need to reduce the company's net income by approximately $750,000 in order to state the 2007 financials in accordance with Generally Accepted Accounting Principals ("GAAP") (Tr. 227). Additionally, in December 2006 or January 2007, the Defendants disclosed pending litigation against Club One, including the "Savang" litigation (JX-42 at 13; Tr.76-77).

On February 24, 2007, the parties executed an Agreement for Purchase and Sale of Stock ("PSA") (JX-2). Under the PSA, provision was made to adjust the purchase price after closing ("Purchase Price Adjustment") to address several factors, including the amount of cash retained by Club One Casino on the closing date (JX-2, § 3.5.1). The Purchase Price Adjustment Clause states as follows:

The Purchase Price shall be increased or decreased as follows:

(a) *increased* by the amount of Closing Date Cash;
(b) *decreased*, dollar-for-dollar, by the amount of the Balance Sheet Liabilities and any other amounts outstanding, whether consisting of principal, interest, penalty or other costs or expenses, under any indebtedness or similar obligations of the Company as of the Closing Date;

4

(c)    *decreased* by three hundred ten thousand dollars ($3 1 0,000);
(d)    *decreased* by 50% of the Fresno Tax Adjustment;
(e)    *decreased* to the extent the Closing Date Balance Sheet does not conform to GAAP; and
(f)    *increased* by the Section 338(h)(10) Adjustment Amount.

(JX-2, § 3.5.1; JX-42 at 8) (emphasis in original). The parties agreed that the Purchase Price Adjustment was to be calculated from the Closing Date Balance Sheet which Club One was required to prepare in accordance with GAAP and to provide to Defendants within 90 days of the Closing Date (JX-2, § 3.4).

Club One argues that Kirkland and Messina had "negotiated for and obtained strong seller representations and warranties" in the PSA (Club One Post-Trial Br. at 5). As to the dispute before the court, Club One adds that it "concluded, based on all of the undisclosed issues taken together and its strong contractural protections, that it had meritorious claim for breach of representations and warranties" (*id.*). Those representations and warranties, provided, *inter alia*, that, "[t]o the best knowledge of the Sellers and the Company, and *except as set forth on §4.3 of the Disclosure Statement* all financial statements delivered under this Agreement have been prepared in accordance with generally accepted accounting principles . . . " (JX-2, § 4.3) (emphasis added). Section 4.3 of the Disclosure Statement states that "compiled financial statements for the years ending December 31, 2003, 2004, and 2005," have been provided to the buyer[4] (Tr. 67:6-17). Thus, Kirkland and Messina had no reasonable expectation that these financial statements were prepared in accordance with GAAP (Tr. 220:17-26; 221:13-26; 48:4-14; 70:8-12) and were accurate (JX-42 at 18). The Disclosure Statement also attached a December 20, 2006 letter from Club One Casino's accountant describing deviations from GAAP (Tr. 67:6-17). In this litigation, Club One asserts that although it was aware of "certain deficiencies in the financial statements provided by Defendants," it "did not appreciate the full extent of this and other financial deficiencies until completion of the post-closing audit" (Club One Post-Trial Br. at 4). However, as the arbitrator found, Club One was fully aware that Defendants never represented that the 2004, 2005, and 2006 financial statements were prepared in accordance with GAAP (JX-42 at 12 and 18).

---

[4] A financial statement for 2006 was also provided (*see* JX-42 at 12).

5

On February 22, 2008, the acquisition closed. It was highly leveraged. Club One financed the purchase with a $22.5 million loan ("Senior Loan") provided by D.B. Zwirn Special Opportunities Fund, L.P., later known as Fortress Value Recovery Fund I LLC ("Fortress" or "Lender"), pursuant to a Financing Agreement between Club One and the Lender, dated February 22, 2008 ("Financing Agreement") (JX-3) together with $5 million in Seller Notes held by Sarantos and Long. In addition, the sellers left in excess of 2.5 million in cash in Club One Casino's accounts to be paid to the Sellers after the adjustments were made pursuant to PSA §3.5.1 (Sarantos Aff. ¶ 13; Tr. 106:10-14). Kirkland states that he invested approximately $800,000 cash and together with Messina signed a $7 million joint and several personal guaranty ("Personal Guaranty") to secure the Senior Loan (JX-37; Kirkland Trial Aff. ¶ 18).

Prior to closing, Messina provided the Lender with a 2007 financial statement (DX-208), which had been prepared by Tawinganone at the direction of Kirkland and Messina (Tr. 225:16-22; 226:6-14). On February 22, 2008, the date of the closing, Messina signed a Compliance Certificate (DX-209) wherein he certified to the Lender that the 2007 financial statement attached to the certification (prepared by Tawinganone) "has been prepared in accordance with GAAP" and "fairly presents in all material respects the consolidated and consolidating financial condition of [Club One] and its Subsidiaries as of the date thereof or the consolidated and consolidating results of operations, retained earnings, and cash flows of [Club One] and its Subsidiaries for the period then ended" (DX-209; Tr. 231:3-10, 17-26; 232:2-233:3). Defendants maintain that this certification was false, as Messina had been advised by Baker Peterson, one day earlier, that the 2007 net income reflected in the existing financial statement for 2007 would have to be reduced by approximately $754,051 in order to state that the 2007 financials were prepared in accordance with GAAP (JX-42 at 16; Tr. 226:26-228:17, 234:3-23). Plaintiff responds that despite the discrepancy, the certification was "materially" accurate (Tr. 235:18-19). The purportedly "false" certification may not have been material to the Lender as the financial statement referred therein to was attached and states that it is "unaudited" (DX-209, at 4).

In connection with the Senior Loan, the Lender required Sarantos and Long to enter into a Seller Subordination Agreement ("Subordination Agreement"), dated February 22, 2008, whereby certain obligations owed them by Club One and Club One Casino would be subordinated to Club

One's obligations to the Lender (JX-40). Section 2(b)(2) of the Subordination Agreement provides generally that no Subordinated Indebtedness shall be paid to Defendants prior to payment of the Senior Indebtedness. The section contains a carve out which provides:

> [S]o long as (x) no Default or Event of Default shall have occurred and be continuing and (y) the Parent and its Subsidiaries shall have Qualified Cash[5] of not less than $500,000, in each case, both before and after giving effect to such payment, the Obligors may make and the Subordinated Creditors may accept (A) regularly scheduled payments of interest under the Subordinated Notes at a rate not to exceed 10% per annum (or such lesser rate as shall be the maximum rate allowable under applicable law) and (B) payments set forth in Section 3.5.1(a) and (f) of the [PSA] as and to the extent due and payable thereunder; and (ii) this Section 2(b)(2) shall not restrict the set off against or reduction in any amounts owing by the Obligors to the Subordinated Creditors under the Subordinated Notes against any indemnification or similar claims owing by the Subordinated Creditors to the Obligors under Section 11.1 of the [PSA].

(JX-40, § 2(b)(2)) (emphasis added). This provision expressly permits payment of interest on the Seller Notes and Club One's payment of the Purchase Price Adjustment pursuant to Sections 3.5.1(a) and (f) of the PSA, prior to payment in full of the Senior Indebtedness under certain circumstances (JX-40, § 2(b)(2); JX-2, § 3.5.1). Sarantos claims that based on the Purchase Price Adjustment provision and the language of the Subordination Agreement, he agreed to leave over $2,500,000 in cash in the business prior to closing in order to cover Defendants' prorated share of any debt that had been incurred prior to closing upon the understanding that any amounts belonging to him and Long would be returned post-closing as part of the PPA (Sarantos Trial Aff. ¶13).

By letter dated May 19, 2008, Club One provided the Closing Date Balance Sheet to Sarantos and Long (JX-56; JX-45; Tr. 200:23-25). Club One also provided schedules reflecting Club One's downward calculation of the Purchase Price Adjustment, which Club One claimed resulted in Defendants owing $23,051.27 to Club One (JX-56). The Purchase Price Adjustment calculation submitted by Club One is summarized in the following chart:

---

[5]"'Qualified Cash' means, as of any date of determination, the amount of unrestricted cash and Cash Equivalents of the Parent and its Subsidiaries that is in deposit accounts or in securities accounts, or any combination thereof, and which such deposit account or securities account (I) is maintained by a branch office of the bank or securities intermediary located within the United States and (ii) is subject to the dominion and control of the agent" (JX-3 at 22).

| Buyer's Purchase Price Adjustment Calculations | | |
|---|---|---|
| **Purchase Price (+/-)** | **PSA Section Reference** | **Amount** |
| | § 3.2 (Purchase Price) | $ 27,000,000 |
| Increased | § 3.4.1 (Closing Date Cash) | $2,338,733.85 |
| Decreased | § 3.4.2 (Balance Sheet Liabilities) | ($ 1,364,716.03) |
| Decreased | § 3.5.1 ($310,000) | ($ 310,000) |
| Decreased | § 3.4.2 (Fresno Tax Adjustment) | ($ 666,500) |
| Decreased | § 3.5.1 (Closing Date Bal. Sheet Not Conforming To GAAP) | ($687,581.59) |
| Increased | § 3.5.1 (338(h)(10) Adj.) | - |
| **Total Price** | | **$26,309,936.23[6]** |

(JX-56). Defendants rejected Club One's claim and demanded a PPA of $1,000,513 thereby creating a dispute, in Club One's view. Club One asserts that it made good faith efforts to resolve this dispute but that the arbitration ensued wherein it asserted a counterclaim for breach of representations and warranties contained in the PSA (Club One Post-Trial Br. at 5).

Defendants contend that Club One knew that its Purchase Price Adjustment calculation was not correct and contrary to Section 3.5.1 of the PSA. They assert that the PPA was submitted as part of an effort to try to reduce the amount it knew it would have to pay Defendants if the PPA was

---

[6]According to Club One, its Purchase Price Adjustment calculation resulted in a final purchase price of $26,309,936.23. It demanded $23,051.27 from the Defendants based on the amount paid at closing. This number was calculated by subtracting the $26,309,936.23 post-adjustment figure from the total amount the Club One paid at closing, $26,332,987.50 (JX-56).

8

calculated properly. Defendants point out that Messina admitted as much in an email to Vasan
Kesavan of D.B. Zwirn,[7] on May 27, 2008. In that email Messina wrote:

> We are now going through the PPAs with the sellers. We are *being as aggressive
> as possible* with them and will hopefully save a few dollars. We have about $ 3
> million in cash so *liquidity isn't an issue.* Originally *we expected to pay out $1.5
> million in the PPA but are working hard to keep the number below $1 million.*

(JX-6) (emphasis added).

Defendants note also and the court agrees that Club One's May 19, 2008 calculation was not
supported by any reasonable interpretation of the PSA. For example, Section 3.5.3 of the PSA
provides that, "[t]he adjustment to the Purchase Price determined in accordance with clause (d) of
Paragraph 3.5.1 [the Fresno Tax Adjustment] shall reduce the cash amount of the Purchase Price
*payable at closing* to both Sellers" (JX-2, § 3.5.3) (emphasis added). Thus, the Fresno Tax
Adjustment ($666,500) was accounted for *at closing* and was not meant to be asserted again as part
of the *post-closing* Purchase Price Adjustment.[8] At trial, Messina admitted that Section 3.5.3 sets
forth the timing of when payments calculated under Section 3.5.1 would be paid (Tr. 204:10-206:7).

Defendants maintain that Club One's assertion that the purchase price should have also been
reduced by $687,581.59 to account for the Closing Date Balance Sheet not conforming to GAAP
(JX-56) was equally unsupported by the language of the PSA, as well as the circumstances
surrounding the transaction. The PSA provides for Club One to "cause the Company's accounting
firm to review the Company's books and records as of the Closing Date . . . and to deliver, within
90 days following the Closing date, the balance sheet for the Company as of the Closing Date" (JX-2,
§ 3.4). Section 3.5.1 allowed a deduction only to the extent that the Closing Date Balance Sheet did
not conform to GAAP (JX-2, § 3.5.1). Messina admitted at trial that the Closing Date Balance Sheet
conforms to GAAP (Tr. 202:23-204:3).

Additionally Defendants argue that Club One's Purchase Price Adjustment calculation fails
to properly account for Closing Date Cash, which is defined in section 3.4.1 as cash or cash

---

[7]As of May 27, 2008 D.B. Zwirn was the Lender.

[8]The suggestion by Plaintiff's counsel that the PSA is ambiguous on this point (207:14-
21) is meritless (*see* Tr. 207:7).

equivalents that "reasonably benefit the company" (JX-56; JX-2, § 3.4.1). Defendants note that Club One failed to include the chip liability account ($200,000) in its calculation of Closing Date Cash on the basis that the funds in the chip liability account did not reasonably benefit the Company[9] (JX-56, Tr. 198:23-199:5). As Defendants state, the claim that the chip liability account did not reasonably benefit the company is not supported by the plain definition of Closing Date Cash in the PSA (JX-2, § 3.4.1).[10] In fact, the chip liability account is cash that benefits the company, as it would provide an economic benefit to the stakeholders of the Casino were the company ever to dissolve (Tr. 199:18-200:4). The chip liability account was established by Sarantos shortly prior to closing to replace a letter of credit that had previously satisfied the chip liability requirement (Tr. 195:18-26; 197:3-7). As Messina admitted, the chip liability account allows the Company to stay in compliance with the regulatory regime governing casinos (Tr. 200:5-14). The parties always contemplated that the obligation to meet regulatory requirements concerning chip liability post-closing would be Club One's responsibility (Tr. 196:9-25).

By letter dated August 21, 2008, counsel for Defendants responded to Club One's May 19, 2008 letter, disputing Club One's assertion that a downward adjustment to the purchase price was warranted. The letter sets forth Defendants' calculation of the Purchase Price Adjustment. It shows an additional $1,000,513 owed to Defendants as is summarized in the following chart:

---

[9]The company keeps cash in the cage reflecting the actual dollar value of casino gaming chips in circulation (Tr. 186:14-16). The chip liability account consists of funds held by Club One in order to comply with regulatory requirements and is in addition to funds owed to customers (Tr. 186:2-5).

[10]Notably, Baker Peterson originally did not classify the $200,000 chip liability account as restricted cash during his 2007 audit (Tr. 212:7-12). However, Messina made the decision to reclassify the chip liability account as restricted cash (Tr. 214:14-215:17). Messina knew that his position was contrary to the position taken by Defendants. In an April 23, 2012 e-mail to Baker Peterson concerning Marshall Scott's questioning of the potential reclassification of the chip liability account as restricted cash, Messina stated: "[i]f [Marshall Scott] wants to fight about the restricted cash he can do that in the arbitration process set up for the purchase price adjustment" (DX-207; Tr. 236:7-15).

10

| Sellers Purchase Price Adjustment Calculation | | |
|---|---|---|
| Purchase Price (+/-) | PSA Section Reference | Amount |
| | § 3.2 (Purchase Price) | $ 27,000,000 |
| Increased | § 3.5.1(a) (Closing Date Cash) | $ 2,646,609 |
| Decreased | § 3.5.1(b) (Balance Sheet Liabilities) | ($ 1,336,096) |
| Decreased | § 3 .5.1(c) (Covenant) | $0 |
| - | § 3.5.1(d) and §3.5.3 (50% Fresno Tax Adjustment) | $0 |
| - | § 3.5.1(e) (Non-GAAP Adjustment) | $0 |
| - | § 3.5.1(f) (IRC § 338(h) Adjustment) | $0 |
| Total Price | | $ 28,000,513 |

(JX-7). The arbitrator concluded that this amount was correct (JX-42).

At the time the Purchase Price Adjustment became due, Club One had sufficient available cash to permit payment without violating the restrictions in the Subordination Agreement. On the day Defendants submitted their calculation of the Purchase Price Adjustment, no Default or Event of Default had occurred under the Financing Agreement and Club One would have had more than $500,000 in Qualified Cash on hand after paying the Purchase Price Adjustment demanded by Defendants (Tr. 97:12-14; 98:2-18; 100:16-25). As such, the Subordination Agreement was not a barrier to payment of the Purchase Price Adjustment in August 2008 when demanded by Defendants (Tr. 99:2-7) Nevertheless, Club One refused to pay the Purchase Price Adjustment (Sarantos Trial Aff. ¶28). Club One and KMGI now assert that the refusal may have been made in error but in bad faith.

Pursuant to Section 3.5.2 of the PSA, Sarantos and Long filed their respective demands for arbitration with the American Arbitration Association on December 30, 2008, each seeking a 50% portion of the $1,000,513 Purchase Price Adjustment. At that time, no Default or Event of Default

11

had occurred under the Financing Agreement and Club One would have had more than $500,000 in Qualified Cash after paying the Purchase Price Adjustment (JX-39 (December Financial Statement); Tr. 113:25-116:5).

In its January 8, 2009 response to Defendants' demands for arbitration, Club One asserted counterclaims alleging that Defendants had made misrepresentations, overstated net income, and hid Club One Casino's declining income and true financial condition by producing false financial statements, resulting in Club One having overpaid for Club One Casino by about $6 million (JX-42 at 3). Defendants argue that Club One asserted these counterclaims in a deliberate effort to prolong the arbitration and to delay paying the Purchase Price Adjustment.

Club One's counterclaims in the arbitration were without merit, as the arbitrator so held. As discussed above, prior to the closing Messina and Kirkland knew and at that time agreed that the financial statements provided to them were not prepared in accordance with GAAP (Tr: 70:8-12); (Tr. 221:20-222:5; JX-42, at 17). Messina and Kirkland were also given unfettered access to Club One Casino's facilities to inspect the property and were informed of all pending claims against the Casino, including the Savang litigation (Tr. 48:15-51:8; 76:10-10 77:10). Club One's claim that Sarantos misled it concerning the condition of Club One Casino's HVAC system, was equally unfounded. Kirkland conceded at trial that Sarantos never hid the condition of the HVAC system during the due diligence process (Tr. 119:7-9).

Moreover, as the arbitrator found, Club One's claim that it would not have closed the transaction had it known that the EBIDTA for 2007 was $5,884,864 (as opposed to $6,771,132) amounted to mere speculation (JX-42 at 19-21). The arbitrator held that even if such alleged financial inaccuracies were taken into account, Club One "received value in excess of what it had bargained for, not less" (JX-42 at 20).

Defendants assert correctly that even if Club One's counterclaims had merit, the PSA did not permit Club One to offset them against the Purchase Price Adjustment so as to withhold payment of the Purchase Price Adjustment (JX-2, § 11.1[a][iv]). Section 11.1 (a)(iv) provides that, "any indemnification claim . . . shall *be satisfied first by a set-off against or reduction in any amounts owed under the [Seller] Notes*, with such set-off or reduction applying to each note equally" (*id.*) (emphasis added). Club One's arbitration counterclaim amounted to between $3,531,162 and

12

$4,500,000 (JX-42 at 2 and 20), and therefore Club One had no right to set off its counterclaim beyond the value of the Seller Notes (Tr. 242:13-16 [Q: "[d]o you understand section 11.1 to allow the purchaser to a set off against monies due to the sellers pursuant to Section 3.5.1?" A [Messina]: "That's not my recollection."]).

Defendants argue that rather than paying the amounts legitimately owed to Defendants, Club One chose to ignore its obligations and intentionally dragged Defendants through a protracted, expensive and frivolous arbitration despite having Qualified Cash sufficient to pay the debt (JX-39). As proof of this claim, Defendants point out that between March 2008 and January 2012, Club One's Qualified Cash fluctuated between a low of $647,000 and a high of $2,607,550[11] (JX-39). In addition, Club One made significant pre-payments of principal to its Lender during 2008 and 2009 such that the amount of Qualified Cash would have been significantly higher had those pre-payments not been made.[12] Defendants assert that Club One was making pre-payments to its Lender in an attempt to keep its Qualified Cash balance artificially low. As further proof, Defendants cite a December 11, 2009 email to Lender, in which Messina stated in relevant part, "[w]e wanted to request your approval to pay down the the loan by $750,000 on December 15 and credit the amount against upcoming payments due early next year . . . *We believe it is important to reduce the amount of cash on our year-end balance sheet as we head into the arbitration proceedings*" (PX-107) (emphasis added). On the basis of this and other evidence discussed below and the court's assessment of the credibility of Kirkland and Messina at trial, the finds that Kirkland and Messina, fully expecting to lose the arbitration, intentionally reduced the amount of Qualified Cash on hand

---

[11]Even if it was unable to pay the full Purchase Price Adjustment in a single month, it had the ability to pay a portion of the Purchase Price Adjustment every month without falling below the $500,000 minimum Qualified Cash threshold.

[12]In a September 17, 2008 email to Lender, Messina stated in relevant part, "We presently have a significant sum sitting with our local Fresno bank . . . we would like to pay down a total of $750,000 of the principal . . ." (JX-9). In an October 26, 2009 email to Lender, Messina stated in relevant part, "[t]he balance sheet remains in good shape. We ended the month with $2 million in cash . . . and made an accelerated principal payment on our loan of $500,000, bringing the outstanding balance to $19.4 million" (JX-11;Tr. 275:18-23 [Q: "[t]hen you in fact made that payment, that prepayment of $750,000 in December of 2008 [sic], correct?" A [Messina]: "It was a similar payment to the one we made the year before . . ."]).

13

at Club One Casino in order to enable Club One to assert after losing the arbitration that the Subordination Agreement prohibited payment of the Purchase Price Adjustment.

In an Interim Award dated April 12, 2011, the arbitrator concluded that Club One's counterclaims were entirely without merit, and that Defendants' calculation of the Purchase Price Adjustment was correct, such that Sarantos and Long were each entitled to receive 50% of $1,000,513.00 (JX-42 at 17 and 25). The arbitrator also noted that Club One had Ted Tawinganone prepare a "re-engineered" version of the 2007 financial statements of Club One Casino, which Club One sent to its Lender about one month before the closing of the acquisition in order to secure the $22.5 million loan used to purchase Club One (*id.* at 15 and 17).[13] Additionally, the arbitrator, who observed Kirkland and Messina throughout the hearings, questioned their credibility (*id.* at 17). The arbitrator stated:

> The claims of Respondent Buyer's representatives [Kirkland and Messina] to the contrary, i.e., that they did not know or understand or could not have known this, are simply not credible in light of this evidence. The credibility of their assertions is also brought into question for the reasons stated in Claimants' post-hearing briefs, i.e., evasive and inconsistent testimony under oath in the hearings, grossly inaccurate and misleading statements made under oath in a pre-hearing declaration submitted in this arbitration, and questionable conduct in submitting a reengineered financial statement to Respondent Buyer's lender.

(*id.*). Of particular relevance to the issue before this court, the arbitrator observed in a subsequent Interim Award that:

> The record shows that the disputes or disagreements between the parties that led to the present arbitration (and that Respondent used to justify withholding payment of the $1,000,513) were not about whether "any adjustments to the Purchase Price are permitted pursuant to Paragraph 3.5.1, "but rather were the result of Respondent asserting a counterclaim accusing Claimants of fraudulent misrepresentation based upon which Respondent demanded a reduction of the price they had paid for the Casino. Respondent did not dispute the accuracy of the Closing Day Balance Sheet ["CDBS"]. Nor did respondent's arbitration counter-demand dated January 5, 2009 and submitted to American Arbitration Association ("Association") on January 8, 2009 assert that there were "any disagreements for which adjustments to the Purchase Price are permitted pursuant to [Section 3.5.1]".

---

[13]As discussed above, Club One knew that these financial statements were incorrect, but certified them and forwarded them to the Lender anyway (Tr. 231:3-10;225:16-22; 226:26-228:17; 234:3-23).

Rather, it alleged that "[Claimants] made misrepresentations, overstated net income and hid the casino's declining income and true financial condition by producing false and fraudulent financial statements. As a result, Buyer paid much more for the casino than it was worth. Consequently, it is Claimant's position that the purchase price needs to be adjusted downward." The counter-demand essentially sought an "offset" against the $1,000,513 upward price adjustment reflected by the CDBS. Although issues were eventually raised by Respondent later in the arbitration process regarding certain line items in the CDBS such as "restricted cash" and "chip liability", they arose in the context of alleged misrepresentations or non-disclosures by Claimants, rather than under any of the scenarios listed in the aforementioned subsections of Section 3.5.1. (JX-16, p. 3).

(*id.*). Finding that pursuant to § 3.5.3 of the PSA, Club One became obligated to pay Defendants $1,000,513, the arbitrator awarded interest from April 10, 2008, which is the date the exact amount of the PPA became known and should have been paid.

Upon issuance of the first Interim Award in April 2011, Club One, Messina and Kirkland set out on a course of action intended to prevent Defendants from reaping the fruits of the arbitrator's decision. In an email to Fortress (the "Lender") sent immediately following issuance of the award, Messina wrote, "[w]e have received notification that we lost the arbitration case . . . . We are obviously disappointed by the outcome and are developing a strategy to address this. In the next week, we will contact you with our ideas and to solicit your input. Please note that *we remain in good financial health despite this setback and are current with all our obligations*" (JX-12) (emphasis added). The strategy Club One developed called for Fortress to send a letter (drafted by counsel for Club One) instructing Club One not to pay any award to Defendants on the theory that payment of the Arbitration Award was prohibited by terms of the Subordination Agreement (JX-13; Tr. 282:2-284:7). Fortress consented and worked with Messina and Kirkland on drafts of the letter which it then sent to Club One, Sarantos and Long on July 13, 2011. Fortress came to rue its participation in Club One's battle to avoid paying the debt owed Defendants (PX-145).

### DISCUSSION

Plaintiffs state correctly that this case turns on one narrow issue: Whether Club One breached the implied covenant of good faith and fair dealing. This issue is distinct from that decided by the arbitrator.